UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
IYANNA DAVIS,

                                  Plaintiffs,        **11-CV-0076**
                                                    **(LDW)(ARL)**

        -against-


COUNTY OF NASSAU, NASSAU COUNTY POLICE        **COUNTY DEFENDANTS'**
OFFICER MICHAEL CAPOBIANCO, Serial #6971,     **DECLARATION IN**
SGT. HERMANN, POLICE OFFICER CARL               **SUPPORT OF**
CAMPBELL, POLICE OFFICER DWIGHT              **MOTION THAT THE**
BLANKENSHIP, POLICE OFFICER JOSEPH          **COURT RULE ON THE**
GRELLA, POLICE OFFICER JOHN DOES #1-5,     **SEARCH WARRANT**
NASSAU COUNTY DISTRICT ATTORNEY'S         **AS A MATTER OF LAW**
OFFICE INVESTIGATOR THOMAS BIDELL,
NASSAU COUNTY DISTRICT ATTORNEY'S
OFFICE INVESTIGATORS JOHN DOES #2-5,
NASSAU COUNTY ASSISTANT DISTRICT
ATTORNEY JOHN DOES #1-5,


                                  Defendants.
-----------------------------------------------------------------------X

       THOMAS LAI, an attorney admitted to practice in the United States District Court for

the Eastern District of New York, declares, pursuant to 28 U.S.C. §1746, under penalty of

perjury, as follows:

     1. The undersigned is employed as a Deputy County Attorney, in the Office of John

Ciampoli, Nassau County Attorney, and hereby represents defendants COUNTY OF NASSAU,

NASSAU COUNTY POLICE OFFICER MICHAEL CAPOBIANCO, Serial #6971, SGT.

HERMANN, POLICE OFFICER CARL CAMPBELL, POLICE OFFICER DWIGHT

BLANKENSHIP, POLICE OFFICER JOSEPH GRELLA and NASSAU COUNTY DISTRICT

ATTORNEY'S OFFICE INVESTIGATOR THOMAS BIDELL (the "County Defendants").

2.   This Declaration in support and attached exhibits are being submitted in support of the County Defendants' Motion That The Court Rule On The Search Warrant As A Matter of Law.

3.   Attached hereto as Exhibit A is a complete copy of the transcript of the deposition of Nassau County District Attorney's Office Investigator Thomas Bidell held on March 28, 2012.

4.   Attached hereto as Exhibit B is a complete copy of the Nassau County Office of the District Attorney Video, Case No: Hom. SPL 21-10 Ferro, May 13, 2010.

5.   Attached hereto as Exhibit C is are the relevant pages of the transcript of the deposition of Police Officer Michael Capobianco held March 12, 2012.

6.   Attached hereto as Exhibit D is a complete copy of relevant transcript pages of the deposition of Police Officer Joseph Grella held on March 12, 2012.

7.   Attached hereto as Exhibit E is a complete copy of the relevant transcript pages of the deposition of Police Officer Dwight Blankenship held March 12, 2012.

8.   Attached hereto as Exhibit F is the affidavit of Sgt. John Hermann.

9.   Attached hereto as Exhibit G is a complete copy of the relevant transcript pages of the deposition of Police Officer Carl Campbell held March 12, 2012.

10. Attached hereto as Exhibit H is a complete copy of the Supporting Deposition of Joanna Little dated May 13, 2010 at 8:30AM.

11. Attached hereto as Exhibit I is a complete copy of the "No Knock" search warrant signed by Judge Steven Jaeger.

Dated: Mineola, New York
        March 11, 2014

                                        CARNELL T. FOSKEY
                                        Acting County Attorney
                        By:     *Thomas Lai*
                                        Thomas Lai
                                        Deputy County Attorney
                                        One West Street
                                        Mineola, NY 11501

(516) 571-6074

To:     Charles Horn (via ECF)

# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

----------------------------X

IYANNA DAVIS,

        Plaintiff,

      vs.              CV-11-0076

COUNTY OF NASSAU, NASSAU COUNTY
POLICE OFFICER "JOHN" SMITH,
NASSAU COUNTY POLICE OFFICER
JOHN DOES #1-5, NASSAU COUNTY
ASSISTANT DISTRICT ATTORNEY'S
JOHN DOES #1-5, NASSAU COUNTY
DISTRICT ATTORNEY INVESTIGATORS
JOHN DOES #1-5,

        Defendants.

----------------------------X

DEPOSITION OF THOMAS BIDELL

Lake Success, New York

Wednesday, March 28, 2012

Reported by:
Thomas R. Nichols, RPR
JOB NO. 24763

**david feldman**
W O R L D W I D E
On-time reporters. On-time transcripts.

www.david-feldman.com
212-705-8585

## Page 2

```
1
2
3
4
5
6
7
8          March 28, 2012
9          10:28 a.m.
10
11      Deposition of THOMAS BIDELL, held at
12   the offices of Friedman, Harfenist, Kraut &
13   Perlstein, LLP, 3000 Marcus Avenue, Lake
14   Success, New York, pursuant to Subpoena,
15   before Thomas R. Nichols, a Registered
16   Professional Reporter and a Notary Public of
17   the State of New York.
18
19
20
21
22
23
24
25
```

## Page 3

```
1
2    APPEARANCES:
3
4      Attorneys for Plaintiff
5        FRIEDMAN, HARFENIST, KRAUT & PERLSTEIN, LLP
6        3000 Marcus Avenue, Suite 2E1
7        Lake Success, New York 11042
8        BY:  CHARLES HORN, ESQ.
9           chorn@fhkplaw.com
10
11     Attorney for Defendants
12        DIANE C. PETILLO, ESQ.
13        Deputy County Attorney
14        One West Street
15        Mineola, New York 11501
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1
2
3          IT IS HEREBY STIPULATED AND AGREED, by
4   and between the attorneys for the respective
5   parties herein, that filing and sealing be
6   and the same are hereby waived.
7          IT IS FURTHER STIPULATED AND AGREED
8   that all objections, except as to the form
9   of the question, shall be reserved to the
10  time of the trial.
11         IT IS FURTHER STIPULATED AND AGREED
12  that the within deposition may be sworn to
13  and signed before any officer authorized to
14  administer an oath, with the same force and
15  effect as if signed and sworn to before the
16  Court.
17
18
19
20
21
22
23
24
25
```

## Page 5

```
1                    Bidell
2      THOMAS BIDELL,  whose business
3   address is 272 Old Country road, Nassau,
4   New York called as a witness, having been
5   duly sworn by a Notary Public, was examined
6   and testified as follows:
7   EXAMINATION BY
8   MR. HORN:
9      Q.   Good morning, sir.
10     A.   Good morning.
11     Q.   First question, have you ever been
12  deposed before?
13     A.   Yes, I have.
14     Q.   I'll go through some of the ground
15  rules. I'm sure you already know them.  Just make
16  sure we don't speak at the same time for a
17  complete record.  The court reporter won't be able
18  to take down both of us speaking at the same time.
19  If you nod your head, gesture with your hand or do
20  anything, any gesticulation, just make sure that
21  you verbalize it that way so that the record is
22  complete to actually what you meant.
23         I would ask you to stay away from
24  expressions like "uh-uh" or "yeah," because it's
25  not clear whether you're encouraging me to
```

2 (Pages 2 to 5)

Bidell

1 continue or you're answering in the affirmative.
2 If you have any questions, please
3 indicate so. If you don't understand a question,
4 I'll attempt to rephrase it. If you want to take
5 a break for any reason, feel free to do so. I
6 just ask you to answer any open question prior to
7 doing so, OK?
8
9 A. OK.
10 Q. Are you presently employed?
11 A. Yes, I am.
12 Q. By whom?
13 A. Nassau County District Attorney's
14 Office.
15 Q. In what capacity?
16 A. As a special investigator.
17 Q. How long have you been so employed?
18 A. Just over five years.
19 Q. Did you attend any schooling in order
20 to hold that position with the Nassau County
21 District Attorney's Office?
22 A. No, I did not.
23 Q. Prior to being a Nassau County special
24 investigator how were you employed?
25 A. With the NYPD.

Bidell

1
2 Q. What did you do for the NYPD?
3 A. I was a detective.
4 Q. What grade?
5 A. First grade.
6 Q. When did you first join the NYPD?
7 A. I started in 1983 with the Housing
8 Police and the merge came in I believe '95.
9 Q. Now, with the Housing Police dealing
10 with the time frame of 1983 to approximately 1995,
11 in what capacity did you serve the City of
12 New York?
13 A. A police officer and detective.
14 Q. How long were you a police officer
15 with the Housing?
16 A. Five years.
17 Q. After that five years that's when you
18 became a detective?
19 A. Correct.
20 Q. What grade?
21 A. Second grade. I started as third and
22 then second.
23 Q. Were you second grade detective by the
24 time the merger took place in 1995?
25 A. I was.

Bidell

1
2 Q. What type of cases did you work on
3 with Housing as a third grade detective?
4 A. Any detective bureau cases from minor
5 aggravated harassment to homicide.
6 Q. And that didn't change when you moved
7 up in grade to second grade, correct?
8 A. That's correct.
9 Q. After the merger in 1995 in what
10 capacity did you serve in the NYPD?
11 A. Detective.
12 Q. And was that also in the beginning at
13 second grade?
14 A. That's correct.
15 Q. How long were you second grade
16 detective with the NYPD?
17 A. Well, between the two it was about
18 five years.
19 Q. Did there come a time where your grade
20 changed?
21 A. Yes.
22 Q. And what year was that?
23 A. I'm not sure of the exact year. I
24 would say somewhere around '99, but I'm not really
25 sure.

Bidell

1
2 Q. Are you comfortable with somewhere
3 around 2000?
4 A. Yes.
5 Q. When you changed from second grade
6 detective to first grade did your work assignments
7 change in any way?
8 A. No.
9 Q. At no point in time with your time
10 with either Housing or the NYPD did you ever go up
11 in rank.
12 A. Other than first grade?
13 Q. Other than grade. I'm talking about
14 rank from either officer or detective to sergeant.
15 A. That's correct. As far as job
16 description though after 9/11 I was transferred to
17 the FBI terrorist task force.
18 Q. Prior to 9/11 while with the NYPD from
19 approximately 1995 to 2001 did you perform
20 basically the same type of investigations,
21 anything from minor harassments all the way up to
22 homicides?
23 A. Yes. I was in a regular catching
24 squad, the Fifth Squad, and then there was a
25 point, I believe '97, where I was transferred to

3 (Pages 6 to 9)

Bidell

the homicide squad, Manhattan South Homicide.

Q. So in approximately 1997 it was homicides that you were investigating, correct?

A. Correct. Well, it was the homicide squad, but you would still, being that it was Manhattan South, anything that was newsworthy you'd also end up getting involved in. If it was criminal you would may be almost used like homicide/task force, so...

Q. Would you characterize your job duties as primarily homicide or were these task force duties the primary or something else?

A. Primarily homicide and the other cases were usually like shootings that were not likely.

Q. You indicated in 2001 you were assigned to the FBI terrorist task force, correct?

A. That's correct.

Q. I'm sorry, I may have put words in your mouth. You said after 9/11.

Was that in 2001 that you were assigned to the FBI task force?

A. Yes.

Q. What were your job duties with the FBI terrorist task force?

Bidell

A. Investigating international terrorism.

Q. Without going into any specifics, how did you do that?

A. We were assigned cases, assigned targets relating to both the 9/11 attack and other attacks around the world.

Q. As far as your participation in this task force were you given assignments by geography? For instance, those targets that resided or were believed to have resided in New York.

A. By geography, yes. Not necessarily New York. I was on an international squad.

Q. Did you work with FBI agents?

A. Yes.

Q. Were your job duties any different than the FBI agents that you worked with in your particular unit?

A. No.

Q. I'm sorry, you called it an international squad?

A. Yes, there is a domestic and an international side.

Q. What's the difference besides domestic

Bidell

or international?

A. Just exactly that.

Q. So the international squad you weren't dealing with individuals that were in the United States?

A. It ended up, you would end up because 9/11 happened here, but it was primarily international.

Q. But what was the difference as far as tasking between domestic and international?

A. You would get, um, domestic would get cases that happened or are occurring in New York, new leads, other new cases and we wouldn't be involved in that. Going out to follow up on new leads, so-and-so was plotting this or that. In New York we wouldn't handle that.

Q. That would be the domestic side.

A. Correct.

Q. And the international side would be doing research and investigating information that was gained from international sources as well as domestic sources regarding individuals or information that were without the country?

A. Right. We would — that and we would

Bidell

go out to several different countries and conduct interviews and investigations.

Q. How long were you with the FBI terrorist task force?

A. Just over five years.

Q. Was that approximately when you left the NYPD?

A. Yes, that's correct -- um, I'm sorry, I didn't understand.

Q. Were you with the --

A. I was with the NYPD at that time. I was assigned to the NYPD working with the FBI.

Q. And when you left the FBI task force you left the NYPD.

A. At the same time, retired from -- I retired from the NYPD, yes. That was my last assignment.

Q. Was there any gap between your employment with the NYPD and the Nassau County District Attorney's Office?

A. Approximately five days.

Q. When did you interview for the Nassau County District Attorney's Office?

A. A few months before I retired. I'm

4 (Pages 10 to 13)

Bidell

1 not sure exactly when.
2
3     Q.  Did you secure a waiver within that
4 five months?
5     A.  Yes, I did.
6     Q.  And you know what I'm talking about,
7 the pension waiver, correct?
8     A.  Yes, 211 waiver.
9         MS. PETILLO: And just so we're clear,
10 he said a few months. I think you said five
11 months.
12        MR. HORN: Oh, I'm sorry.
13        THE WITNESS: A few months.
14     Q.  A few months. And you were able to
15 secure a 211 waiver in the few months between your
16 interview process and actually securing a job with
17 the Nassau County District Attorney's Office?
18     A.  Yeah, the waiver was obtained or
19 submitted by the Nassau County District Attorney's
20 Office.
21     Q.  On your behalf.
22     A.  Yes.
23     Q.  Who was the DA when you secured
24 employment with the District Attorney's Office?
25     A.  Kathleen Rice.

Bidell

1
2     Q.  And when you first joined the Nassau
3 County District Attorney's Office what was your
4 tasking?
5     A.  Just a special investigator
6 investigating whatever the type of cases they
7 assigned to me.
8     Q.  You've remained at that
9 characterization, a special investigator, for the
10 five years, correct?
11     A.  Right. And I also, um, was also the
12 liaison to the terrorist task force from the
13 Nassau County District Attorney's Office.
14     Q.  Was that immediately upon entering the
15 Nassau County District Attorney's Office?
16     A.  That's correct.
17     Q.  When you say the liaison to the
18 terrorist task force, you're referring to the FBI
19 terrorist task force, right?
20     A.  That's correct.
21     Q.  And you've remained that liaison for
22 the five years you have been with the Nassau
23 County District Attorney's Office?
24     A.  That's correct. It has slowed down a
25 bit, but they used to have regular meetings with

Bidell

1
2 outside agencies and they no longer do. So I'm
3 still liaison, but it's not quite as intense as it
4 was.
5     Q.  Other than this liaison position have
6 your job duties changed at all within the Nassau
7 County District Attorney's Office from the time
8 you entered it till the present?
9     A.  No.
10     Q.  The Nassau County District Attorney's
11 Office special investigators work within a
12 subdivision of the Nassau County District
13 Attorney's Office, do they not?
14     A.  It's a bureau of the District
15 Attorney's Office, yes.
16     Q.  And that bureau, when you first joined
17 the bureau, who was the chief or supervisor of
18 that bureau?
19     A.  Chuck Ribando.
20     Q.  Can you spell the last?
21     A.  R-i-b-a-n-d-o.
22     Q.  He's an investigator, correct?
23     A.  He is the chief investigator or he was
24 the chief investigator. He has been since
25 promoted. I don't know what his title is now.

Bidell

1
2 Something higher up.
3     Q.  Does he still run the bureau?
4     A.  Yes.
5     Q.  Now, the bureau, what's it called?
6     A.  Investigations bureau.
7     Q.  Is it the special investigations
8 bureau or just investigations bureau?
9     A.  Investigations bureau. I believe it's
10 investigations bureau.
11     Q.  As far as the composition of the
12 personnel within the bureau, you have special
13 investigators, you obviously have the chief and
14 you also have assistant district attorneys that
15 are assigned to that unit, correct?
16     A.  That's correct.
17     Q.  As well as support staff.
18     A.  That's correct.
19     Q.  When you first joined the bureau how
20 many special investigators did the bureau have?
21     A.  I think it has maintained somewhere
22 between I would say 35 and 40 at a time there.
23     Q.  In the time you've been there how many
24 assistant district attorneys at any one time have
25 been assigned to the bureau?

5 (Pages 14 to 17)

Bidell

1
2    A.  I'm really not sure.
3    Q.  As far as do you deal with any
4 assistant district attorneys in your job duties
5 presently?
6    A.  I do.
7    Q.  How many do you deal with?
8    A.  It all depends on what kind of case.
9 I mean, we deal with several. I can deal with
10 twenty, you know, in just a short brief case, one
11 single case with them and move on or I could do an
12 assignment for someone and move on.
13    Q.  As far as the investigations bureau is
14 concerned, they have their own, as well as working
15 for the District Attorney's Office on cases that
16 may require an investigator, they run their own
17 case load, correct?
18    A.  I believe so.
19    Q.  And how many assistant district
20 attorneys participate in any given time in running
21 that case load?
22    A.  I don't know.
23    Q.  Where is the office of the Bureau of
24 Investigations located?
25    A.  272 Old Country Road, Mineola,

Bidell

1
2 New York.
3    Q.  That's a building immediately facing
4 the courthouse to the right?
5    A.  Correct.
6    Q.  And that building has three floors
7 including the basement?
8    A.  Including the basement, yes.
9    Q.  Are there any other bureaus that
10 occupy that building other than investigations
11 bureau?
12    A.  Yes, there are.
13    Q.  Which others?
14    A.  Public corruption, asset forfeiture.
15 There's another one. I don't know what they call
16 it. There's another one. The name escapes me.
17 I'm not sure what it is.
18    Q.  Within the building, the
19 investigations bureau is segregated from these
20 other bureaus, is it not?
21    A.  I'm sorry?
22    Q.  Within the building, the
23 investigations bureau is segregated from these
24 other subdivisions of the District Attorney's
25 Office, correct?

Bidell

1
2    A.  I think every bureau has their own
3 office. So, I mean, if your own office is
4 segregated, yes.
5    Q.  How many assistant district attorneys
6 occupy office space within this area that is
7 utilized by the Bureau of Investigations?
8    MS. PETILLO:  Can you repeat the
9    question?
10    MR. HORN:  I'll rephrase it.
11    Q.  There is a segregated area for the
12 Bureau of Investigations, correct?
13    A.  You know? The way I know it of only,
14 and I really don't know more about it, the special
15 investigators have an office space to themselves
16 both on the first floor and the basement. Then
17 the rest of the building is those different
18 bureaus, and I don't know if they are all part of
19 investigations. I'm not sure how the flow chart
20 goes exactly.
21    Q.  During your duties with the Nassau
22 County District Attorney's Office have you ever
23 had the occasion to investigate an individual
24 named Stephanie Swan?
25    A.  No. I don't really recall the name.

Bidell

1
2    Q.  Have you ever in your time with the
3 Nassau County District Attorney's Office
4 investigated an individual named Reginald Lecator?
5    A.  Yes. Well, I have him as Rashon.
6    Q.  How do you spell Rashon?
7    A.  R-a-s-h-o-n.
8    Q.  And that last name is L-e-c-a-t-o-r?
9    A.  I have it both ways, t-u-r and t-o-r.
10 I have the sister as o-r and he as u-r.
11    Q.  Did that individual either Rashon
12 Lecator or Reginald Lecator, regardless of whether
13 it is o-r or u-r, did that individual reside or
14 did you have information that that individual
15 resided at 31 Lafayette Avenue, Hempstead,
16 New York?
17    A.  That's correct.
18    Q.  When did that investigation begin?
19    A.  I think the beginning of April 2010.
20    Q.  How did you first become involved in
21 it?
22    A.  I had an informant that we were doing
23 drug buys from/with in the Hempstead area, and he
24 had originally, the original location that we were
25 targeting was 20 Miriam Street in Hempstead.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

**22**

Bidell

Q. Miriam, is that M-i-r-i-a-m?

A. Correct. And we had arranged a drug buy with a fellow known as Sha from 20 Miriam Street, and when the buy went down Sha had sent Reginald Lecator or Rashon Lecator to make the deal. And that's how we began then looking at 31 Lafayette. The informant knew Rashon to reside at 31 Lafayette.

Q. Who was the individual that you were looking into at 20 Miriam Street?

A. His nickname was Sha; S-h-a.

Q. You testified that Sha sent Rashon or Reginald Lecator to do the buy; is that correct?

A. The sale, yes.

Q. The sale. Where did Rashon or Reginald Lecator perform this sale?

A. That was in a street corner or vicinity of Lafayette and Miriam.

Q. How close geographically are 31 Lafayette Avenue and 20 Miriam?

A. If you look at, um, it kind of forms a T. If Miriam is -- if Lafayette is the top of the T, Miriam comes straight down into almost the middle of 31 Lafayette.

**23**

Bidell

Q. How far down Miriam is 20 from the intersection of the T?

A. Several houses down, six or seven, guessing. Maybe less.

Q. If one were walking down Miriam toward Lafayette would 20 Miriam be on the left-hand side or the right-hand side?

A. Left-hand side.

Q. And this was a sale that was being observed by the Nassau County District Attorney's Office?

A. That's correct.

Q. And the informant at the time was working for the Nassau County District Attorney's Office, correct?

A. That's correct.

Q. The individual who you now know to be Rashon or Reginald Lecator, had you known his identity prior to this sale?

A. No, I did not.

Q. And this sale occurred in approximately April of 2010?

A. Yes, early April.

Q. Did you ever make a connection between

**24**

Bidell

Rashon Lecator or Reginald Lecator and 31 Lafayette Avenue?

A. Yes.

Q. And how did you make that connection?

A. As I said earlier, the informant knew at that time Reginald or Rashon. He was known to the informant as Shon and he knew him to reside at 31 Lafayette Avenue.

Q. Did you observe the sale in early April between Rashon or Reginald Lecator and the informant?

A. I observed the meeting, but not the whole sale, no.

Q. Can you tell me what you mean by that?

A. We had to keep moving. 20 Miriam is what they would describe as a crack house, an active crack house, and with that they had lookouts up and down the block, around the side of the block for the police. So it was a tough area to do a, conduct a surveillance. They would just sit right there. So we had to drive by so we'd see a piece of the sale. We wouldn't sit there for the entire sale. We would see the meeting or we would see a hand to hand, depending on what

**25**

Bidell

part we were able to see what was going on as we drove by.

Q. But you were part of the observation team for this sale with the informant and who eventually became known to you as Rashon Lecator or Reginald Lecator, correct?

A. That's correct.

Q. At any point in time either before or after the sale did either you or any of your team observe Rashon Lecator or Reginald Lecator either coming from or going to 31 Lafayette Avenue?

A. During this sale?

Q. Yes.

A. No.

Q. What is the next thing that occurs as far as the investigation into Mr. Lecator after the sale that you have informed us occurred in early April?

A. The next thing was the informant somehow or another, whether he knew it already or he got it then, had the phone number of Mr. Lecator and he set up a deal to buy heroin directly from him skipping Sha, leaving Sha out of the deal. He dealt being directly with

7 (Pages 22 to 25)

Bidell

1 Mr. Lecator.
2
3 Q. Now, according to your information did
4 Mr. Lecator work for Sha?
5 A. According to our information, yes.
6 Q. And do you know when the informant
7 worked out this side deal with Mr. Lecator to deal
8 directly with him?
9 A. I don't know exactly when. But they
10 had conversations on the -- April 14th was our
11 next deal directly with Mr. Lecator, which took
12 place at 31 Lafayette Avenue.
13 MR. HORN: Could you just read that
14 back.
15 (A portion of the record was read.)
16 Q. Were there any phone calls between
17 your informant and Mr. Lecator between the first
18 early April meeting or sale and this April 14th
19 sale?
20 A. Yes, there were. I don't have the
21 dates though.
22 Q. And those phone calls were monitored
23 by the Nassau County District Attorney's Office?
24 A. No, they were not.
25 Q. Why not?

Bidell

1
2 A. Most of the time when you try and
3 reach the target you're looking to speak with they
4 don't pick up or they don't -- it's not where you
5 can sit down and say let's call this guy. It
6 takes quite a -- a numerous amount of time. It's
7 just not convenient or conducive to continue other
8 investigations while you're doing that.
9 So we would normally let the informant
10 arrange something. And if possible, we would try
11 and, you know, once it's set, we would try and
12 then sometimes record a call if it's possible and
13 if it's not we'll just let the deal go.
14 Q. Do you know if you recorded any
15 telephone calls between the informant and
16 Mr. Lecator prior to the April 14th sale?
17 A. I don't believe so.
18 Q. And you indicated that a sale was
19 arranged for April 14th between Mr. Lecator and
20 the informant?
21 A. That's correct.
22 Q. The informant's name has never been
23 released, correct?
24 A. Correct.
25 Q. The sale on April 14th conducted by

Bidell

1
2 Mr. Lecator, that was arranged by the Nassau
3 County District Attorney's Office as far as
4 producing money for that sale.
5 A. That's correct.
6 Q. And how much was that sale, how much
7 heroin was that sale?
8 A. I don't have that information with me.
9 Q. If you went back to your office and
10 wanted to how many heroin was purchased on
11 April 14th, where would you look?
12 A. In my arrest folder.
13 Q. And you maintain an arrest folder for
14 the investigation that was conducted into Reginald
15 or Rashon Lecator?
16 A. Yes.
17 Q. And that would be all the way up until
18 the actual arrest?
19 A. That's correct.
20 Q. When the April 14th sale was conducted
21 were there any monitoring devices placed on your
22 informant?
23 A. Yes, there were.
24 Q. What was placed on the informant?
25 A. Audio and video equipment.

Bidell

1
2 Q. Did the Nassau County District
3 Attorney's Office investigations bureau secure any
4 audio recordings of this sale of April 14th?
5 A. Yes.
6 Q. And did they obtain any video
7 recordings of this sale?
8 A. Yes.
9 Q. Where did the actual sale take place?
10 A. Inside of 31 Lafayette Avenue,
11 Hempstead.
12 Q. How long did this sale take place?
13 Ballpark.
14 A. I'm guessing anywhere from five to ten
15 minutes. You know, somewhere around there, I
16 guess, yes.
17 Q. During the course of the sale was the
18 merchandise weighed?
19 A. No.
20 Q. Was it tested in any way?
21 A. No. By the CI? By the informant?
22 Q. By the informant.
23 A. No.
24 Q. Do you recall generally what took
25 place during the sale?

8 (Pages 26 to 29)

Bidell

2  A.  Just generally the -- just generally
3  CI give him U.S. currency and Reginald Lecator
4  gave him a bag containing alleged heroin. I don't
5  recall how much. All the sales were for a couple
6  of hundred dollars. I don't remember exactly how
7  much.
8  Q.  And this particular sale, do you have
9  any recollection of observing the video or
10  listening to the audio of this sale?
11  A.  Yes.
12  Q.  And going back to the video, can you
13  tell me when the video starts, what it depicts and
14  when it ends?
15  A.  I could not off the top of my head.
16  Other than there was an exchange of currency and
17  then Mr. Lecator gave him a bag containing alleged
18  heroin.
19  Q.  Was the video color?
20  A.  It's color, but they're very dark and
21  grainy. Not a lot of light in the house.
22  Q.  And the audio, you listened to that as
23  well, correct?
24  A.  Yes.
25  Q.  While listening to the audio did you

Bidell

2  hear any, for lack of a better term, small talk
3  between Mr. Lecator and the informant?
4  A.  Yes.
5  Q.  Was there more than just a few minutes
6  of small talk?
7  A.  There was small talk. You know, I
8  don't remember exactly what, but there's usually
9  small talk through the entire deal.
10  Q.  Did the informant at any point in time
11  use any of the product that he was purchasing
12  during this sale on April 14th?
13  A.  No.
14  Q.  As far as your investigation goes,
15  what was the next step?
16  A.  A second buy was scheduled for
17  April 15th, 2010, and the same process occurred at
18  the same location.
19  Q.  Now, I understand you don't remember
20  the exact amounts. The amounts that were
21  purchased, were they amounts that would be
22  indicative of personal use or would they be
23  amounts that would be indicative that the
24  informant was going to resell the product?
25  A.  Resell the product.

Bidell

2  Q.  Now, the second sale, that was set up
3  on the 15th.
4  A.  That's correct.
5  Q.  When was it set up?
6  A.  On the 15th.
7  Q.  Via phone call?
8  A.  Yes.
9  Q.  And did you monitor that phone call?
10  A.  No, we did not.
11  Q.  And when you say a phone call, you
12  were talking about a phone call between your
13  informant and Mr. Lecator?
14  A.  That is correct.
15  Q.  Did a sale on April 15th come to
16  fruition?
17  A.  Yes.
18  Q.  And was that between the informant and
19  Mr. Lecator?
20  A.  That's correct.
21  Q.  And was that at 31 Lafayette Avenue?
22  A.  That's correct.
23  Q.  And was Mr. Lecator outfitted with
24  video and audio equipment from the Nassau County
25  District Attorney's Office?

Bidell

2  A.  No. The informant was outfitted with
3  that.
4  Q.  I'm sorry, did I say Mr. Lecator?
5  A.  Yes.
6  Q.  Let me rephrase the question. Was the
7  informant equipped with video and audio monitoring
8  equipment during this sale on April 15th?
9  A.  That's correct.
10  Q.  Did you ever observe the video that
11  was produced as a result of this April 15th buy?
12  A.  I did.
13  Q.  Can you tell me what was depicted in
14  that video?
15  A.  Similar to the previous one. It was
16  currency exchange for a bag containing the alleged
17  heroin.
18  Q.  And the audio?
19  A.  The audio was good quality.
20  Q.  By no means am I attempting to
21  ascertain the specific nature of the video
22  recording device or the audio, but my question to
23  you is, the video, when does it begin?
24  A.  When we have the CI. Before the deal
25  is set or the buy actually takes place, we have

9  (Pages 30 to 33)

Bidell

the informant with us. We wire him up. And when
he leaves us the equipment is turned on.

    Q.  And actually while you're wiring him
up you'll be able to see on your own monitors what
is being captured through that video device,
correct?

    A.  I don't want to get into details of
it, but no, that's not correct. It's not a live
feed.

    Q.  OK. So you don't have real-time
depiction of the video recording.

    A.  Not in this case.

    Q.  Now, the video recording though begins
while you're still in the presence of the
informant, correct?

    A.  Correct.

    Q.  And that video recording will continue
until it is turned off by one of the
investigators, correct?

    A.  Correct.

    Q.  And in this case on the 15th the video
began in the presence of investigators, captured
him going to the sale, coming back from the sale
until it was turned off by one of the investigators,

Bidell

correct?

    A.  Correct.

    Q.  And that would be the same for the
April 14th --

    A.  That's correct.

    Q.  -- sale, correct?

    A.  Yes.

    Q.  Now, the audio, the audio, was it
similar where there was no real-time feed, but you
got it later?

    A.  Sometimes we would use an audio device
that we could hear live, real-time.

    Q.  And in this circumstances were you
hearing real-time?

    A.  Yes.

    Q.  As far as the video device, these are
produced at criminal trials, correct? By the
prosecutors as evidence, correct?

    MS. PETILLO:  Can we go off the
record.

    MR. HORN:  Sure.

    (Discussion off the record.)

    Q.  I would like to ask you, regarding the
video equipment that was utilized on April 14th,

Bidell

can you tell me what field is captured within that
video if one were standing in a room and there
were no obstructions in front of that video
device?

    A.  It all depends on that specific moment
or how the informant is wearing the device or what
angle the device is at. So it can vary from one
extreme to the other. You could end up looking at
the floor. You could end up looking at the
ceiling. You could look two feet in front of you
or you could see an entire room. It totally
fluctuates as the person is wearing the device.

    Q.  But if pointed straight ahead in a
room, you will be able to pick up the details of
the room in that video device.

    A.  If pointed straight ahead, yes. If
there's enough lighting.

    Q.  And this video device was the same for
both days, the 15th and the 14th, correct?

    A.  Yes.

    Q.  Maybe not the exact same device, but
the same type of device.

    A.  That's correct.

    Q.  After this second sale on April 15th

Bidell

what was the next step of your investigation?

    A.  Another sale was arranged for
April 19th.

    Q.  I'm sorry, I don't know whether I
asked you this. The April 15th sale was also at
31 Lafayette Avenue, correct?

    A.  Inside 31 Lafayette Avenue, correct.

    Q.  Was it in a different location than
the April 14th sale within 31 Lafayette Avenue?

    A.  I don't believe so.

    Q.  Now, the April 19th sale, who set that
up? The informant?

    A.  The informant, correct.

    Q.  And that was done via telephone?

    A.  Yes.

    Q.  That was a telephone call that you
monitored or not?

    A.  Not monitored.

    Q.  Did that sale ever come to fruition?

    A.  Yes, it did.

    Q.  Did that sale take place at
31 Lafayette Avenue?

    A.  That's correct.

    Q.  Was that sale monitored via video and

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

Bidell

audio by members of the investigations bureau of
the Nassau County District Attorney's Office?

A. The video was monitored after the sale
took place.

Q. But it was similar to the April 14th
and 15th sales where -- real-time audio postsale
monitoring of the video.

A. That's correct.

Q. And the April 19th sale, did that
occur within the same location of 31 Lafayette
Avenue as the April 14th and 15th sales?

A. Yes.

Q. As far as the time frame for the
April 15th sale, was it similar to the April 14th
sale where it was approximately five to ten
minutes?

A. I can't recall off the top of my head.

Q. How about the April 19th sale?

A. Again, I don't recall exactly.

Q. Without remembering exactly how long
each sale, each of these two sales were, and I'm
speaking of the 15th and 19th, were the sales
taking more time? Were these guys kind of making
more small talk or were they becoming much more

Bidell

expedited transfers?

A. I haven't viewed the tapes in almost
two years. So I don't really recall.

Q. And those are tapes that you would
have had -- withdrawn.

A. When I say tapes I mean CDs.

Q. I age myself, am doing that
constantly.

The CDs that contain the video footage
of the April 14th, 15th and 19th sales, those
would be maintained in your arrest folder that you
had indicated earlier?

A. That's correct.

Q. And the same would be true for the
audio recordings?

A. Correct.

Q. During the April 14th sale was there
anyone else present other than Mr. Lecator and the
informant?

MS. PETILLO: I'm sorry, what date
sale?

MR. HORN: April 14th.

A. I don't recall. I know out of the
three sales other people were present, male,

Bidell

female, both male and female, but I don't recall
exactly on what dates they were present.

Q. Did you ever identify these male or
females that were present?

A. No, they didn't participate in the
sale, so we weren't interested in them really.

Q. When you say present, I want to make
sure, are you talking about in the same room, in
the same edifice, on the same property? Something
else?

A. In the same room.

Q. Have you ever identified any of these
individuals? I know you said they weren't
involved, but did you ever identify them?

A. I did not.

Q. Do you know whether they were ever
identified by the Nassau County District
Attorney's Office investigations bureau?

A. They were not.

Q. Do you know whether a determination
was ever made whether any of the individuals
depicted in the video and audio of either the
sales of the April 14th, 15th or 19th resided at
31 Lafayette Avenue?

Bidell

A. Do I know if they ever resided there,
the people in the video?

Q. Was it ever determined that any of
these individuals that are depicted in the video
and audio resided at 31 Lafayette Avenue? And I'm
talking about the video and audio from either
April 14th, 15th or 19th.

A. They were never identified. So I
don't know where they lived.

Q. When I'm saying identified, I just
want to make sure. You might not have known their
name, but you knew they lived there. That's the
question I'm asking.

A. It was an assumption of mine that, um,
at least that I can recall at least one female
resided there. From whatever conversation was
going on, it appeared that the female resided
there.

Q. And was that a female that you later
learned her identity to be Stephanie Swan?

A. No. I don't know a Stephanie Swan off
the top of my head.

Q. After the sale on April 19th, what was
the next thing that happened in your

Bidell

1 investigation?
2
3     A.    We then spoke to an ADA to obtain a
4 search warrant.
5     Q.    And when you say we, who are you
6 talking about?
7     A.    Myself.
8     Q.    With whom did you speak?
9     A.    You know, I'm not a hundred percent
10 sure. I believe it was David Arias, ADA Arias,
11 but I'm not a hundred percent sure.
12    Q.    Can you spell the name?
13    A.    I don't know how to spell his name.
14 A-r-i-a-s? But I'm not sure. David is his first
15 name.
16    Q.    Is he still with the Nassau County
17 District Attorney's Office?
18    A.    Yes.
19    Q.    Why did you go speak to him?
20    A.    To obtain a search warrant for
21 31 Lafayette Avenue.
22    Q.    So he could actually draft the request
23 for a search warrant?
24    A.    Correct.
25    Q.    What did you say to Mr. Arias?

Bidell

1
2     A.    I informed him of the information with
3 the buys, concerning the buys, how the whole
4 investigation went as I previously discussed with
5 you.
6     Q.    Did you give him any documentation
7 during this discussion regarding your attempt to
8 obtain a search warrant?
9     A.    I gave him the paperwork, yes.
10    Q.    What paperwork?
11    A.    Vouchers, lab requests, I believe the
12 DVDs concerning the buys. Also discussed with
13 him, we had buys as well. Like I said, the two
14 houses we believed were connected, 20 Miriam and
15 31 Lafayette, and gave him information regarding
16 buys we had at that location as well.
17    Q.    Did you show any video or audio to
18 Mr. Arias?
19    A.    Yes.
20    Q.    Were you present when he watched or
21 listened to either one of those?
22    A.    Yes.
23    Q.    The video has no audio on it, though,
24 correct?
25    A.    Yes, it does.

Bidell

1
2     Q.    Oh, it does?
3     A.    Yes.
4     Q.    What did Mr. Arias say in response to
5 receiving this paperwork you've mentioned and
6 watching the video and listening to the audio?
7     A.    That he would request the, um, he
8 would do the paperwork for the search warrant.
9     Q.    Did you submit an affidavit to
10 Mr. Arias or did he draft one up for you based on
11 the information you gave him or something else?
12    A.    He drafted it.
13    Q.    Did you review that affidavit?
14    A.    I did.
15    Q.    Did you sign that affidavit?
16    A.    I did.
17    Q.    And were any modifications made at any
18 point in time to the affidavit you were first
19 given other than your signature being added?
20    A.    Not that I recall.
21    Q.    Was the content of that affidavit
22 correct?
23    A.    I believe so.
24    Q.    Now, you indicated that you went to
25 Mr. Arias and said in words or substance, you

Bidell

1
2 know, we're looking to obtain a search warrant for
3 20 Miriam and 31 Lafayette Avenue.
4     Did you ever identify any individuals
5 whom you were targeting?
6     A.    Yes, we did.
7     Q.    And who were those individuals?
8     A.    Rashon Lechter/Lecator.
9     Q.    The individual you identified as Sha
10 or was known to you as Sha, was he a target of
11 these search warrants?
12    A.    Well, when you talk about search -- I
13 was getting -- if I can just backtrack a little.
14 Somewhere between the actual buys and the
15 obtaining of the search warrant it came to our
16 attention that not only the Nassau DA's office had
17 buys in 20 Miriam, but so did the Hempstead PD
18 and so did Nassau County narcotics.
19    So it was agreed upon that Hempstead
20 PD would obtain the search warrant for 20 Miriam
21 and we would obtain the search warrant for
22 31 Lafayette Avenue.
23    Q.    What information did you have to give
24 Mr. Arias regarding 20 Miriam in furtherance of
25 obtaining a search warrant for that premises?

Bidell

A. Like I said, we didn't obtain the
search warrant there. That was obtained by
Hempstead PD. But I gave him, you know, we had
buys at that location as well.

Q. Who obtained the search warrant for
31 Lafayette?

A. I did.

MR. HORN: Off the record.

(Discussion off the record.)

Q. Directing your attention to your
conversation with Mr. Arias, did you ever explain
to him what the purpose that you sought to achieve
for the search warrant at 31 Lafayette?

MS. PETILLO: OK, I'm going to object
to specifics of conversations as it goes to
their strategy with respect to the -- if you
want to establish that they had a
conversation prior to the search warrant
being obtained, but I'm going to object to
the specifics of the conversation as it goes
to the strategy behind how they were
handling this particular prosecution,
because it did I believe at some point
become a criminal prosecution with respect

Bidell

to individuals at the home.

MR. HORN: What's the privilege that
you're asserting?

MS. PETILLO: It goes to the strategy
that the DA's office utilized to determine
how to prosecute against the individuals of
the home, how they would ultimately
prosecute their case. I mean, it all went
into building a case again these other
individuals who are not parties to this
lawsuit.

MR. HORN: My question though is
directed toward not the prosecution of
individuals. Mine is he's speaking of
obtaining a search warrant and I want to
know why he wanted a search warrant. I'll
even word it that way.

BY MR. HORN:

Q. Why did you want a search warrant of
31 Lafayette?

THE WITNESS: Answer?

MS. PETILLO: Yes.

A. To obtain evidence that would enhance
our case.

Bidell

Q. What kind of evidence?

A. Any drugs, drug paraphernalia, if any
weapons were there, currency. Along those lines.

MR. HORN: Could you just read back
the response.

(A portion of the record was read.)

Q. In your last answer you indicated that
you were seeking evidence that may enhance your
case. Against whom? Case against whom?

A. Against Lecator.

Q. Anyone else?

A. No.

Q. During your investigation prior to
speaking with Mr. Arias did you ever determine
whether Mr. Lecator resided at 31 Lafayette?

A. I'm sorry. Could you repeat?

Q. Prior to speaking with Mr. Arias did
you ever make a determination that Mr. Lecator
resided at 31 Lafayette?

A. Yes.

Q. What was that based on?

A. It was based on the informant telling
us that and as well on May 10th we went to that
location, myself and two other investigators,

Bidell

under a ruse and knocked on that door and
determined he lived there.

Q. When did your conversation with
Mr. Arias take place?

A. I'm not sure of the exact date.
Somewhere between the 19th of April and May 5th.

Q. So when you spoke to Mr. Arias the
determination that Mr. Lecator resided at 31
Lafayette was based on the representations of the
informant as well as his physical presence at that
location on April 14th, 15th and 19th, correct?

A. Correct. And we had observed him at
that location as well.

Q. When had you observed him at that
location?

A. Between the 14th and May 5th, between
the 14th of April and May 5th we had done several
surveillances of the location.

Q. Now, you indicated there came a point
in time where you approached 31 Lafayette with
some sort of ruse.

A. Yes.

Q. And knocked on the door?

A. Correct.

Bidell

Q. Now when you say you, are you talking about you personally?

A. Yes.

Q. Who were you with?

A. I believe Detective Investigator Walsh and Maher. M-a-h-e-r.

Q. Detective Investigator Walsh, is that a Nassau County detective that's assigned to the investigations bureau?

A. He's a special investigator as myself, yes, assigned there as well, yes.

Q. Does he work for the District Attorney's Office or --

A. Yes.

Q. And Maher?

A. The same.

MR. HORN: Just off the record.

(Discussion off the record.)

Q. And what was this ruse?

A. Well, just backtracking a little bit, on May 10th when I did my observations, I observed a second mailbox. I observed two mailboxes in front of the house. So I wanted to ensure that or decide whether it was a one-family house or a

Bidell

two-family house. So we knocked on the door on the 11th, May 11th. We knocked on the door and said that there was a report of children crying. You know, we just wanted to make sure everything was OK.

Q. And as far as how you identified yourself, do you recall what you said to the individual who answered the door?

A. Yes, we're from the -- detectives from the DA's office, or special investigators. I don't remember detective exactly or special investigator exactly.

Q. Who answered the door?

A. That was Rashon's sister. She identified herself as Rashondra Lecator.

Q. There came a point in time when arrests were made at 31 Lafayette, correct?

A. Correct.

Q. Who was arrested?

A. Rashon Lecator and during the investigation, during the search warrant, one of the females inside the residence was arrested as well.

Q. And do you know that individual's

Bidell

name?

A. I do not recall. It was not his sister, I know that.

Q. The individual who identified herself as Rashondra Lecator.

A. It was not her.

Q. Were you present for the arrests at 31 Lafayette?

A. Yes.

MR. HORN: Off the record.

(Discussion off the record.)

Q. You indicated that you had made an observation that there were more than one mailbox --

A. Yes.

Q. -- at the premises.

When did you make that observation?

A. On the 10th of May.

Q. How did you make that observation?

A. Like I said, the area of 20 Miriam is a thriving crack house and had scouts or spies or whatever looking out for police up and down the block all around the corner of 20 Miriam. So you really couldn't sit. We were trying to watch

Bidell

31 Lafayette, and you would have to sit down the block quite a bit on an angle to the house and try to identify who was coming and going, if you could see if any kind of delivery, drug delivery, any kind of activity, what we could observe.

And from that vantage point we always only saw the one or I only saw the one mailbox. And when you drove by you really didn't want to look at that location because you didn't want someone to lock on with you and then they would know for sure you were the police.

So there came a day on May 10th that I was able to look straight over. There was no one out in the front of the house and I observed a second mailbox that was -- from where I was it was behind shrubs. I really couldn't see it.

Q. To your knowledge were you the first amongst your team or squad to make that observation?

A. Yes.

Q. What did you do after making that observation?

A. I then, um, later that day I sent my informant back to the location. Not to make a

14 (Pages 50 to 53)

Bidell

1
2 buy, but just to try and get some small talk and
3 obtain any information he could to find out if it
4 was a two-family house or if it was a one-family
5 house.
6     Q. And did he go to the premises for that
7 purpose?
8     A. He did.
9     Q. And was he wired when he went?
10     A. No. He wasn't, like I said, he wasn't
11 making any kind of a drug purchase.
12     Q. Did there come a point in time where
13 he returned and relayed any information regarding
14 what he discovered?
15     A. Yes. He believed it was a one-family
16 house from what he could tell.
17     Q. What did he say specifically to you in
18 that regard?
19     A. I don't remember the exact words, but
20 just his feelings were that from what he --
21 whoever he spoke to, a female at the location,
22 that he was under the impression it was one-family
23 house.
24     Q. I'm sorry, and he spoke to a female at
25 the location?

Bidell

1
2     A. Correct.
3     Q. Did you ever identify who this female
4 was that he spoke with?
5     A. No, I didn't.
6     Q. Did he identify her?
7     A. No, he did not.
8     Q. Did he say whether she lived there or
9 not?
10     A. Yes, she did. He had seen her. I
11 don't think he knew her name, but he had seen her
12 from previous times.
13     Q. What was the ruse that he used to go
14 to that location on the 10th?
15     A. He was looking for Rashon Lecator.
16     MS. PETILLO: Objection. I don't
17 think there's been testimony that the CI
18 went to the location on the 10th.
19     Did the CI go on the 10th.
20     THE WITNESS: Yes. I sent him there.
21     MS. PETILLO: OK, and then you went on
22 the 11th?
23     THE WITNESS: No, I knocked on the
24 door on the 11th, correct.
25     MS. PETILLO: I apologize.

Bidell

1
2     Q. Why did you want to determine whether
3 it was a one- or two-family house?
4     A. Well, we wanted to make sure -- we had
5 already had the search warrant. We had the search
6 warrant for the whole house.
7     Q. Why did you send him there to
8 determine whether it was a one- or two-family?
9     A. Because we didn't want to go, I mean,
10 if there was a second family on another floor, I
11 didn't want to enter that location.
12     Q. When you say you didn't want to enter,
13 you didn't want whoever --
14     A. The search warrants conducted at that
15 location.
16     MS. PETILLO: You have to let him ask
17 the question first.
18     THE WITNESS: I'm sorry.
19     MS. PETILLO: Do you want to get the
20 question out?
21     Q. And the reason why you sent him there
22 to make the determination whether it was a one- or
23 two-family is you didn't want the search warrant
24 executed in an area of the house that wasn't the
25 subject of your investigation if it was subdivided

Bidell

1
2 into two families, correct?
3     A. I didn't want, right. If it was a
4 two-family house, a clear two-family house, I
5 didn't want a search warrant executed in that
6 house, in that second house.
7     Q. Second part of the house unrelated to
8 your investigation.
9     A. Well, second -- if it was two separate
10 residences I didn't want it in that residence.
11     MS. PETILLO: In that second
12 residence.
13     A. That second residence that would not
14 have been involved.
15     Q. Specifically what did your informant
16 tell you?
17     A. Again, I don't remember exact words,
18 but his feel coming back after speaking with this
19 female that it was a one-family house from what he
20 could determine.
21     Q. Was he definitive about that?
22     A. He was definitive as he could be.
23     Q. You eventually went to see for
24 yourself though, correct, on May 11th?
25     A. Correct.

15 (Pages 54 to 57)

Bidell

1
2  Q.   Was that because he wasn't definitive?
3  A.   I just wanted to, you know, I wanted
4  to verify myself. I couldn't — he was saying one
5  thing, but, you know, I don't just go with
6  everything he says. I try and verify if I could.
7  Q.   Did he indicate to you whether he was
8  positive that it was a one-family house, that from
9  what he could gather it was a one-family house,
10 something else?
11 A.   It was more from what he could gather
12 it was a one-family house. And I asked him, you
13 know, not even that time. I had asked him how long
14 before while the buys were going on had he ever
15 been upstairs in that house and he said no.
16 Q.   Had he ever indicated to you what the
17 layout of the house was?
18 A.   On the first floor.
19 Q.   Yes.
20 A.   Yes.
21 Q.   Did he ever indicate to you that he
22 ever observed a stairway going to the second
23 floor?
24 A.   No, and I had asked him that.
25 Q.   When did you ask him that?

Bidell

1
2  A.   During this time on the 10th.
3  Q.   During this time where you were trying
4  to ascertain whether it was a one-family or a
5  two-family?
6  A.   Correct.
7  Q.   Did you make any notes regarding your
8  conversation with your informant after he returned
9  from 31 Lafayette on May 10th?
10 A.   No.
11 Q.   Was there anything that you have in
12 your file or somewhere else in your workplace
13 where you could go and read it to refresh your
14 recollection as to what the informant based his
15 feeling that it was a one-family house?
16 A.   No.
17 Q.   There came a point in time where you
18 decided yourself to go and make your own
19 determination on May 11th, correct?
20 A.   Correct.
21 Q.   And you indicated that you went with
22 Detective Maher and Detective Walsh, correct?
23 A.   Correct.
24 Q.   And you went up to the front door?
25 A.   Correct.

Bidell

1
2  Q.   And did you knock, ring a doorbell,
3  something else?
4  A.   I believe knocked.
5  Q.   Who spoke to the individual who
6  answered the door?
7  A.   I did.
8  Q.   At this point in time when you were
9  standing in the door were you able to see any
10 mailboxes?
11 A.   Yes.
12 Q.   How many?
13 A.   Two.
14 Q.   Did they have names on them?
15 A.   Not that I recall.
16 Q.   After the door opened who spoke first?
17 A.   I don't recall if I spoke first or the
18 woman spoke first. I don't recall.
19 Q.   But you indicated yourselves to be
20 investigators with the DA's office and that you
21 were here on a complaint of a crying child; is
22 that correct?
23 A.   Correct.
24 Q.   And what, if anything, did the
25 individual say after hearing that?

Bidell

1
2  A.   She said there was no crying child
3  there.
4  Q.   What, if anything, did you say in
5  response to that?
6  A.   I asked if I could come in. She said
7  yes.
8  Q.   And did you go in?
9  A.   Yes.
10 Q.   And what, if anything, happened after
11 you entered?
12 A.   I just said that there was a report of
13 like a crying child. It could be nothing, it
14 could be someone's TV. Do you mind if I ask you a
15 few questions? And she said, Yes, go ahead. And
16 I asked her who resided at the location.
17         During this conversation another woman
18 came over, and the first woman like I said
19 identified herself as Rashondra Lecator. The
20 second woman refused to identify herself.
21 Q.   What did this other woman look like?
22 A.   I just remember being female, black,
23 and I put her anywhere over, I guess older than 25
24 to thirty. She was older than. I don't know
25 exactly how old.

16 (Pages 58 to 61)

Bidell

1
2    Q.   Was she thin, heavy, something else?
3    A.   She was not thin. That I recall. She
4  was not thin.
5    Q.   Would you say she was above or below
6  five six?
7    A.   I really don't recall.
8    Q.   When you first entered the house with
9  the woman who answered the door, where did you go?
10   A.   I stood right inside the doorway.
11   Q.   Did all three of you come into the
12 house?
13   A.   Yes.
14   Q.   Did you have this conversation with
15 her while you were standing? Did you sit down,
16 something else?
17   A.   We stood. And after I got the
18 information from her about who resided there, I
19 asked her who lived there. She told me that her
20 brother lived there, Rashon. I believe she said
21 that her child lived there. I forget the name of
22 the child.
23        She said that this woman resided
24 there. She said that there was a male that
25 resided there. She could only give me the first

Bidell

1
2  name of the male. She didn't know his last name.
3    Q.   What was the first name that she gave
4  you?
5    A.   I don't recall.
6    Q.   Did you write that down in a memo book
7  or something like that?
8    A.   I did.
9    Q.   And that would be contained in your
10 arrest file?
11   A.   Yes.
12   Q.   Were any of you wired in any fashion
13 when you entered the house?
14   A.   No. She also mentioned Theresa
15 resided there, and she said that there was another
16 female black that lived on the second floor and
17 she didn't know her name.
18   Q.   Did she ever indicate there were any
19 children on the second floor?
20   A.   She did not, no.
21   Q.   Did you ever ask?
22   A.   No.
23   Q.   And at any point in time during this
24 conversation did you ever see the child she said
25 that resided there?

Bidell

1
2    A.   I don't recall seeing the child, but
3  what I did see is there was a small toddler's bed
4  approximately six to eight feet away from the
5  front door. Right like in the middle of the room
6  type of thing.
7    Q.   Did you ever ask in sum or substance
8  whether there were any other children other than
9  the one she mentioned who resided at the premises?
10   A.   No, I did not.
11   Q.   Why not?
12   A.   I wasn't really interested in the
13 children too much. You know, when I saw that bed,
14 I made a mental note of the bed just in case of an
15 entry with a search warrant. She told me like I
16 said she had a child. She didn't mention any
17 others, so...
18   Q.   Did you ever see any stairs going to
19 the second floor?
20   A.   I didn't see any from where I was
21 standing. I asked if we could just take a quick
22 look around and she said yes. And she walked us
23 straight through to the kitchen. I didn't see any
24 stairs at that time. But I didn't go into the
25 room. I didn't open any doors. I was looking for

Bidell

1
2  a staircase, but I didn't observe one. We went
3  right through to the kitchen.
4        And I said Theresa, is Theresa home or
5  this other woman, are they home? And she said,
6  yes, and she opened the kitchen door. She said
7  knock on that door. She pointed to a door and I
8  knocked on that door and Theresa answered the
9  door.
10       MR. HORN: Off the record.
11       (Discussion off the record.)
12   Q.   I would like to show you what has been
13 previously marked as Plaintiff's Exhibit 1 and it
14 was marked such on March 8, 2012.
15       I ask you if you recognize what's
16 depicted in that photograph.
17   A.   Yes, it's the photo of the front of
18 31 Lafayette Avenue.
19   Q.   And I just ask you to take a look to
20 the left and the right of that photograph. Do you
21 see what appears to be mailboxes?
22   A.   Yes, I do.
23   Q.   Are those the two mailboxes that you
24 referred to earlier in your testimony that you
25 observed on May 10th?

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

Bidell

A. Yes, they are.

Q. Just by looking at those mailboxes does that refresh your recollection as to whether there were any names on the mailboxes?

A. No, I can't identify any names on here now and I don't recall seeing any.

Q. I would like to show you what has previously been marked as Plaintiff's Exhibit 6 and it was so marked on March 8, 2012.

I ask you if you recognize what's depicted in that photograph.

A. No, I do not.

Q. So there came a point in time where you knocked on the door?

A. Correct.

Q. Just for clarification, you were in the kitchen and Rashondra indicates to you that if you're looking for Theresa she would be through that door?

A. Right. Her room is upstairs.

Q. Now, did she point to a door in the kitchen?

A. No, she opened a kitchen door which led to what I guess would be like an enclosed

Bidell

porch area and there were two other doors there and I believe it was the further away door from the kitchen door.

Q. So as far as the -- you opened the door from the kitchen and you go into an enclosed porch area, correct?

A. Correct.

Q. Now, did you see in this enclosed porch area any windows that you could see the outside?

A. I don't recall.

Q. Was there a back door?

A. There was another door, yes.

Q. Could you tell whether it was the door leading to the outside?

A. Yes.

Q. And did you later determine at any point in time that that was the back door?

A. Yes. Right then I could see there was a back door.

Q. So you exit the kitchen through a doorway and you go into what you're describing as an enclosed porch area, correct?

A. Correct.

Bidell

Q. And where was this back door in relation to you as you exited the kitchen door?

A. I think -- well, if you come out of, from what I recall, and it's been a while, but you come out kitchen door and you have to go left. So that door would be on my right.

Q. I would like to show you what has previously been marked as Plaintiff's Exhibit 5 and it was so marked on March 8, 2012, and ask you to take a look at that photograph.

Is that the back door that you just referenced, understanding that there might be some damage to it that wasn't there when you saw it?

MS. PETILLO: If you can tell. If can recognize what's in the photo obviously.

A. I would believe it is. I'm not a hundred percent positive only because of -- I know the cement in the back had two cement columns on the side of the door and it looks like one of them is here, so I would say yes.

Q. Now, the door that you came out of from the kitchen, is that door depicted in the photograph?

A. I don't know if that's it or not. I

Bidell

can't tell.

Q. But when you exited that door --

MS. PETILLO: When you say you can't tell if that's it, are you referring to something specific in this photo when you say if that's it is or are you just --

A. Is this the door I came out of or is there another door here?

Q. In that photograph there is a door that's obviously damaged, correct?

A. Yes.

Q. And it has windows on it.

A. Correct.

Q. And there's another door behind it where you can see a locking mechanism and a doorknob and that's off to the far right of the photograph somewhere toward the middle.

A. Right.

Q. With what appears to be a door handle just above both the doorknob and the locking mechanism, correct?

A. I see what you're referring to. I don't know what that black is. Is that the handle you're referring to, the black thing?

18 (Pages 66 to 69)

70

1         Bidell

2    Q.  If you can determine whether it was a

3 handle.

4    A.  I can't determine whether it was a

5 handle. I see what you're referring to is a

6 black, you know, I just can't tell if it's a

7 handle or not.

8    Q.  When you exited the kitchen door, to

9 the best of your recollection the back door was to

10 your right; is that correct?

11    A.  When I came out the kitchen, from the

12 kitchen, the back door is to my right, yes.

13    Q.  And then directing your attention back

14 to Plaintiff's Exhibit 6, do you recognize this as

15 the enclosed porch area that you were describing

16 earlier?

17    A.  No, I do not.

18    Q.  Did you have to walk down a hallway

19 past the back door to get to another doorway?

20    A.  Not that I recall, no.

21    Q.  When you walked into the enclosed

22 porch area did you walk up to a door and knock on

23 a particular door?

24    A.  Yes, she, um, Rashondra pointed to the

25 door for us to knock on.

71

1         Bidell

2    Q.  Now, that was not the door that you

3 exited the kitchen through. That was yet another

4 door, correct?

5    A.  Correct.

6    Q.  And you knocked on that door.

7    A.  Right.

8    Q.  And what happened after you knocked on

9 that door?

10    A.  That was answered by a female who

11 identified herself as Theresa Tompkins.

12    Q.  Did you have a conversation with

13 Ms. Tompkins?

14    A.  Yes, I did.

15    Q.  Who said what first?

16    A.  I identified myself to her and told

17 her the same thing that we had told Rashondra, yu

18 know, that we're here responding to a complaint of

19 a crying child.

20    Q.  What, if anything, did Ms. Tompkins

21 say in response to that?

22    A.  She invited us to go up the stairs

23 with her. We walked up the stairs with her.

24    Q.  Let me stop you there.

25    A.  Uh-huh.

72

1         Bidell

2    Q.  I would like to show you what has

3 previously been marked as Plaintiff's Exhibit 7,

4 so marked on March 8, 2012, and ask you if you

5 recognize what's depicted in that photograph.

6    A.  I don't recall the staircase.

7    Q.  Did there come a point in time where

8 you reached the top of the staircase?

9    A.  Yes.

10    Q.  I would like to show you what has

11 previously been marked as Plaintiff's Exhibit 8

12 and ask you if you recognize what's depicted in

13 that photograph?

14    A.  Yes, I do recall this.

15    Q.  What do you recognize it to be?

16    A.  This is where we stood exactly while

17 we spoke to Theresa Tompkins.

18    Q.  When you say where we stood, are you

19 talking about a specific area that's depicted in

20 that photograph?

21    A.  Yes, right here. I'm pointing to the

22 front of the, right by the railing of the

23 staircase.

24    Q.  And on that photograph, that would be

25 in the bottom center of the photograph?

73

1         Bidell

2    A.  Correct.

3    Q.  And this was all three of you,

4 Detective Walsh, Detective Maher and yourself?

5    A.  Yes.

6    Q.  Was it only Ms. Tompkins that was

7 engaged in this discussion in the hallway of the

8 upstairs --

9    A.  That's correct.

10    Q.  -- area?

11    And what did she say after you

12 identified yourselves?

13    A.  You know, I asked her who resided on

14 the second floor with her, and she said that she

15 resided there with her daughter and that another

16 woman resided there with a child.

17    Actually, I don't know if she said her

18 daughter. She may have said a child. I don't

19 know if she had a daughter or a son. She resided

20 there with her child as well as there was another

21 woman she didn't know that had a room there with

22 her child as well.

23    Q.  And what was the other woman's name?

24    A.  I did not know.

25    Q.  Did she tell you and you don't

19 (Pages 70 to 73)

Bidell

2 remember?

3    A. No, she didn't know. She didn't know
4 the woman's name.

5    Q. What else did she say, if anything?

6    A. I had asked her about, um, you know,
7 the people downstairs, that resided downstairs.
8 And she said yes, that they knew them. She knew
9 Shon, that Shon, um --

10    Q. That would be Mr. Lecator?

11    A. Correct. Shon hangs out with her
12 frequently upstairs. And she knew Rashondra
13 Lecator. I asked her if she knew the other
14 woman's name downstairs and she said no. I asked
15 her if she knew the name of the other man
16 downstairs and she said no. She said there were
17 several men downstairs, but she didn't know who
18 they were.

19    Q. Now, I am just going to backtrack for
20 a second. When you knocked on the door that
21 eventually led you upstairs did that door have a
22 doorknob?

23    A. I don't recall.

24    Q. Did the door have an exterior key
25 lock?

Bidell

2    A. I don't recall.

3    Q. Were you looking for that?

4    A. I was looking -- I wasn't really
5 looking for the exterior key lock or anything. I
6 was trying to see if there was a staircase inside
7 the house, and that's what I was concerned, trying
8 to see if I could determine.

9    Q. Did you not testify earlier that you
10 were there to determine whether it was a
11 two-family house?

12    A. Yes.

13    Q. So why wouldn't you look to see
14 whether there was indicia of segregated space?

15    A. Well, that's what I was trying to
16 determine.

17    Q. So wouldn't an exterior key lock be
18 such indicia?

19    A. Yes, it would be.

20    Q. But you didn't look for it?

21    A. I didn't think of it, no.

22    Q. So there came a point in time when you
23 got upstairs and you had this conversation with
24 the woman, Theresa Tompkins. She indicated to you
25 who lived there and that Mr. Lecator came up there

Bidell

2 from downstairs to hang out with her. Anything
3 else?

4    A. No. Not really. I was trying to see
5 if I saw an entrance of a staircase or anything
6 here, but I couldn't determine if there was one or
7 was not one.

8    Q. I'm sorry, could you clarify?

9    A. I was trying -- from my vantage point
10 here I was trying to see if there was another
11 staircase, but I couldn't tell with the other
12 doors, that the other doors appeared to be all
13 closed. So I couldn't tell what the layout of the
14 house was upstairs.

15    Q. From where you were standing you could
16 see there was a bathroom though, correct? Up
17 there?

18    A. No, I couldn't tell. Like I said, the
19 doors were all closed up there.

20    Q. What about the kitchen?

21    A. I couldn't tell what was in any of the
22 rooms or doors.

23    Q. And you're saying because the doors
24 were closed?

25    A. Correct.

Bidell

2    Q. On all these rooms.

3    A. Right. And if, you know, looking at
4 the photos, if there was a door or not a door,
5 just from like standing right here was my
6 viewpoint, and, you know, you couldn't determine
7 even if there wasn't a door, which I don't know if
8 this has a door or not, but you can't see inside
9 the room, what's inside the room.

10    Q. And you're indicating the first
11 doorway to the left as depicted in Plaintiff's
12 Exhibit 8, correct?

13    A. Correct.

14    Q. Let me make sure we're clear on this.
15 Were the doors opened or closed?

16    A. From what I could, what I recall,
17 doors were closed. Or what I was -- what I recall
18 is that you couldn't make a determination what was
19 in the rooms, whether something was a bedroom,
20 something was a kitchen, something was a bathroom.
21 From where I was, I couldn't determine.

22    Q. When did you go there?

23    A. On the 11th, May 11th.

24    Q. At what time?

25    A. I don't recall the exact time.

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

## 78

Bidell

Q. It wasn't nighttime though, right?

A. No, it was daytime. Absolutely daytime.

Q. While you guys were having these conversations, all three of you investigators and Ms. Tompkins were in this hallway that's depicted in Plaintiff's Exhibit 8, correct?

A. Correct.

Q. Were you trying to determine what was in these rooms?

A. I was trying to determine, trying to spot or observe a staircase from another room.

Q. Leaving aside a staircase, did you look around for other indicia that this was a segregated apartment?

A. No, I did not.

Q. Why not?

A. Because I didn't want -- already what I was doing was really I think was, um, jeopardizing our search warrant and didn't want to raise up people that much. So I just went with the story that I said, we're just here, we just wanted to see if we hear any children crying, if everybody was OK. So I didn't want to push the

## 79

Bidell

envelope so to speak.

Q. But you were there to determine whether there was segregated space, were you not?

A. Correct.

Q. Wouldn't you look for something like another kitchen up there?

A. Again, like I said, I tried to just see both downstairs and upstairs, what I could observe without making it look like I'm searching for something.

Q. I want to make sure your testimony's clear. You said that you were looking around but for a staircase.

A. Correct.

Q. My question to you is, did you ever make an attempt to look in any of these rooms to see whether you could see a kitchen?

A. No, I did not.

Q. Did you ever look into these rooms to see if there was a bathroom up here?

A. I didn't look into any of the rooms, period.

Q. And that was because you didn't want to jeopardize the warrant?

## 80

Bidell

A. Correct.

Q. How long were you up there?

A. Just a very few minutes. I guess anywhere from three to five minutes.

Q. Did you see any other individuals other than Ms. Tompkins while you were up there?

A. I did not.

Q. Did you hear any other individuals in the residence while you were on the second floor?

MS. PETILLO: When you say the residence, you're referring to the second floor of the residence?

MR. HORN: Yes.

A. I did not.

Q. Did you move your position at all after reaching the hallway that's depicted in Plaintiff's Exhibit 8?

A. No, I did not.

Q. Who was doing the speaking with Ms. Tompkins?

A. I was.

Q. What were Mr. Walsh and Maher doing while you were speaking with Ms. Tompkins?

A. They were standing behind me.

## 81

Bidell

Q. Did there come a time where Detectives Walsh, Maher, yourself exited the hallway that's depicted in Plaintiff's Exhibit 8?

A. Yes.

Q. And did you return back down the stairs that you had come up?

A. Yes.

Q. And did Ms. Tompkins escort you down those stairs?

A. I don't recall if she came with us or not.

Q. Did you guys close the door to the second floor?

A. I don't recall.

Q. Do you know if Ms. Tompkins closed the door?

A. I don't recall.

Q. What, if anything, happened after that?

A. We just went back the same way we came and exited the location.

Q. And just so we're clear, you're saying you went back into the kitchen?

A. Correct.

21 (Pages 78 to 81)

Bidell

1
2     Q.   Now, when you were speaking with
3  Ms. Tompkins was Rashondra with you?
4     A.   No.
5     Q.   You went down the stairs, you came to
6  a door that was originally opened by Ms. Tompkins,
7  correct?
8     A.   Correct.
9     Q.   You opened that door and you go into
10 what you described as the enclosed porch area?
11    A.   Right.
12    Q.   And then there came a point in time
13 where you go back to the door that you came
14 through from the kitchen, correct?
15    A.   Correct.
16    Q.   Now, the back door would now be on
17 your left to the best of your recollection,
18 correct?
19    A.   Correct.
20    Q.   Was that door open or closed at the
21 time?
22    A.   Closed.
23    Q.   And you were able to see through the
24 backyard through the windows in that door?
25    A.   Correct.

Bidell

1
2     Q.   The door to the kitchen, did it have a
3  handle?
4     A.   I don't recall.  Well, it had a handle
5  from the inside.  I don't know if it had one on
6  the outside.  I don't recall.  I can remember her
7  pulling on the handle.  What's her name?
8  Rashondra, I can remember her pulling on the
9  handle.
10    Q.   And you're talking about when she
11 initially --
12    A.   Inside the kitchen, when we were
13 inside, correct.
14    Q.   When she initially opened it for you?
15    A.   Correct.
16    Q.   When you got back down to that door to
17 the kitchen, who opened it out of yourself, Walsh
18 or Maher?
19    A.   I don't recall who opened the door.
20    Q.   And then the three of you entered the
21 kitchen; is that correct?
22    A.   Correct.
23    Q.   And at any point in time after
24 entering the kitchen did you see Rashondra?
25    A.   Yes.

Bidell

1
2     Q.   And where was she?
3     A.   In the kitchen.
4     Q.   And did you say anything to her as you
5  passed through the kitchen?
6     A.   No, we just said thank you very much.
7  We appreciate her cooperation.
8     Q.   And then you walked back to the front
9  door; is that correct?
10    A.   Correct.
11    Q.   The door that one of you, either
12 yourself, Walsh or Maher, opened leading into the
13 kitchen from the enclosed porch area, was that
14 door locked?
15    A.   No.
16    Q.   Did it have a locking mechanism?
17    A.   Not that I recall.
18    Q.   Can you describe the door?
19    A.   No.  I just recall it was a door and I
20 remember it being stuck like an old house or
21 something with a lot of paint that took a tug to
22 open kind of thing.
23    Q.   And there came a point in time when
24 you exited the house, correct?
25    A.   Correct.

Bidell

1
2     Q.   And what did you do after exiting the
3  house?
4     A.   We went back to the office.
5     MS. PETILLO:  Is it OK to take a
6  five-minute break at this point?
7     MR. HORN:  Sure.  Why don't we take a
8  half hour.
9     (A luncheon recess was taken at
10 12:37 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

22  (Pages 82 to 85)

Bidell

AFTERNOON SESSION

(Time noted: 1:32 p.m.)

THOMAS BIDELL, resumed and
testified further as follows:

EXAMINATION BY (Cont'd.)

MR. HORN:

Q. So there came a point in time after going up and speaking with Ms. Tomkins that you exited 31 Lafayette Avenue, correct?

A. Correct.

Q. Did you speak with anyone else other than briefly saying goodbye to Rashondra from the time you exited the second floor till you exited the actual premises?

A. No.

Q. Where did you go after leaving the premises?

A. Just back to our office, 272 Old Country Road.

Q. Did you do anything in furtherance of the investigation when you got back to your office?

A. I don't believe so. Computer checks, you know, did some computer checks trying to

Bidell

identify who was there.

Q. What do you mean by that?

A. The residents of the house, you know, trying to see if there's any other determination that I could make, you know.

Q. If I'm understanding you correctly, you utilized a computer to run certain research to determine whether there was any other people residing at the residence?

A. Correct, try and further identify, like they had given me the first name of that male they didn't know his last name, you know.

Q. And what was the determination you made after doing those computer checks, if any?

A. We identified the, or I identified the male. I don't recall his name, but we were able to do a EJustice complaint, you know, and saw his criminal history. We saw our target's criminal history.

Q. What about Ms. Tompkins or any of the females you had met?

A. As far as what?

Q. Did you find them in any of your computer research or were you even looking?

Bidell

A. You know, once I had them I wasn't looking for them anymore. So if they may have been there, I don't know.

Q. This computer research, did you print it out?

A. I don't believe so. I don't believe so.

Q. If you did, would it be contained in your arrest folder?

A. It would be.

Q. What was the purpose of doing the computer research?

A. Just to identify anybody that we could that was living in the house.

Q. Why?

A. Well, again, criminal records, see what kind of past history. Like the one fellow I believe had, um, the one I identified had a previous rape conviction. So we were looking to see if any violence, what other type of people we might be dealing with.

Q. Is it fair to say this computer search was done to see what type of people the officers executing the warrant could encounter when they

Bidell

actually performed that duty?

A. That's correct.

Q. Was there any other purpose for this search?

A. No. Not that I can recall.

Q. After doing this computer research what, if anything, was the next thing you did in furtherance of this investigation and/or execution of the warrant?

A. I met with the BSO lieutenant to give him the information that I had found.

Q. Who was that?

A. I don't recall his name.

Q. What did he look like?

A. He was a male white, stocky build, I guess in his forties, maybe fifties.

Q. Where did you meet him?

A. Excuse me?

Q. Where did you meet him?

A. At the BSO office, Newbridge Road in Bellmore.

Q. When did you meet him?

A. Sometime between, I don't know. It was actually on the 12th.

Bidell

Q. Do you remember what time?

A. Afternoon. I don't know exact time, but afternoon, it was in the afternoon.

Q. What did you tell him?

A. I told him what we found, you know, I told him that I saw two mailboxes. We tried to do an investigation to determine if there was a one-family house or a two-family house. We couldn't determine. We couldn't make a determination. I told him that drug sales did take place on the first floor.

I told him that there are children in the house. I told him that there was a toddler bed, which I thought was very important, the a toddler bed six feet from the front door that I knew they would usually throw a flash bang in and that's liable to land right on some kid's chest. So do not do that.

I told him that we went into the house. There's only that we saw a rear staircase. We don't know if there's another staircase or not. We couldn't determine.

I told him that it's affiliated with 20 Miriam, which is a known gang hangout house and

Bidell

that we believed they are both connected and we don't know what would be found as far as weapons or gang members. Others males are said to be in the house, unidentified both upstairs and down.

Q. Now, you said that it's gang related. What gang?

A. I don't recall whether it was – it was either Bloods or Crips. I don't recall which.

Q. Would that be reflected in your arrest folder?

A. It should be.

Q. And you indicated there was a connection between 20 Miriam and 31 Lafayette.

Other than the fact that Sha eventually introduced your informant to Mr. Lecator, what other connection was there between the two?

A. Well, that was the connection. And their immediate vicinity to one another as well.

Q. Now, you indicated to this lieutenant in BSO that you were unable to determine whether it was a two-family house, correct?

A. Correct. And he brought me to, when I met him, he brought me into an actual briefing

Bidell

that BSO members were conducting regarding this house, and I told this information to the entire group of them, I guess anywhere from 10 to 15 members.

I also gave him copies of the rap sheets, the criminal arrest reports and the names of the people that we were able to identify.

Q. Did you go to the buildings department to pull any of the layouts or blueprints of the premises?

A. No, I did not.

Q. Did you ever attempt to check with the any government entity regarding taxation to see what the house was zoned as?

A. No, I did not.

Q. Did anyone else in the Bureau of Investigations do any checks to see how the house was zoned to your knowledge?

A. I don't believe so.

Q. Within the Bureau of Investigations do individual investigators have cases that they are heading up or supervising or they are the lead detective or investigator on a particular case?

A. Is that how it works?

Bidell

Q. Yes.

A. Yes.

Q. You were the lead investigator on this investigation at 31 Lafayette?

A. That's correct.

Q. Did you tell anyone other than Maher or Walsh that you were going to go to the house specifically to attempt to confirm whether it was a one-family or a two-family on May 11th?

A. No, I did not.

Q. Did you tell anyone other than this BSO lieutenant that you were unable to determine whether it was a one-family or a two-family?

A. Not that I can recall. Other members of the investigations, coworkers of mine, I told them.

Q. Now, you testified you were unable to determine whether it was a one-family or a two-family.

Why did you say that to the BSO lieutenant?

A. Because of the two mailboxes.

Q. The two mailboxes were indicia that it was a two-family, correct?

Bidell

1
2    A.   The two mailboxes would lead you to
3  believe it could be a two-family, but it's not a
4  definite sign that it is a two-family.
5    Q.   But it would be -- I'm not saying that
6  it makes it a two-family. But two mailboxes would
7  be indicia of two families, correct?
8    A.   What does indicia mean? I'm sorry.
9    Q.   Indicia would be some sort of evidence
10 that it was two-family.
11   A.   It would be a clue that it's a
12 two-family. However, it doesn't at all
13 necessarily mean it's a two-family.
14   Q.   It's not conclusive, correct?
15   A.   Correct.
16   Q.   But it's some evidence.
17   A.   Yes. That's what rose me to take the
18 actions that I did.
19   Q.   So you saw the two mailboxes and you
20 found that to be some evidence of two-family. So
21 then you took action after making that
22 observation, correct?
23   A.   Correct.
24   Q.   What action did you take in
25 furtherance of discovering whether this was a

Bidell

1
2  two-family? And I'm speaking of 31 Lafayette
3  Avenue.
4    A.   Just the actions that I repeated, that
5  I stated to you earlier. I sent the CI back to
6  the location to see if he could determine. We
7  went there with a ruse to try and see if we could
8  determine.
9         We did the computer checks, what we
10 could, to see if there was anything that would
11 stand out that would say it was a two-family.
12   Q.   Let me stop you there. What computer
13 checks did you do to determine whether it was a
14 two-family?
15   A.   On the address at 31 Lafayette.
16   Q.   What searches did you run to determine
17 whether it was a two-family?
18   A.   Accurint.
19   Q.   Could you describe that search?
20   A.   It would tell you the names of the
21 people and there were a ton of names of people
22 listed at the -- it didn't help us. It didn't
23 assist us.
24   Q.   Accurint, that will show you, anyone
25 who has ever used that, as their address, correct?

Bidell

1
2    A.   Correct. It wasn't helpful.
3    Q.   That's not going to let you know who
4  actually resided there at that time, correct?
5    A.   Correct. And that's also though how
6  we used and identified the other fellow that they
7  only knew the first name of.
8    Q.   Accurint is much better when you have
9  a partial name. You run the search and then you
10 look through the list to see if anyone matches
11 that name, correct?
12   A.   That's one of the uses, yes.
13   Q.   After seeing those mailboxes and as
14 you described it taking action, what evidence did
15 you receive that said to you that this was a
16 one-family house?
17   A.   The evidence, the main thing basing my
18 decision on was looking at and interviewing and
19 going to see for myself what I could, get in the
20 doors and try and determine if it was a one- or
21 two-family house, and from what I could see it
22 appeared to be a one-family house that people came
23 and went as they pleased.
24         And I guess it seemed like the people
25 didn't all know each other. It seems almost as if

Bidell

1
2  rooms were possibly rented out by the week. They
3  didn't seem like they knew each other very well
4  and it seemed like it was a one-family house. My
5  impression was it was a one-family house, that
6  different rooms were rented out to people was the
7  impression I took away.
8    Q.   Now, you've entered houses under ruses
9  before to seek some sort of evidence, correct?
10   A.   Correct.
11   Q.   And this neighborhood that
12 31 Lafayette is in, is a high crime area; is it
13 not?
14   A.   That's correct.
15   Q.   In high crime areas people tend not to
16 be extremely forthcoming with their names,
17 correct?
18   A.   Correct.
19   Q.   And they tend to give false names or
20 aliases, correct?
21   A.   Correct.
22   Q.   And they also tend not to talk too
23 much about what's going on in the neighborhood as
24 just for sheer self-preservation, correct?
25   A.   Sometimes, yes.

25  (Pages 94 to 97)

Bidell

Q. As far as them not knowing each other, it could simply be a case of they didn't want to give you the full name of any of these individuals, correct?

A. It could be, correct.

Q. And you have encountered that before, have you not?

A. You can't prove it, but you can get that feeling that's what's going on.

Q. What I want to make clear is, did you ever make a determination -- because you just testified that it appeared to be a one-family house.

A. Correct.

Q. Did you ever make that determination or is it your testimony that you were unable to make a determination of whether it was one or two-family or something else?

A. My determination, it was a one-family house that had almost like rooms for rent. That was my determination. And it didn't appear structured. People didn't know each other inside the house. You know, it didn't seem like, it didn't seem like there was a family residing on

Bidell

this floor and another family residing on that floor. It didn't seem like clear-cut determination that way. I wasn't able to determine that.

Q. In areas such as this in high crime areas that you've entered, isn't it a fact that even when you have one family it's not the nuclear family -- withdrawn. Isn't it a fact that in these type of neighborhoods where it's high crime areas it's common for multiple families to be residing in the same residence?

A. It's common for multiple families to be residing in a residence, yes.

Q. Even within a segregated space it's common in these high crime areas for multiple families to be living in one segregated space.

A. Is that the same question?

Q. I just want to make sure we're clear. We're saying premises. I want to say in one segregated space.

A. Yeah, like I said, it appeared to be a place where rooms were for rent inside the one house.

Q. No, my question to you though is, in

Bidell

these kinds of areas where you have indicated you have gone in under ruses and everything else, my question is, in one segregated space isn't it common for multiple families to live in one segregated space?

A. Um, yes. I guess yes.

Q. Isn't it also common in these types of areas where there's high crime to have individuals who were unrelated residing with each other, and giving you an, example, a mother, a daughter and a man who's unrelated to either one of those females?

A. Yes.

Q. Isn't common for multiple single mothers to reside in the same segregated space for financial reasons?

A. I don't know about multiple -- I don't have experience with multiple single mothers. I don't know about that.

Q. How about multiple children with different mothers living in the same premises?

A. I wouldn't -- I don't know it to be that extent. I just know multiple people, that it doesn't appear that they are related to be living

Bidell

in the same household. That's been my experience.

Q. And that was present at 31 Lafayette, correct?

A. That's what it appeared to me, yes.

Q. You know the purpose for going into 31 Lafayette on May 11th was to determine whether it was a two-family house, correct?

A. Yes.

Q. Now, you weren't going in there to determine whether there were two families living there. Your purpose was to go see whether there was two segregated spaces within that dwelling, correct?

A. Correct.

Q. When you got there, my question to you is, what evidence did you find regarding segregated space?

A. Just the feeling that I got from talking to the people, talking to Rashondra and talking to Theresa that it seemed like it was one household with different people residing there.

Q. Did you make any physical observation that you can articulate as you sit here today that led you to believe that this was a one-family

```
1           Bidell
2    house?
3        A.   Well, I observed one kitchen.
4        Q.   Let me stop you there.  I want to make
5    sure my question is clear.  From your short
6    response it seems it wasn't.
7        A.   OK.
8        Q.   What positive observation did you make
9    that led you to believe that this was a one-family
10   house?  Not what you didn't see, what you did see.
11       A.   Well, I saw one kitchen, which would
12   make me believe that it was a one-family house.
13       Q.   OK.
14       A.   I saw a common staircase.  You know, I
15   was looking to see if there was another staircase
16   or not.  It seemed like there was interaction
17   between the floors, yes, you know, they're up on
18   my floor and, yes, I'm down on that floor where
19   their rooms are.  I guess that's about it.  I
20   can't think.  You know, if something else comes to
21   mind I'll mention it.
22       Q.   Is there anything that you didn't see
23   that led you to believe that this was a one-family
24   house?
25       A.   Is there anything I didn't see?
```

```
1           Bidell
2        Q.   Something you were looking for you
3    didn't see it and you came to use that as evidence
4    to say this is a one-family house.
5        A.   If I had seen a second kitchen I would
6    have thought it may better be a two-family house.
7    And again, that wouldn't necessarily mean it was a
8    two-family house, but it would just be another
9    point in that direction that it was a two-family
10   house.  Because I have been in plenty of houses
11   that had three kitchens and it was still a
12   one-family house.  You know, they had one in the
13   basement, you know, one for other relatives living
14   in the house.  But, um, no.
15       Q.   Another bathroom would be some sort of
16   clue that there was --
17       A.   No, because you could have four
18   bathrooms in a one-family house.
19       Q.   My question is, keep in mind this
20   question started out with is there something you
21   didn't see that led you to believe it was a
22   one-family house.
23           Did you see a bathroom on the second
24   floor?
25       A.   No.
```

```
1           Bidell
2        Q.   Was that part of your thought process
3    where you said, You know what?  I didn't even see
4    a bathroom up there.  They've got to be all using
5    the bathroom on the first floor?
6        A.   No.
7        Q.   What about locks?  Isn't that
8    something you would want to look for if you were
9    trying to figure out whether space was segregated?
10       A.   Well, that was something I was trying
11   to look for.
12       Q.   But you testified earlier you didn't
13   even look to see whether there were locks on the
14   door that led up to the second floor, correct?
15       A.   Yes, I didn't have time to study.
16   There were things that I want to do and what
17   actually happened are two different things.  You
18   know, in there talking, you're trying to conduct
19   an interview at the same time you're trying to
20   look around and observe what you can.  So it was
21   something that I never got to really observe.
22           You're trying to do as many things at
23   once.  At the same time you're hoping that
24   obviously that the defendant is not in there or
25   that you're going to have a confrontation with
```

```
1           Bidell
2    people.  So there's a lot of things going through
3    your head distracting you all at once where you're
4    trying to attain those goals.
5        Q.   Did you ever have the premises under
6    24-hour video observation at any point in time in
7    the 30 days before the eventual execution of the
8    warrant?
9        A.   No, I did not.
10       Q.   Did you ever have any stationary video
11   surveillance on the outside of the premises prior
12   to the raid?
13       A.   No, I did not.
14       Q.   Are you aware of whether there was any
15   stationary video surveillance on the premises
16   within the 30 days prior to the raid?
17       A.   I'm not aware of it, no.
18       Q.   When I say stationary video
19   surveillance, do you know what I'm talking about?
20       A.   You're talking about a pole camera or
21   something?
22       Q.   A pole camera, a plant camera.  It
23   could be anything from a --
24       A.   Not that I'm aware of.
25       Q.   -- fake bush to a twig that they put
```

27  (Pages 102 to 105)

Bidell

1 at the premises just to see the comings and goings
2 of individuals.
3    A. No, I am not aware of that.
4    Q. You indicated that you had
5 surveillance on the premises prior to the
6 execution of the raid and that that surveillance
7 was not static but highly dynamic because of the
8 spotters in the area, correct?
9    A. Correct.
10    Q. During any of this surveillance you
11 had at 31 Lafayette did you ever see individuals
12 entering and leaving the premises through the back
13 door?
14    A. No, I did not. That was another thing
15 that we were looking for, to see if there was
16 another entrance. We didn't see another entrance
17 from what we could see, but everybody we saw came
18 and entered the front door.
19    Q. Are you familiar with an individual
20 called Iyanna Davis?
21    A. No, I'm not.
22    Q. Are you familiar with an individual
23 named Natasha Little?
24    A. Natasha Little I believe is the name

Bidell

1 given by the woman that was shot.
2    Q. Are you aware now as you sit here
3 today that her name, the woman who was shot, is
4 Iyanna Davis?
5    A. That sounds familiar.
6    Q. Just so it's clear, I actually
7 represent Iyanna Davis and this lawsuit is in
8 regards to a shooting that she alleges took place
9 at 31 Lafayette.
10    A. Right.
11    Q. Going back to your conversation with
12 the lieutenant from the BSO, what did you tell him
13 was your reason to believe that this was a
14 one-family?
15    A. I didn't elaborate to him.
16    Q. But you did tell him that you believed
17 it was a one-family.
18    A. I told him that there were two
19 mailboxes, but we couldn't make a determination,
20 anything to show us that it was a two-family
21 house.
22    Q. Why did you tell him that?
23    A. Because there were two mailboxes.
24    Q. No, no, no. When I asked you just

Bidell

1 earlier you said you made the determination that
2 it was a one-family, correct?
3    A. I made the — I believed it was a
4 one-family. That's my determination, correct.
5    Q. So my question to you is, you just
6 testified that you told the lieutenant in BSO that
7 you couldn't make a determination, did you not?
8    A. I couldn't make a determination that
9 it was a two-family house. I didn't see that it
10 was a two-family. Because two mailboxes would
11 lend you to believe that it was a two-family.
12 However, I wasn't able to make that determination.
13    Q. I'm going to have to ask this question
14 again because I'm not clear on your response.
15    A. Uh-huh.
16    Q. Did you tell the lieutenant in BSO
17 that you made a determination that it was your
18 belief that that was a one-family house?
19    A. Yes.
20    Q. Did you tell the lieutenant from BSO
21 that you could not make a determination as to
22 whether it was a one-family or a two-family?
23    A. No. If I said that, I misspoke.
24    Q. When you had this conversation with

Bidell

1 the lieutenant from BSO and you told him that you
2 had made a determination that this was a
3 one-family, did you give him any support for your
4 opinion?
5    A. No.
6    Q. Did you ever tell him why you thought
7 it might have been a two-family house?
8    A. Only the two mailboxes.
9    Q. Did you indicate to the lieutenant
10 from BSO that the stairs could not be accessed
11 from the first floor without going through two
12 sets of doors?
13    A. No. I told him that we entered the
14 second floor through a rear stairwell, but we
15 couldn't determine if there was another staircase
16 or not.
17    Q. Did you tell him that that stairwell
18 was not accessible unless you went through two
19 doors from the first floor?
20    A. I told him that there was a — I
21 guess, yeah, you had to go out the kitchen door
22 and then to that other door, correct.
23    Q. What else did you tell the BSO
24 lieutenant?

## 110

Bidell

1
2    A.  Like I said about that bed basically,
3  um, I wouldn't use the flash bang grenade because
4  a child may be sleeping by the front door. I told
5  him that, like I stated earlier, that we believed
6  it to be associated with 20 Miriam and they
7  already were aware they were doing two entries.
8  It was going to be a simultaneous search warrant
9  on 20 Miriam and 31 Lafayette and that, you know,
10  we didn't know what to expect as far as gang
11  activity inside 31 Lafayette or persons that would
12  be in there. I gave him the names of people that
13  we did identify and criminal records that we could
14  identify of the people in 31 Lafayette.
15    Q.  And you indicated there was a briefing
16  with 12 to 15 people?
17    A.  That's the same conversation I'm
18  talking about.
19    Q.  Oh, OK.
20    A.  When I first met the lieutenant he
21  just brought me right into the briefing.
22    Q.  Now, the individuals at the briefing,
23  were these rank and file BSO?
24    A.  They were rank and file BSO and I
25  believe the inspector was present as well.

## 111

Bidell

1
2    Q.  And what was the content of the
3  briefing?
4    A.  I wasn't privy to their briefing.
5  When I walked in I did see a large screen showing
6  a picture of 31 Lafayette, which led me to believe
7  that's what they were there for, because he just
8  said just come into this room. I wasn't planning
9  on attending their briefing or anything. It just
10  happened it was going on when I was there and I
11  just told them the information I had just given
12  you and left. I wasn't asked to stay and I didn't
13  ask to stay for the remainder of their briefing.
14    Q.  Just so we're clear, the information
15  that you gave to the lieutenant, when you gave
16  that testimony, you were talking about the
17  information you gave to all these rank and file of
18  the BSO.
19    A.  That's correct.
20    Q.  And that would be the testimony you
21  just testified regarding the mailboxes, your
22  belief that it was a one-family, et cetera.
23    A.  Correct.
24    Q.  There was no independent conversation
25  with simply the lieutenant from BSO, correct?

## 112

Bidell

1
2  Other than --
3    A.  No, there was not.
4    Q.  -- introductions.
5    A.  There was a meeting just to initiate
6  BSO's involvement, and that was back -- I don't
7  have an exact date. Let's see. Somewhere between
8  the 19th I believe of April and the 5th of May
9  there was an initial meeting with myself, I
10  believe Investigator Maher, the inspector from
11  BSO, the same lieutenant from BSO and members of
12  the Hempstead PD in which we discussed the
13  initial, um, bringing to them the idea that we
14  wanted to have two search warrants at the same
15  time.
16    Q.  Bringing to BSO?
17    A.  Yes. To do the entries for us.
18    Q.  During that meeting -- I'm sorry, when
19  was that meeting?
20    A.  When?
21    Q.  Yes.
22    A.  I don't have an exact date, but
23  sometime after the April 19th and May 5th of 2010.
24    MR. HORN:  Could we go off the record.
25    (Discussion off the record.)

## 113

Bidell

1
2    Q.  At this meeting were your
3  determinations as to how many people resided at
4  the house discussed? And the reason I ask that is
5  because you've given the date, time range of
6  April 19th to May 5th.
7    A.  Right.
8    Q.  Yet your earlier testimony you talked
9  about it wasn't till May 10th that you first
10  observed evidence that it might be a two-family
11  house.
12    A.  Right.
13    Q.  So my question to you is, during this
14  conversation that you had with Hempstead PD, when
15  you first discussed doing a joint search warrant,
16  did you have any discussion regarding your belief
17  that it might be a two-family house?
18    A.  No, I had no knowledge of -- at that
19  time I hadn't seen the two mailboxes. The CI
20  never said anything of it. None of my
21  observations led me to believe it was a
22  two-family, so no.
23    Q.  After this meeting with BSO you
24  relayed your information that you've just
25  testified to and you left the room; is that

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

Bidell

1 correct?
2 A. This first one, yes.
3 Q. So --
4 A. The first --
5 MS. PETILLO: Wait a minute.
6 Q. -- fast forward to when you spoke to
7 the lieutenant and the 12 to 15 officers, the rank
8 and file of the BSO, where you told them your
9 observations, after you gave your information to
10 them you left the room?
11 A. That's correct.
12 Q. And this would be approximately
13 May 12th?
14 A. It was May 12th, yes.
15 Q. And that would be sometime in the
16 afternoon, correct?
17 A. In the afternoon, correct.
18 Q. Why did you leave?
19 A. I wasn't asked to stay. You know, I
20 know they're going to be going over. I gave them
21 everything I had. I don't recall them asking me
22 any questions.
23 At that point I would understand like
24 a BSO or emergency service unit they would then be

Bidell

1 talking about their tactics. I'm not going to be
2 involved in any of that. There's no need for me
3 to remain.
4 Q. Did you stay at BSO headquarters or
5 you just left?
6 A. No, I left.
7 Q. Where was your next involvement with
8 this investigation and/or execution of this
9 warrant?
10 A. The morning of the 13th.
11 Q. And talk to me. What is your
12 involvement, your first involvement on the 13th?
13 A. We had a predetermined meeting spot.
14 It was over on Franklin Avenue in Garden City I
15 believe, and they just gave out at that time, I
16 don't remember who, but someone instructed the
17 lines of how the search warrant would be
18 conducted, the way we would drive over to execute
19 the search warrant, that we would not enter the
20 premise until we were told to enter the premise
21 from a member of BSO. They would secure the house
22 before we entered.
23 We were instructed to stay down the
24 block from the house until we were told to enter

Bidell

1 and I think they may have given us a position in
2 the caravan of emergency service vehicles where we
3 should be. I don't recall exactly. They gave me,
4 um, they gave a description of the road or
5 whatever way they were going to drive there, but
6 we really didn't have to worry because we were
7 just following the car in front of us to that
8 location.
9 Q. Did you in fact convoy with the BSO
10 over to the 31 Lafayette --
11 A. Yes.
12 Q. -- 20 Miriam area?
13 A. Yes.
14 Q. Did you in fact park down the block
15 from 31 Lafayette?
16 A. Correct.
17 Q. Were you on Lafayette or Miriam?
18 A. I was on Lafayette.
19 Q. North or south of the location?
20 A. I don't know north or south too well.
21 If you're standing in front of 31 Lafayette I was
22 down the block to the left.
23 Q. After you parked there tell me what
24 you heard, observed in regards to the execution of

Bidell

1 the raid, warrant.
2 A. We were I guess anywhere from four to
3 six or seven houses down the block. You observed,
4 I observed the BSO members exit their vehicles.
5 It appeared like they were surrounding the house
6 and charged up. You could hear them screaming
7 "Police, search warrant." You could hear a lot of
8 banging, a lot of noise, them constantly yelling
9 "Police, search warrant."
10 Off in the distance you could hear
11 what appeared to be flash grenades going off,
12 which to me I was thinking it was possibly at
13 20 Miriam that they were using those, that search
14 warrant was being executed. That's it.
15 Q. Did you hear a gunshot?
16 A. There was a time, a little after the
17 initial entrance to the house, I mean, they were
18 still running around the outside of the house, but
19 they had already entered the premise. BSO was
20 still running around the house and there was a
21 time, I don't know how many minutes from that, but
22 there was a noise where I was standing with a
23 couple of fellows that I worked with and you heard
24 a noise. Again, there was a lot of banging and

30 (Pages 114 to 117)

Bidell

1 everything, and I didn't determine that it was a
2 gunshot, but somebody said they thought it was a
3 gunshot. Somebody I was with said they thought it
4 sounded like a gun shot.
5　　Q. Just so I'm clear, you heard a noise,
6 but you couldn't tell whether it was a gunshot --
7　　A. I couldn't.
8　　Q. -- or not, correct?
9　　A. There was constant banging and noise
10 and yelling, so I couldn't determine.
11　　Q. After you heard that noise that you
12 couldn't distinguish, what did you do, if
13 anything?
14　　A. Nothing. Stood right there.
15　　Q. Did there come a point in time where
16 you eventually went to 31 Lafayette?
17　　A. Yes.
18　　Q. Who told you that it was clear to go
19 there?
20　　A. A member of BSO.
21　　Q. Were you informed at all that there
22 had been a gunshot fired prior to going to
23 31 Lafayette?
24　　A. Yes.

Bidell

1　　Q. Who told you that?
2　　A. A member of BSO.
3　　Q. What was his name?
4　　A. I don't recall. They all had the
5 helmets on. I really didn't know. We had also,
6 um, after that noise we then heard -- I believe
7 there was, um, I think they were with us in the
8 procession, but I'm not a hundred percent sure,
9 but like ambulance personnel going to the
10 location.
11　　Q. Did you hear over the radio that
12 someone was shot?
13　　A. We didn't have a radio.
14　　Q. You saw medical personnel approaching
15 31 Lafayette?
16　　A. Correct.
17　　Q. At that point in time did you know
18 that someone was shot?
19　　A. Not then. Not until after. When one
20 of the BSO guys was somewhere in our vicinity, I
21 said, Was that a gunshot? And he said yes. And I
22 said, Was everybody OK? And he said, I believe he
23 said a woman upstairs was shot.
24　　Q. Did you ever see the woman who was

Bidell

1 shot?
2　　A. No.
3　　Q. Did there come a point in time where
4 you went into the first floor?
5　　A. Yes.
6　　Q. Were there any individuals detained at
7 that point in time on the first floor?
8　　A. Yes.
9　　Q. And was it a male and a female?
10　　A. I remember seeing my target. I don't
11 remember seeing the female.
12　　Q. But as you sit here today, you know a
13 female was arrested, correct?
14　　A. Yes, she wasn't arrested -- she wasn't
15 placed under arrest on entry, the female. The
16 circumstances I recall of the female being
17 arrested, she had asked to use the bathroom and we
18 had a female investigator watching her, and she
19 said, Yes, you can use the bathroom, and on her
20 way to the bathroom she grabbed some kind of box
21 or something, some kind of object, and the
22 investigator approached her. What are you doing
23 with that? And she tried to get into the bathroom
24 and I believe there was a little scuffle involved

Bidell

1 and the box was opened up and there was I believe
2 some kind of drugs and drug paraphernalia in that
3 box, and at that time she was placed under arrest.
4　　Q. Were you present for this?
5　　A. I was in the house. I didn't witness
6 it.
7　　Q. But your target was detained when you
8 first entered the house, correct?
9　　A. Correct.
10　　Q. And that was Mr. Lecator?
11　　A. Correct.
12　　Q. What did you do when you entered the
13 house?
14　　A. We were told originally we could begin
15 our search of the first floor and basement.
16 However, the second floor was going to be held as
17 a crime scene. So we wouldn't be able to go up
18 there until it was cleared. I don't even recall
19 if she was -- I don't remember if she was taken
20 out, the victim was taken out at that time or not.
21 If she was still up there when we went in or not,
22 I really don't remember. She might have been.
23 She was probably removed before we got in.
24　　Q. But there came a point in time where

Bidell

1 you searched the first floor?
2    A. Correct.
3    Q. Can you tell me what you did in
4 pursuit of the search?
5    A. We began searching for any evidence of
6 drugs, contraband, weapons.
7    Q. How many of you?
8    A. I don't recall exactly, but I would
9 guess about six of us were in there. Different
10 people had different jobs. One fellow was there
11 to -- Gillespie, William Gillespie was there to
12 take photos. I believe photos were taken before
13 the search began. He walked around, Gillespie
14 took photos before the search began.
15     And some people were assigned to guard
16 the prisoners such as the one female investigator
17 that was guarding the, um, not just prisoners, but
18 anybody in the apartment. You want them to just
19 sit still until the search is concluded, you know,
20 and patted down. They would be patted down,
21 searched as well for any weapons or contraband.
22    Q. What was that female investigator's
23 name?
24    A. Lana, and it's a long last name.

Bidell

1 Sapuza (phon)? I don't know. Something with a Z.
2 It's quite a long name, Russian name.
3    Q. Who else?
4    A. Myself.
5    Q. What duties were you charged with?
6    A. Searching.
7     Phil Jardina.
8    Q. What was Mr. Jardina doing?
9    A. I don't recall if he was on the search
10 team or not.
11    Q. Who else?
12    A. I know Bill Walsh and James Carol
13 transported the prisoner to 272 Old Country Road.
14 They were in charge of transporting any prisoners.
15    Thomas Maher, I think he was in there.
16 I don't recall what his duties were.
17    Q. Did you have anyone videotape the
18 downstairs?
19    A. No, just the still pictures.
20    Q. And you would take still photos before
21 the search and then after the search just to
22 preserve them for evidence?
23    A. I don't know if pictures were taken
24 afterwards. I remember them being taken before,

Bidell

1 definitely. I don't know if they were taken
2 afterwards.
3    Q. How thorough a search did you do? Was
4 it a cursory search or did you go into drawers?
5    A. We went into drawers. You know,
6 narcotics could be very small. They could be in a
7 jacket pocket or anything.
8    Q. So you checked clothing?
9    A. Correct.
10    Q. Drawers?
11    A. Objects.
12    Q. Anything you think that --
13    A. Anyplace that we believed you could
14 hide narcotics.
15    Q. Were dogs ever brought in or a dog?
16    A. I'm not sure. I believe a dog was
17 brought in. Somebody requested a dog, but I'm not
18 positive.
19    Q. Would that be reflected in your arrest
20 folder?
21    A. Not necessarily. Also involved at the
22 location with us were state police, New York State
23 police. We had one investigator from the state
24 police. He was assigned to take the names of

Bidell

1 those that were entering and leaving the premise,
2 and another investigator was assigned to just
3 guard the rear of the premise.
4    Q. Where was this guy, this state officer
5 who was taking the names of people entering and
6 leaving?
7    A. Where was he?
8    Q. Yes.
9    A. He was in the front of the house,
10 outside the house.
11    Q. How long did the search of the first
12 floor take?
13    A. I don't recall how long the entire
14 search took and we wouldn't know the time for a
15 single floor. We wouldn't know what the time we
16 break up the three levels.
17    Q. How long would it be the first and
18 second floor search?
19    A. Again, I don't recall how long we were
20 there.
21    Q. Did you do a search of the second
22 floor or was that --
23    A. Yes. No, we did it and I remember
24 there was a delay. We had to wait. After our

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

```
 1              Bidell
 2   search of the basement and first floor were
 3   conducted, we had to wait a while until they
 4   concluded their investigation on the second floor,
 5   and by they, I mean I believe Nassau County
 6   homicide was there. Who else? Members of the
 7   Nassau County Third Squad, detective squad were
 8   there. Crime scene -- and Nassau County crime
 9   scene were there.
10       Q.   Did you participate personally in the
11   search of the second floor?
12       A.   Yes.
13       Q.   Tell me what happened when you got to
14   the second floor.
15       A.   We just conducted a search of the
16   second floor similar to the search on the first
17   floor.
18       Q.   As thorough?
19       A.   Yes.
20       Q.   What rooms did you search?
21       A.   I don't recall exact rooms.
22       Q.   What rooms were up there?
23       A.   There was a bathroom. I believe there
24   was a kitchen. I don't know if there was a living
25   room. I don't think there was a living room. I
```

```
 1              Bidell
 2   think it was just bedrooms the rest, but I'm not
 3   sure.
 4       Q.   Did you seize any property from the
 5   first floor?
 6       A.   That drug paraphernalia and drugs from
 7   that basket that woman was holding I described
 8   earlier that was arrested. And I believe currency
 9   was recovered from somewhere that was also taken.
10       Q.   How about the basement? Anything
11   seized?
12       A.   I don't think anything was seized. I
13   didn't go down the basement myself.
14       Q.   What about the second floor?
15       A.   No.
16       Q.   No currency?
17       A.   Not that I'm aware of, no.
18       Q.   How about any weapons on the first
19   floor?
20       A.   I don't believe any weapons were
21   recovered anywhere in the house.
22       Q.   Once you did the search of the second
23   floor did there come a time where you came to the
24   conclusion that this was a two-family house?
25       A.   No.
```

```
 1              Bidell
 2       Q.   Did you ever speak to anyone above you
 3   within the investigations bureau indicating to
 4   them that you had already received a warrant but
 5   you were going to conduct further investigation to
 6   determine whether it was a two-family house?
 7       A.   I didn't tell them. It was
 8   Chief Ribando. I didn't tell him I was going to.
 9   I told him what I had done.
10       Q.   You told him after the fact?
11       A.   I told him after, correct.
12       Q.   Without giving his name, the CI, is he
13   still alive?
14       A.   Yes.
15       Q.   Did you ever speak with any district
16   attorney, anyone from the District Attorney's
17   Office, and I'm speaking of assistant district
18   attorneys or the DA, regarding your investigation
19   into whether 31 Lafayette was a two-family house?
20       A.   No.
21       Q.   Why not?
22       A.   I didn't think it was necessary.
23       Q.   When you decided to conduct an
24   investigation into whether it was a one- or
25   two-family after seeing the two mailboxes, what
```

```
 1              Bidell
 2   was your intention if you discovered that it was a
 3   two-family?
 4       A.   If it was a two-family house we
 5   wouldn't have -- and we could have determined
 6   that, um, well, I don't know. I really can't say.
 7   Because I don't know if I would have gotten a
 8   second search warrant or not. I'm not sure what I
 9   would have done.
10       Q.   In that situation, you conduct an
11   investigation, you find out that it's a two-family
12   house, according to your past practice would you
13   go get a second search warrant or simply tell BSO
14   only execute in these areas of the house or
15   something else?
16       A.   If we determined it was a second, past
17   practice we would get, if we wanted to go and see
18   what was there, we would go and get a second
19   search warrant.
20       Q.   I'm not sure I understand your answer,
21   because you're saying to see what's there. So let
22   me make sure my question is clear.
23           In this circumstance you testified
24   that you saw some clues that may have led you to
25   believe that it was possible this was a two-family
```

```
                                    130                                              132
```

**Bidell**

house. So you sent the CI in and you went in
yourself along with Walsh and Maher, correct?

    A.  Correct.

    Q.  If as a result of that investigation
you determined that it was a two-family house,
what would you have done based on past practice?

    A.  Right. Again, to see whether we would
want a second search warrant for the second
family, and the reason I say whether we would want
to or not, because I was kind of getting the
impression that there may have been a relationship
between that Theresa and Mr. Lecator.

    So if it was a second family, I may
have asked the ADA if we would have enough for a
second search warrant or not. That's if we
decided that we wanted to go there.

    Q.  But your first search warrant had the
whole house.

    A.  Right.

    Q.  So my question to you is, was it your
intention to go seek a search warrant just for the
first floor, seek separate search warrants for the
first and second floor or would you have simply
told BSO we have a search warrant for the whole

---

**Bidell**

house, but only execute on the basement and the
first floor, that second floor is a separate
residence?

    A.  Would that be my intention?

    Q.  What were you going to do?

    A.  I don't understand the question. I'm
sorry.

    Q.  OK, I'll break it down for you. You
go and conduct an investigation to make a
determination whether it's a two-family or a
one-family after seeing the mailboxes, right?

    A.  Right.

    Q.  You make a determination it's a
two-family house.

    A.  OK.

    Q.  You got some choices there.

    A.  Right.

    Q.  You can seek a separate search warrant
just for the downstairs. You could seek separate
search warrants for the downstairs and then one
for the upstairs or you could tell BSO, Look,
since we got the search warrant we've received
information it's a two-family house. The criminal
activity, all our evidence indicates it is

---

**Bidell**

downstairs. We have no evidence anything went on
upstairs. Only execute on the first floor and the
basement.

    My question to you is, those are three
choices of what you could do. Would you have
chosen one them or something else if you made the
determination that it was a two-family house?

    A.  Again, we would have to make a
determination whether we wanted to go upstairs or
not. If we determined it was a two-family house
and we still wanted to go up there, we would have
to -- we would have to determine, I'm sorry, we
would have to determine that we wanted to go up
there. So that would be the call.

    So we would have to -- I'd have to get
together with my team members and then if we
determined that yes, it's a second family up
there, a second total separate residence, first of
all, they would have to talk to our guys, did we
think we had enough to go up there with the search
warrant. After that, then we would have to
approach the ADA to see if we had enough for a
search warrant.

    Q.  But you already had a search warrant

---

**Bidell**

of the whole house, right?

    A.  Correct.

    Q.  And let's say you felt, You know what?
I want to check upstairs while we're there.

    After making a determination that that
was a separate apartment, would you then have to
go get another search warrant, individual search
warrants for the top and bottom, or could you just
use the old search warrant?

    A.  If we made a determination that it was
a second house up there, we would then have to
decide whether we wanted to go up there or not.

    Q.  Let's say all right, you decide, you
know what? We want to go up there.

    A.  Then we would have to get a second
search warrant. If we determined that's a second
residence, a totally separate residence, we would
get a second search warrant. Same if there was a
shed in the garage and we determined we wanted to
go into the shed for some reason when we got to
the location, we would have to go get a second
search warrant or amend the search warrant.

    Q.  Let's say you go up there, you
determine that it's a second apartment and you

Bidell

1 say, You know what? Nah, I don't want to go up to
2 the second floor.
3
4       You have a warrant for the whole house
5 at that point. What do you do?
6   A.   So your question is, it is a separate
7 house, it is a second apartment?
8   Q.   You've made that determination.
9   A.   That it is a separate apartment?
10  Q.   Yes.
11  A.   But I don't want to go up there?
12  Q.   Right. Do you change the warrant or
13 do you just tell BSO not to go up there?
14  A.   I don't know. It sounds too, um, too
15 convoluted. I have a search warrant for the
16 entire house.
17  Q.   Let me break this down for you. Use
18 this situation. You had a search warrant on
19 May 5th for the entire house, correct?
20       MS. PETILLO:  No, May 13th.
21       MR. HORN:  No, May 5th.
22  Q.   You had a search warrant for the whole
23 house, correct?
24  A.   Yes.
25  Q.   And that's on May 5th, correct?

Bidell

1
2   A.   Correct.
3   Q.   May 10th rolls around. You see some
4 clues that this might be a two-family, correct?
5   A.   Correct.
6   Q.   You send in the CI to go over there
7 and do some snooping around to determine whether
8 he can find out whether it's a two-family,
9 correct?
10  A.   Correct.
11  Q.   Then you on the 11th actually conduct
12 a ruse where you actually enter the premises for
13 the purpose of making a determination whether it
14 is a two-family or a one-family house, correct?
15  A.   Correct.
16  Q.   You when you entered that house on
17 May 11th, you know you have a search warrant for
18 this entire house, correct?
19  A.   Correct.
20  Q.   And if after your investigation you
21 determined this is a two-family house and I don't
22 really need to bother with that second floor as
23 far as a search, I have made a determination that
24 all my evidence says that criminal activity has
25 taken place downstairs, you now have a warrant for

Bidell

1
2 the whole house.
3       Do you go get an amended warrant that
4 says just the downstairs or do you tell BSO don't
5 bother going upstairs, I don't need it, or do you
6 say don't worry it, we already got a warrant for
7 the whole house. Just search the whole house just
8 in case we find anything?
9   A.   Well, if I determined it's a second
10 residence we wouldn't be searching the whole
11 house, so that's out.
12  Q.   So now you have the two choices. Do
13 you tell BSO -- do you keep the existing warrant
14 for the whole house and tell BSO only search the
15 downstairs or do you get that warrant amended?
16  A.   I think it could go either way. I
17 don't know. I think it could go either way.
18  Q.   The BSO lieutenant that you spoke with
19 on the 12th, had you ever met him before?
20  A.   Yes. Between, um, somewhere between
21 April 19th and May 5th, that first meeting.
22  Q.   I'm sorry, before this investigation.
23  A.   No.
24  Q.   Had you ever worked with BSO before?
25  A.   I may have, but not on a search

Bidell

1
2 warrant.
3   Q.   Did you ever work with emergency
4 services in the NYPD for the execution of a search
5 warrant?
6   A.   Yes.
7   Q.   Did you ever while you were at the
8 NYPD conduct investigations to determine if areas
9 that were the target of warrants were actually
10 segregated into separate dwelling areas?
11  A.   Similar to this case, yes.
12  Q.   When you were with Housing, did you
13 ever work with emergency services?
14  A.   Yes.
15  Q.   Had you ever made determinations
16 whether there was segregated space in areas in
17 which you wished to target with a search warrant?
18  A.   No.
19  Q.   You never did execution of search
20 warrants in Housing?
21  A.   We did, but we didn't have to --
22 there's such small apartments, there's no two
23 mailbox type of thing.
24       MR. HORN:  Off the record.
25       (Discussion off the record.)

Bidell

2 Q. Did you ever attempt to discern
3 whether there was two gas meters at the premises?
4 A. I did not.
5 Q. Did you ever attempt to go into the
6 computer and do any research to see if there was
7 any separate billing for utilities at the
8 premises?
9 A. I did not. And the reason for that
10 is, those were -- in my experience they're very
11 misleading. The best thing you can do is if you
12 can get into the house and try and observe
13 yourself and talk to the people, it's going to be
14 more accurate than those computer checks.
15 Q. As far as going and talking to people
16 and making your own observations, people can lie,
17 but what you observe is what you observe, correct?
18 A. Correct.
19 Q. Have you spoken to anyone other than
20 your attorney who is here with you today or to
21 anyone at the Nassau County attorney's office or
22 any private counsel regarding your testimony here
23 today?
24 A. No.
25 Q. Have you spoken to any of the other

Bidell

2 individuals that presented at 31 Lafayette in May
3 of 2010 regarding what you were going to testify
4 about here today?
5 A. What do you mean by presented?
6 Q. Any of the guys that showed up that
7 day for the execution of the warrant.
8 A. Did I speak about what I was going to
9 say?
10 Q. Yes.
11 A. No.
12 Q. Did you talk to any of those guys
13 about the shooting of the woman in that house?
14 A. Not BSO, no. My own investigators
15 that I work with, we spoke about the incident, her
16 being shot, yes.
17 Q. Did you review any materials prior to
18 testifying here today?
19 A. Yes.
20 Q. What did you look at?
21 A. My attorney here showed me some
22 photos.
23 Q. Anything other than photos?
24 A. I reviewed my folder.
25 Q. The arrest folder that you --

Bidell

2 A. Yes.
3 Q. Was that purely to refresh your
4 recollection?
5 A. Yes, just trying to remember what
6 happened.
7 Q. And it need not be noted, but you
8 jotted down some notes for you to remember dates
9 and everything else?
10 A. That was yesterday, yes.
11 Q. And you've utilized that here today.
12 A. Yes.
13 Q. You're on payroll so this question
14 might be odd, are you drunk or so
15 incapacitated by drugs that you are unable to
16 recall any of the events you have already
17 testified to?
18 A. No.
19 Q. Are you on any medication, whether it
20 be legal or illegal, that would hamper your
21 ability to remember those events?
22 A. No.
23 Q. And are you on any medication or have
24 you consumed any alcohol that has inhibited your
25 ability to communicate your recollections to me

Bidell

2 effectively?
3 A. No.
4 Q. As far as this case goes, this
5 litigation, have you read anything in the
6 newspapers regarding the shooting of the woman at
7 31 Lafayette?
8 A. I believe the next day there was a —
9 there was an article in the paper that I read.
10 There was also a photo of us standing at the
11 scene. I read that. I don't recall at all what
12 it said, but I can remember reading because a
13 photo was there.
14 MR. HORN: A pleasure chatting with
15 you. We're done.
16 (Time noted: 2:45 p.m.)
17
18 _____
19 THOMAS BIDELL
20
21 Subscribed and sworn to before me
22 this ___ day of _____, 2012.
23
24
25 NOTARY PUBLIC

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

142

```
 1
 2                CERTIFICATE
 3   STATE OF NEW YORK    )
 4                        : ss.
 5   COUNTY OF SUFFOLK    )
 6
 7        I, THOMAS R. NICHOLS, a Notary
 8   Public within and for the State of New York,
 9   do hereby certify:
10        That THOMAS BIDELL, the witness
11   whose deposition is hereinbefore set forth,
12   was duly sworn by me and that such
13   deposition is a true record of the testimony
14   given by the witness.
15        I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage, and that I am in no
18   way interested in the outcome of this
19   matter.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 9th day of April, 2012.
22
23
24        _____
25            THOMAS R. NICHOLS
```

143

```
 1        INSTRUCTIONS TO WITNESS
 2
 3     Please read your deposition over carefully
 4   and make any necessary corrections. You should state
 5   the reason in the appropriate space on the errata
 6   sheet for any corrections that are made.
 7     After doing so, please sign the errata sheet
 8   and date it.
 9     You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12     It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25
```

144

```
 1                 E R R A T A
 2
 3
 4
 5     I wish to make the following changes,
 6   for the following reasons:
 7
 8   PAGE LINE
 9   ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE:_____
16   REASON:_____
17   ___ ___ CHANGE:_____
18   REASON:_____
19   ___ ___ CHANGE:_____
20   REASON:_____
21
22   _____    _____
23   WITNESS' SIGNATURE        DATE
24
25
```

37  (Pages 142 to 144)

**A**

ability 140:21,25
able 5:17 14:14
  25:2 34:5
  36:15 53:14
  60:9 82:23
  87:17 92:8
  99:4 108:13
  121:18
Absolutely 78:3
accessed 109:11
accessible
  109:19
accurate 138:14
  143:16
Accurint 95:18
  95:24 96:8
achieve 46:13
action 94:21,24
  96:14 142:16
actions 94:18
  95:4
active 24:18
activity 53:6
  110:11 131:25
  135:24
actual 28:18
  29:9 45:14
  86:15 91:25
ADA 42:3,10
  130:15 132:23
added 44:19
address 5:3
  95:15,25
administer 4:14
affidavit 44:9,13
  44:15,18,21
affiliated 90:24
affirmative 6:2
afternoon 90:3,4
  90:4 114:17,18
age 39:8
agencies 16:2
agents 11:15,18
aggravated 8:5
agreed 4:3,7,11
  45:19

ahead 36:14,17
  61:15
alcohol 140:24
aliases 97:20
alive 128:13
alleged 30:4,17
  33:16
alleges 107:9
ambulance
  119:10
amend 133:23
amended 136:3
  136:15
amount 27:6
amounts 31:20
  31:20,21,23
and/or 89:9
  115:9
angle 36:8 53:3
answer 6:7
  47:22 48:8
  129:20
answered 51:9
  51:14 60:6
  62:9 65:8
  71:10
answering 6:2
anybody 88:14
  122:19
anymore 88:3
Anyplace 124:14
apartment 78:16
  122:19 133:7
  133:25 134:7,9
apartments
  137:22
apologize 55:25
appear 98:22
  100:25
appeared 41:18
  76:12 96:22
  98:13 99:22
  101:5 117:6,12
appears 65:21
  69:20
appreciate 84:7
approach

132:23
approached
  49:21 120:23
approaching
  119:15
appropriate
  143:5
approximately
  7:10 9:19 10:3
  13:7,22 23:23
  38:16 64:4
  114:13
April 21:19
  23:23,24 24:11
  25:19 26:10,18
  26:18 27:16,19
  27:25 28:11,20
  29:4 31:12,17
  32:15 33:8,11
  35:5,25 36:25
  37:4,6,10,12
  38:6,10,12,15
  38:15,19 39:11
  39:18,23 40:24
  41:8,24 49:7
  49:12,18 112:8
  112:23 113:6
  136:21 142:21
area 20:6,11
  21:23 24:20
  52:21 56:24
  67:2,7,10,24
  70:15,22 72:19
  73:10 82:10
  84:13 97:12
  106:9 116:13
areas 97:15 99:6
  99:7,11,16
  100:2,9 129:14
  137:8,10,16
Arias 42:10,10
  42:25 43:18
  44:4,10,25
  45:24 46:12
  48:15,18 49:5
  49:8
arrange 27:10

arranged 22:3
  27:19 28:2
  37:3
arrest 28:12,13
  28:18 39:12
  63:10 88:10
  91:10 92:7
  120:16 121:4
  124:20 139:25
arrested 51:20
  51:23 120:14
  120:15,18
  127:8
arrests 51:18
  52:8
article 141:9
articulate
  101:24
ascertain 33:21
  59:4
aside 78:14
asked 37:6 58:12
  58:13,24 61:6
  61:16 62:19
  64:21 73:13
  74:6,13,14
  107:25 111:12
  114:20 120:18
  130:15
asking 41:14
  114:22
asserting 47:4
asset 19:14
assigned 10:17
  10:22 11:5,5
  13:13 15:7
  17:15,25 50:9
  50:12 122:16
  124:25 125:3
assignment
  13:18 18:12
assignments 9:6
  11:9
assist 95:23
assistant 1:9
  17:14,24 18:4
  18:19 20:5

128:17
associated 110:6
assumption
  41:15
attached 143:11
attack 11:6
attacks 11:7
attain 105:4
attempt 6:5 43:7
  79:17 92:13
  93:9 138:2,5
attempting
  33:20
attend 6:19
attending 111:9
attention 45:16,
  46:11 70:13
attorney 1:10
  3:11,13 128:16
  138:20 139:21
  143:13
attorneys 3:4 4:4
  17:14,24 18:4
  18:20 20:5
  128:18
attorney's 1:9
  6:13,21 13:21
  13:24 14:17,19
  14:24 15:3,13
  15:15,23 16:7
  16:10,13,15
  18:15 19:24
  20:22 21:3
  23:11,15 26:23
  28:3 29:3
  32:25 38:3
  40:19 42:17
  50:14 128:16
  138:21
audio 28:25 29:4
  30:10,22,25
  32:24 33:7,18
  33:19,22 35:9
  35:9,12 38:2,7
  39:16 40:23
  41:6,7 43:17
  43:23 44:6

**authorized** 4:13
**Avenue** 2:13 3:6
  21:15 22:21
  24:3,9 25:12
  26:12 29:10
  32:21 37:7,8
  37:10,23 38:12
  40:25 41:6
  42:21 45:3,22
  65:18 86:10
  95:3 115:15
**aware** 105:14,17
  105:24 106:4
  107:3 110:7
  127:17
**A-r-i-a-s** 42:14
**a.m** 2:9

**B**

**B** 5:2 86:4
**back** 26:14 28:9
  30:12 34:24
  48:5 53:25
  57:18 67:13,19
  67:21 68:2,12
  68:19 70:9,12
  70:13,19 81:6
  81:21,24 82:13
  82:16 83:16
  84:8 85:4
  86:19,22 95:5
  106:13 107:12
  112:6
**backtrack** 45:13
  74:19
**backtracking**
  50:21
**backyard** 82:24
**bag** 30:4,17
  33:16
**Ballpark** 29:13
**bang** 90:17
  110:3
**banging** 117:9
  117:25 118:10
**based** 44:10
  48:22,23 49:10
  59:14 130:7

**basement** 19:7,8
  20:16 103:13
  121:16 126:2
  127:10,13
  131:2 132:4
**basically** 9:20
  110:2
**basing** 96:17
**basket** 127:7
**bathroom** 76:16
  77:20 79:21
  103:15,23
  104:4,5 120:18
  120:20,21,24
  126:23
**bathrooms**
  103:18
**becoming** 38:25
**bed** 64:3,13,14
  90:15,16 110:2
**bedroom** 77:19
**bedrooms** 127:2
**began** 22:7
  34:23 122:6,14
  122:15
**beginning** 8:12
  21:19
**begins** 34:14
**behalf** 14:21
**belief** 108:19
  111:22 113:16
**believe** 7:8 9:25
  17:9 18:18
  27:17 37:11
  42:10 43:11
  44:23 46:24
  50:6 60:4
  62:20 67:3
  68:17 86:24
  88:7,7,19
  92:20 94:3
  101:25 102:9
  102:12,23
  103:21 106:25
  107:14 108:12
  110:25 111:6
  112:8,10

  113:21 115:16
  119:7,23
  120:25 121:2
  122:13 124:17
  126:5,23 127:8
  127:20 129:25
  141:8
**believed** 11:11
  43:14 54:15
  91:2 107:17
  108:4 110:5
  124:14
**Bellmore** 89:22
**best** 70:9 82:17
  138:11
**better** 31:2 96:8
  103:6
**Bidell** 1:15 2:11
  5:1 6:1 7:1 8:1
  9:1 10:1 11:1
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1 40:1 41:1
  42:1 43:1 44:1
  45:1 46:1 47:1
  48:1 49:1 50:1
  51:1 52:1 53:1
  54:1 55:1 56:1
  57:1 58:1 59:1
  60:1 61:1 62:1
  63:1 64:1 65:1
  66:1 67:1 68:1
  69:1 70:1 71:1
  72:1 73:1 74:1
  75:1 76:1 77:1
  78:1 79:1 80:1
  81:1 82:1 83:1
  84:1 85:1 86:1
  87:1 88:1 89:1
  90:1 91:1 92:1

  93:1 94:1 95:1
  96:1 97:1 98:1
  99:1 100:1
  101:1 102:1
  103:1 104:1
  105:1 106:1
  107:1 108:1
  109:1 110:1
  111:1 112:1
  113:1 114:1
  115:1 116:1
  117:1 118:1
  119:1 120:1
  121:1 122:1
  123:1 124:1
  125:1 126:1
  127:1 128:1
  129:1 130:1
  131:1 132:1
  133:1 134:1
  135:1 136:1
  137:1 138:1
  139:1 140:1
  141:1,19
  142:10
**Bill** 123:13
**billing** 138:7
**bit** 15:25 50:21
  53:3
**black** 61:22
  63:16 69:24,25
  70:6
**block** 24:19,20
  52:24 53:3
  115:25 116:15
  116:23 117:4
**blood** 142:17
**Bloods** 91:9
**blueprints** 92:10
**book** 63:6
**bother** 135:22
  136:5
**bottom** 72:25
  133:9
**box** 120:21
  121:2,4
**break** 6:6 85:6

  125:17 131:9
  134:17
**brief** 18:10
**briefing** 91:25
  110:15,21,22
  111:3,4,9,13
**briefly** 86:13
**bringing** 112:13
  112:16
**brother** 62:20
**brought** 91:24
  91:25 110:21
  124:16,18
**BSO** 89:11,21
  91:22 92:2
  93:13,21
  107:13 108:7
  108:17,21
  109:2,11,24
  110:23,24
  111:18,25
  112:11,11,16
  113:23 114:9
  114:25 115:5
  115:22 116:10
  117:5,20
  118:21 119:3
  119:21 129:13
  130:25 131:22
  134:13 136:4
  136:13,14,18
  136:24 139:14
**BSO's** 112:6
**build** 89:16
**building** 19:3,6
  19:10,18,22
  20:17 47:10
**buildings** 92:9
**bureau** 8:4
  16:14,16,17,18
  17:3,5,6,8,8,9
  17:10,12,19,20
  17:25 18:13,23
  19:11,19,23
  20:2,7,12 29:3
  38:2 40:19
  50:10 92:17,21

128:3
**bureaus** 19:9,20
20:18
**bush** 105:25
**business** 5:2
**buy** 22:4,5,14
25:23 31:16
33:11,25 54:2
**buys** 21:23 43:3
43:3,12,13,16
45:14,17 46:5
58:14

**C**

**C** 3:2,12 142:2,2
**call** 19:15 27:5
27:12 32:7,9
32:11,12 37:17
132:15
**called** 5:4 11:21
17:5 106:21
**calls** 26:16,22
27:15
**camera** 105:20
105:22,22
**capacity** 6:15
7:11 8:10
**captured** 34:6
34:23 36:2
**car** 116:8
**caravan** 116:3
**carefully** 143:3
**Carol** 123:13
**case** 18:8,10,11
18:17,21 34:13
34:22 47:9,10
47:25 48:10,10
64:14 92:24
98:3 136:8
137:11 141:4
**cases** 8:2,4 10:14
11:5 12:13,14
15:6 18:15
92:22
**catching** 9:23
**CDs** 39:7,10
**ceiling** 36:11
**cement** 68:19,19

**center** 72:25
**certain** 87:8
**certify** 142:9,15
**cetera** 111:22
**change** 8:6 9:7
134:12 144:9
144:11,13,15
144:17,19
**changed** 8:20
9:5 16:6
**changes** 143:9
144:5
**characterization**
15:9
**characterize**
10:11
**charge** 123:15
**charged** 117:7
123:6
**CHARLES** 3:8
**chart** 20:19
**chatting** 141:14
**check** 92:13
133:5
**checked** 124:9
**checks** 86:24,25
87:15 92:18
95:9,13 138:14
**chest** 90:18
**chief** 16:17,23
16:24 17:13
128:8
**child** 60:21 61:2
61:13 62:21,22
63:24 64:2,16
71:19 73:16,18
73:20,22 110:4
**children** 51:4
63:19 64:8,13
78:24 90:13
100:21
**choices** 131:17
132:6 136:12
**chorn@fhkpla...**
3:9
**chosen** 132:7
**Chuck** 16:19

**CI** 29:21 30:3
33:24 55:17,19
95:5 113:19
128:12 130:2
135:6
**circumstance**
129:23
**circumstances**
35:14 120:17
**City** 7:11 115:15
**clarification**
66:17
**clarify** 76:8
**clear** 5:25 14:9
57:4 77:14
79:13 81:23
98:11 99:19
102:5 107:7
108:15 111:14
118:6,19
129:22
**cleared** 121:19
**clear-cut** 99:3
**close** 22:20
81:13
**closed** 76:13,19
76:24 77:15,17
81:16 82:20,22
**clothing** 124:9
**clue** 94:11
103:16
**clues** 129:24
135:4
**color** 30:19,20
**columns** 68:19
**come** 8:19 32:15
37:20 54:12
61:6 62:11
68:4,6 72:7
81:2,7 111:8
118:16 120:4
127:23
**comes** 22:24
102:20
**comfortable** 9:2
**coming** 25:12
34:24 53:4

57:18
**comings** 106:2
**common** 99:11
99:13,16 100:5
100:8,15
102:14
**communicate**
140:25
**complaint** 60:21
71:18 87:18
**complete** 5:17
5:22
**composition**
17:11
**computer** 86:24
86:25 87:8,15
87:25 88:5,13
88:23 89:7
95:9,12 138:6
138:14
**concerned** 18:14
75:7
**concerning** 43:3
43:12
**concluded**
122:20 126:4
**conclusion**
127:24
**conclusive** 94:14
**conducive** 27:7
**conduct** 13:2
24:21 104:18
128:5,23
129:10 131:10
135:11 137:8
**conducted** 27:25
28:14,20 56:14
115:19 126:3
126:15
**conducting** 92:2
**confirm** 93:9
**confrontation**
104:25
**connected** 43:14
91:2
**connection**
23:25 24:5

91:14,17,19
**constant** 118:10
**constantly** 39:9
117:9
**consumed**
140:24
**contain** 39:10
**contained** 63:9
88:9
**containing** 30:4
30:17 33:16
**content** 44:21
111:2
**continue** 6:2
27:7 34:18
**contraband**
122:7,22
**Cont'd** 86:6
**convenient** 27:7
**conversation**
41:17 46:12,19
46:21 49:4
59:8 61:17
62:14 63:24
71:12 75:23
107:12 108:25
110:17 111:24
113:14
**conversations**
26:10 46:16
78:6
**conviction** 88:20
**convoluted**
134:15
**convoy** 116:10
**cooperation** 84:7
**copies** 92:6
**corner** 22:18
52:24
**correct** 7:19 8:7
8:8,14 9:15
10:4,5,17,18
12:19 13:9
14:7 15:10,16
15:20,24 16:22
17:15,16,18
18:17 19:5,25

20:12 21:17
22:3,14 23:13
23:16,17 25:7
25:8 27:21,23
27:24 28:5,19
30:23 32:4,14
32:20,22 33:9
34:7,9,16,17
34:20,21 35:2
35:3,6,7,18,19
36:20,24 37:7
37:8,14,24
38:9 39:14,17
42:24 43:24
44:22 49:12,13
49:25 51:18,19
55:2,24 57:2
57:24,25 59:6
59:19,20,22,23
59:25 60:22,23
66:16 67:7,8
67:24,25 69:11
69:14,22 70:10
71:4,5 73:2,9
74:11 76:16,25
77:12,13 78:8
78:9 79:5,15
80:2 81:25
82:7,8,14,15
82:18,19,25
83:13,15,21,22
84:9,10,24,25
86:10,11 87:11
89:3 91:23,24
93:6,25 94:7
94:14,15,22,23
95:25 96:2,4,5
96:11 97:9,10
97:14,17,18,20
97:21,24 98:5
98:6,15 101:4
101:8,14,15
104:14 106:9
106:10 108:3,5
109:23 111:19
111:23,25
114:2,12,17,18

116:17 118:9
119:17 120:14
121:9,10,12
122:3 124:10
128:11 130:3,4
133:3 134:19
134:23,25
135:2,4,5,9,10
135:14,15,18
135:19 138:17
138:18
corrections
143:4,6
correctly 87:7
corruption
19:14
counsel 138:22
countries 13:2
country 5:3
12:24 18:25
86:20 123:14
County 1:7,7,8,8
1:9 3:13 6:13
6:20,23 13:20
13:24 14:17,19
15:3,13,15,23
16:7,10,12
20:22 21:3
23:11,15 26:23
28:3 29:2
32:24 38:3
40:18 42:16
45:18 50:9
126:5,7,8
138:21 142:5
couple 30:5
117:24
course 29:17
court 1:1 4:16
5:17 143:16
courthouse 19:4
coworkers 93:16
crack 24:17,18
52:22
crime 97:12,15
99:6,10,16
100:9 121:18

126:8,8
criminal 10:9
35:18 46:25
87:19,19 88:17
92:7 110:13
131:24 135:24
Crips 91:9
crying 51:4
60:21 61:2,13
71:19 78:24
currency 30:3
30:16 33:16
48:4 127:8,16
cursory 124:5
CV-11-0076 1:6

**D**

D 5:2 86:4
DA 14:23 128:18
damage 68:14
damaged 69:11
dark 30:20
date 39:21 49:6
112:7,22 113:5
143:8 144:23
dates 26:21 40:3
140:8
daughter 73:15
73:18,19
100:11
David 42:10,14
Davis 1:4 106:21
107:5,8
day 53:13,24
139:7 141:8,22
142:21
days 13:22 36:20
105:7,16
143:14
daytime 78:3,4
DA's 45:16 47:6
51:11 60:20
deal 18:3,7,9,9
22:7 25:23,25
26:7,7,11
27:13 31:9
33:24
dealing 7:9 12:5

88:22
dealt 25:25
decide 50:25
133:13,14
decided 59:18
128:23 130:17
decision 96:18
deemed 143:16
defendant
104:24
Defendants 1:11
3:11
definite 94:4
definitely 124:2
definitive 57:21
57:22 58:2
delay 125:25
delivery 53:5,5
department 92:9
depending 24:25
depends 18:8
36:6
depicted 33:13
40:23 41:5
65:16 66:12
68:23 72:5,12
72:19 77:11
78:7 80:17
81:4
depiction 34:12
depicts 30:13
deposed 5:12
deposing 143:13
deposition 1:15
2:11 4:12
142:11,13
143:3,11,14,15
Deputy 3:13
describe 24:17
84:18 95:19
described 82:10
96:14 127:7
describing 67:23
70:15
description 9:16
116:5
details 34:8

36:15
detained 120:7
121:8
detective 7:3,13
7:18,23 8:3,4
8:11,16 9:6,14
50:6,8,9 51:12
59:22,22 73:4
73:4 92:24
126:7
detectives 51:10
81:3
determination
40:21 48:19
49:9 56:22
59:19 77:18
87:5,14 90:11
98:12,16,18,20
98:22 99:4
107:20 108:2,5
108:8,9,13,18
108:22 109:3
131:11,14
132:8,10 133:6
133:11 134:8
135:13,23
determinations
113:3 137:15
determine 47:6
48:15 56:2,8
57:20 67:18
70:2,4 75:8,10
75:16 76:6
77:6,21 78:10
78:12 79:3
87:9 90:8,10
90:23 91:22
93:13,19 95:6
95:8,13,16
96:20 99:5
101:7,11
109:16 118:2
118:11 128:6
132:13,14
133:25 135:7
137:8
determined 41:4

49:3 129:5,16
130:6 132:11
132:18 133:17
133:20 135:21
136:9
**device** 33:22
34:6 35:12,17
36:5,7,8,13,16
36:19,22,23
**devices** 28:21
**DIANE** 3:12
**difference** 11:25
12:10
**different** 11:17
13:2 20:17
37:9 97:6
100:22 101:22
104:17 122:10
122:11
**directed** 47:14
**directing** 46:11
70:13
**direction** 103:9
**directly** 25:24,25
26:8,11
**discern** 138:2
**discovered** 54:14
129:2
**discovering**
94:25
**discussed** 43:4
43:12 112:12
113:4,15
**discussion** 35:23
43:7 46:10
50:19 52:12
65:11 73:7
112:25 113:16
137:25
**distance** 117:11
**distinguish**
118:13
**distracting**
105:3
**district** 1:1,2,9
1:10 6:13,21
13:21,24 14:17

14:19,24 15:3
15:13,15,23
16:7,10,12,14
17:14,24 18:4
18:15,19 19:24
20:5,22 21:3
23:11,15 26:23
28:3 29:2
32:25 38:3
40:18 42:17
50:13 128:15
128:16,17
**documentation**
43:6
**dog** 124:16,17
124:18
**dogs** 124:16
**doing** 6:8 12:21
21:22 27:8
39:8 78:20
80:20,23 87:15
88:12 89:7
110:7 113:15
120:23 123:9
143:7
**dollars** 30:6
**domestic** 11:23
11:25 12:11,12
12:18,23
**door** 49:2,24
51:2,3,9,14
55:24 59:24
60:6,9,16 62:9
64:5 65:6,7,7,8
65:9 66:15,20
66:22,24 67:3
67:4,6,13,14
67:15,19,21
68:2,3,6,7,12
68:20,22,23
69:3,8,9,10,15
69:20 70:8,9
70:12,19,22,23
70:25 71:2,4,6
71:9 74:20,21
74:24 77:4,4,7
77:8 81:13,17

82:6,9,13,16
82:20,24 83:2
83:16,19 84:9
84:11,14,18,19
90:16 104:14
106:14,19
109:22,23
110:4
**doorbell** 60:2
**doorknob** 69:17
69:21 74:22
**doors** 64:25 67:2
76:12,12,19,22
76:23 77:15,17
96:20 109:13
109:20
**doorway** 62:10
67:23 70:19
77:11
**downstairs** 74:7
74:7,14,16,17
76:2 79:9
123:19 131:20
131:21 132:2
135:25 136:4
136:15
**draft** 42:22
44:10
**drafted** 44:12
**drawers** 124:5,6
124:11
**drive** 24:22
115:19 116:6
**drove** 25:3 53:9
**drug** 21:23 22:3
48:3 53:5
54:11 90:11
121:3 127:6
**drugs** 48:3 121:3
122:7 127:6
140:15
**drunk** 140:14
**duly** 5:5 142:12
**duties** 10:11,13
10:24 11:17
16:6 18:4
20:21 123:6,17

**duty** 89:2
**DVDs** 43:12
**dwelling** 101:13
137:10
**dynamic** 106:8

_____ **E** _____
**E** 3:2,2 5:2 86:2
86:2,4 142:2,2
144:1
**earlier** 24:6
39:13 65:24
70:16 75:9
95:5 104:12
108:2 110:5
113:8 127:8
**early** 23:24
24:10 25:19
26:18
**EASTERN** 1:2
**edifice** 40:10
**effect** 4:15
**effectively** 141:2
**eight** 64:4
**either** 9:10,14
21:11 25:9,10
25:11 40:23
41:7 43:21
84:11 91:9
100:12 136:16
136:17
**EJustice** 87:18
**elaborate** 107:16
**emergency**
114:25 116:3
137:3,13
**employed** 6:10
6:17,24
**employment**
13:20 14:24
**enclosed** 66:25
67:6,9,24
70:15,21 82:10
84:13
**encounter** 88:25
**encountered**
98:7
**encouraging**

5:25
**ended** 12:7
**ends** 30:14
**engaged** 73:7
**enhance** 47:24
48:9
**ensure** 50:24
**enter** 56:11,12
115:20,21,25
135:12
**entered** 16:8
61:11 62:8
63:13 83:20
97:8 99:7
106:19 109:14
115:23 117:20
121:9,13
135:16
**entering** 15:14
83:24 106:13
125:2,6
**entire** 24:24 31:9
36:12 92:3
125:14 134:16
134:19 135:18
**entity** 92:14
**entrance** 76:5
106:17,17
117:18
**entries** 110:7
112:17
**entry** 64:15
120:16
**envelope** 79:2
**equipment** 28:25
32:24 33:8
34:3 35:25
**equipped** 33:7
**errata** 143:5,7
143:10,13
**escapes** 19:16
**escort** 81:9
**ESQ** 3:8,12
**establish** 46:18
**et** 111:22
**events** 140:16,21
**eventual** 105:7

eventually 25:6
57:23 74:21
91:16 118:17
everybody 78:25
106:18 119:23
evidence 35:19
47:24 48:2,9
94:9,16,20
96:14,17 97:9
101:17 103:3
113:10 122:6
123:23 131:25
132:2 135:24
exact 8:23 31:20
36:22 49:6
54:19 57:17
77:25 90:3
112:7,22
126:21
exactly 12:3 14:2
20:20 26:9
30:6 31:8
38:20,21 40:3
51:12,13 61:25
72:16 116:4
122:9
EXAMINATI...
5:7 86:6
examined 5:5
example 100:11
exchange 30:16
33:16
Excuse 89:19
execute 115:19
129:14 131:2
132:3
executed 56:24
57:5 117:15
executing 88:25
execution 89:9
105:7 106:7
115:9 116:25
137:4,19 139:7
Exhibit 65:13
66:9 68:9
70:14 72:3,11
77:12 78:8

80:18 81:4
existing 136:13
exit 67:22 117:5
exited 68:3 69:3
70:8 71:3 81:3
81:22 84:24
86:10,14,14
exiting 85:2
expect 110:10
expedited 39:2
experience
100:19 101:2
138:10
explain 46:12
expressions 5:24
extent 100:24
exterior 74:24
75:5,17
extreme 36:9
extremely 97:16

F
F 86:2 142:2
facing 19:3
fact 91:15 99:7,9
116:10,15
128:10
fail 143:15
fair 88:23
fake 115:25
false 97:19
familiar 106:20
106:23 107:6
families 57:2
94:7 99:11,13
99:17 100:5
101:11
family 56:10
98:25 99:2,8,9
130:10,14
132:18
far 9:15 11:8
12:10 17:11
18:3,13 23:2
25:17 28:3
31:14 35:17
38:14 51:7
67:5 69:17

87:23 91:3
98:2 110:10
135:23 138:15
141:4
fashion 63:12
fast 114:7
FBI 9:17 10:17
10:22,24 11:15
11:18 13:4,13
13:14 15:18
feed 34:10 35:10
feel 6:6 57:18
feeling 59:15
98:10 101:19
feelings 54:20
feet 36:11 64:4
90:16
fellow 22:4
88:18 96:6
122:11
fellows 117:24
felt 133:4
female 40:2,2
41:16,18,20
54:21,24 55:3
57:19 61:22
63:16 71:10
120:10,12,14
120:16,17,19
122:17,23
females 40:5
51:23 87:22
100:13
field 36:2
Fifth 9:24
fifties 89:17
figure 104:9
file 59:12 63:10
110:23,24
111:17 114:9
filing 4:5
financial 100:17
find 54:3 87:24
101:17 129:11
135:8 136:8
fired 118:23
first 5:11 7:5,6

9:6,12 15:2
16:16 17:19
20:16 21:20
26:17 42:14
44:18 53:18
56:17 58:18
60:16,17,18
61:18 62:8,25
63:3 71:15
77:10 87:12
90:12 96:7
104:5 109:12
109:20,110:20
113:9,15 114:3
114:5 115:13
120:5,8 121:9
121:16 122:2
125:12,18
126:2,16 127:5
127:18 130:18
130:23,24
131:3 132:3,19
136:21
five 6:18 7:16,17
8:18 13:6,22
14:4,10 15:10
15:22 29:14
38:16 62:6
80:5
five-minute 85:6
flash 90:17
110:3 117:12
floor 20:16
36:10 56:10
58:18,23 63:16
63:19 64:19
73:14 80:10,13
81:14 86:14
90:12 99:2,3
102:18,18
103:24 104:5
104:14 109:12
109:15,20
120:5,8 121:16
121:17 122:2
125:13,16,19
125:23 126:2,4

126:11,14,16
126:17 127:5
127:14,19,23
130:23,24
131:3,3 132:3
134:3 135:22
floors 19:6
102:17
flow 20:19
fluctuates 36:13
folder 28:12,13
39:12 88:10
91:11 124:21
139:24,25
follow 12:15
following 116:8
144:5,6
follows 5:6 86:5
footage 39:10
force 4:14 9:17
10:10,12,17,22
10:25 11:9
13:5,14 15:12
15:18,19
forfeiture 19:14
forget 62:21
form 4:8
forms 22:22
forth 142:11
forthcoming
97:16
forties 89:17
forward 114:7
found 89:12 90:6
91:3 94:20
four 103:17
117:3
frame 7:10
38:14
Franklin 115:15
free 6:6
frequently 74:12
Friedman 2:12
3:5
from/with 21:23
front 36:4,11
50:24 53:15

59:24 64:5
65:17 72:22
84:8 90:16
106:19 110:4
116:8,22
125:10
**fruition** 32:16
37:20
**full** 98:4
**further** 4:7,11
67:3 86:5
87:11 128:5
142:15
**furtherance**
45:24 86:21
89:9 94:25

---
**G**
---
**gained** 12:22
**gang** 90:25 91:4
91:6,7 110:10
**gap** 13:19
**garage** 133:20
**Garden** 115:15
**gas** 138:3
**gather** 58:9,11
**generally** 29:24
30:2,2
**geographically**
22:20
**geography** 11:10
11:13
**gesticulation**
5:20
**gesture** 5:19
**getting** 10:8
45:13 130:11
**Gillespie** 122:12
122:12,14
**give** 30:3 43:6
45:23 62:25
89:11 97:19
98:4 109:4
**given** 11:9 18:20
44:19 87:12
107:2 111:11
113:5 116:2
142:14

**giving** 100:11
128:12
**go** 5:14 9:10
13:2 27:13
35:20 42:19
54:6 55:13,19
56:9 58:5
59:13,18 61:8
61:15 62:9
64:24 67:6,23
68:6 71:22
77:22 82:9,13
86:17 92:9
93:8 101:12
109:22 112:24
118:19 121:18
124:5 127:13
129:13,17,18
130:17,22
131:10 132:10
132:12,14,21
133:8,13,15,21
133:22,24
134:2,11,13
135:6 136:3,16
136:17 138:5
**goals** 105:4
**goes** 20:20 31:14
46:16,21 47:5
141:4
**going** 11:3 12:15
25:2,12 30:12
31:24 34:24
41:18 46:15,20
53:4 58:14,22
64:18 74:19
86:9 93:8 96:3
96:19 97:23
98:10 101:6,10
104:25 105:2
107:12 108:14
109:12 110:8
111:10 114:21
114:21 115:2
116:6 117:12
118:23 119:10
121:17 128:5,8

131:6 136:5
138:13,15
139:3,8
**goings** 106:2
**good** 5:9,10
33:19
**goodbye** 86:13
**gotten** 129:7
**government**
92:14
**grabbed** 120:21
**grade** 7:4,5,20
7:21,23 8:3,7,7
8:13,15,19 9:5
9:6,12,13
**grainy** 30:21
**grenade** 110:3
**grenades** 117:12
**ground** 5:14
**group** 92:4
**guard** 122:16
125:4
**guarding** 122:18
**guess** 29:16
61:23 66:25
80:4 89:17
92:4 96:24
100:7 102:19
109:22 117:3
122:10
**guessing** 23:5
29:14
**gun** 118:5
**gunshot** 117:16
118:3,4,7,23
119:22
**guy** 27:5 125:5
**guys** 38:24 78:5
81:13 119:21
132:20 139:6
139:12

---
**H**
---
**H** 5:2 86:4
**half** 85:8
**hallway** 70:18
73:7 78:7
80:17 81:4

**hamper** 140:20
**hand** 5:19 24:25
24:25 142:21
**handle** 12:17
69:20,24 70:3
70:5,7 83:3,4,7
83:9
**handling** 46:23
**hang** 76:2
**hangout** 90:25
**hangs** 74:11
**happened** 12:8
12:13 41:25
61:10 71:8
81:19 104:17
111:10 126:13
140:6
**harassment** 8:5
**harassments**
9:21
**Harfenist** 2:12
3:5
**head** 5:19 30:15
38:18 41:23
105:3
**heading** 92:23
**headquarters**
115:5
**hear** 31:2 35:13
78:24 80:9
117:7,8,11,16
119:12
**heard** 116:25
117:24 118:6
118:12 119:7
**hearing** 35:15
60:25
**heavy** 62:2
**held** 2:11 121:17
**helmets** 119:6
**help** 95:22
**helpful** 96:2
**Hempstead**
21:15,23,25
29:11 45:17,19
46:4 112:12
113:14

**hereinbefore**
142:11
**hereunto** 142:20
**heroin** 25:23
28:7,10 30:4
30:18 33:17
**hide** 124:15
**high** 97:12,15
99:6,10,16
100:9
**higher** 17:2
**highly** 106:8
**history** 87:19,20
88:18
**hold** 6:20
**holding** 127:7
**home** 47:2,8
65:4,5
**homicide** 8:5
10:2,2,5,12,14
126:6
**homicides** 9:22
10:4
**homicide/task**
10:10
**hoping** 104:23
**HORN** 3:8 5:8
14:12 20:10
26:13 35:22
39:23 46:9
47:3,13,19
48:5 50:18
52:11 65:10
80:14 85:7
86:7 112:24
134:21 137:24
141:14
**hour** 85:8
**house** 24:17,18
30:21 50:24,25
51:2 52:22
53:3,15 54:4,5
54:16,23 56:3
56:6,24 57:4,4
57:6,6,7,19
58:8,9,12,15
58:17 59:15

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123 (212)705-8585

62:8,12 63:13
75:7,11 76:14
84:20,24 85:3
87:4 88:15
90:9,9,14,21
90:25 91:5,23
92:3,15,18
93:8 96:16,21
96:22 97:4,5
98:14,21,24
99:24 101:8
102:2,10,12,24
103:4,6,8,10
103:12,14,18
103:22 107:22
108:10,19
109:8 113:4,11
113:17 115:22
115:25 117:6
117:18,19,21
121:6,9,14
125:10,11
127:21,24
128:6,19 129:4
129:12,14
130:2,6,19
131:2,15,24
132:8,11 133:2
133:12 134:4,7
134:16,19,23
135:14,16,18
135:21 136:2,7
136:7,11,14
138:12 139:13
**household** 101:2
101:22
**houses** 23:4
43:14 97:8
103:10 117:4
**Housing** 7:7,9
7:15 8:3 9:10
137:12,20
**hundred** 30:6
42:9,11 68:18
119:9

——— I ———
**idea** 112:13

**identified** 40:13
40:18 41:9,11
45:9 51:7,16
52:5 61:19
71:11,16 73:12
87:16,16 88:19
96:6
**identify** 40:4,15
45:4 53:4 55:3
55:6 61:20
66:6 87:2,11
88:14 92:8
110:13,14
**identity** 23:20
41:21
**illegal** 140:20
**immediate** 91:20
**immediately**
15:14 19:3
**imperative**
143:12
**important** 90:15
**impression**
54:22 97:5,7
130:12
**incapacitated**
140:15
**incident** 139:15
**including** 19:7,8
**independent**
111:24
**indicate** 6:4 58:7
58:21 63:18
109:10
**indicated** 10:16
27:18 39:13
44:24 48:8
49:20 52:13
58:16 59:21
60:19 75:24
91:13,21 100:2
106:5 110:15
**indicates** 66:18
131:25
**indicating** 77:10
128:3
**indicative** 31:22

31:23
**indicia** 75:14,18
78:15 93:24
94:7,8,9
**individual** 20:23
21:4,11,13,14
22:10 23:18
45:9 51:9 52:5
60:5,25 92:22
106:20,23
133:8
**individuals** 12:5
12:23 40:14,22
41:5 45:4,7
47:2,7,11,15
80:6,9 98:5
100:9 106:3,12
110:22 120:7
139:2
**individual's**
51:25
**informant** 21:22
22:8 23:14
24:6,8,12 25:5
25:20 26:6,17
27:9,15,20
28:22,24 29:21
29:22 31:3,10
31:24 32:13,18
33:2,7 34:2,16
36:7 37:13,14
39:20 48:23
49:11 53:25
57:15 59:8,14
91:16
**informant's**
27:22
**information**
12:21,24 21:14
26:3,5 28:8
43:2,15 44:11
45:23 54:3,13
62:18 89:12
92:3 111:11,14
111:17 113:24
114:10 131:24
**informed** 25:18

43:2 118:22
**inhibited** 140:24
**initial** 112:9,13
117:18
**initially** 83:11,14
**initiate** 112:5
**inside** 29:10 37:8
51:23 62:10
75:6 77:8,9
83:5,12,13
98:23 99:23
110:11
**inspector** 110:25
112:10
**instance** 11:10
**instructed**
115:17,24
**INSTRUCTI...**
143:1
**intense** 16:3
**intention** 129:2
130:22 131:5
**interaction**
102:16
**interested** 40:7
64:12 142:18
**international**
11:2,14,22,24
12:2,4,9,11,20
12:22
**intersection** 23:3
**interview** 13:23
14:16 104:19
**interviewing**
96:18
**interviews** 13:3
**introduced**
91:16
**introductions**
112:4
**investigate** 20:23
**investigated**
21:4
**investigating**
10:4 11:2
12:21 15:6
**investigation**

21:18 25:17
28:14 31:14
37:2 42:2 43:4
48:14 51:22
56:25 57:8
86:22 89:9
90:8 93:5
115:9 126:4
128:5,18,24
129:11 130:5
131:10 135:20
136:22
**investigations**
9:20 13:3 17:6
17:7,8,9,10
18:13,24 19:10
19:19,23 20:7
20:12,19 27:8
29:3 38:2
40:19 50:10
92:18,21 93:16
128:3 137:8
**investigator** 6:16
6:24 15:5,9
16:22,23,24
18:16 50:6,8
50:11 51:13
92:24 93:4
112:10 120:19
120:23 122:17
124:24 125:3
**investigators**
1:10 16:11
17:13,20 20:15
34:20,23,25
48:25 51:11
60:20 78:6
92:22 139:14
**investigator's**
122:23
**invited** 71:22
**involved** 10:8
12:15 21:20
40:15 57:14
115:3 120:25
124:22
**involvement**

112:6 115:8,13
115:13
**Iyanna** 1:4
106:21 107:5,8

——————— **J** ———————
**jacket** 124:8
**James** 123:13
**Jardina** 123:8,9
**jeopardize** 79:25
**jeopardizing**
78:21
**job** 1:22 9:15
10:11,24 11:17
14:16 16:6
18:4
**jobs** 122:11
**JOHN** 1:7,8,9,10
**join** 7:6
**joined** 15:2
16:16 17:19
**joint** 113:15
**jotted** 140:8

——————— **K** ———————
**Kathleen** 14:25
**keep** 24:16
103:19 136:13
**key** 74:24 75:5
75:17
**kid's** 90:18
**kind** 18:8 22:22
38:24 48:2
53:5,6 54:11
84:22 88:18
120:21,22
121:3 130:11
**kinds** 100:2
**kitchen** 64:23
65:3,6 66:18
66:23,24 67:4
67:6,22 68:3,6
68:23 70:8,11
70:12 71:3
76:20 77:20
79:7,18 81:24
82:14 83:2,12
83:17,21,24

84:3,5,13
102:3,11 103:5
109:22 126:24
**kitchens** 103:11
**knew** 22:8 24:6
24:8 25:21
41:13 55:11
74:8,8,12,13
74:15 90:17
96:7 97:3
**knock** 60:2 65:7
70:22,25
**knocked** 49:2,24
51:2,3 55:23
60:4 65:8
66:15 71:6,8
74:20
**know** 5:15 14:6
16:25 18:10,22
19:15 20:13,13
20:14,18 23:18
26:6,9 27:11
27:14 29:15
31:7 37:5
39:24 40:14,17
40:21 41:2,10
41:22 42:9,13
45:2 46:4
47:17 51:5,25
52:4 53:12
58:3,5,13
61:24 63:2,17
64:13 68:18,25
69:24 70:6
71:18 73:13,17
73:19,21,24
74:3,3,6,17
77:3,6,7 81:16
83:5 86:25
87:4,6,13,13
87:18 88:2,4
89:24 90:3,6
90:22 91:3
96:3,25 98:23
98:24 100:18
100:20,23,24
101:6 102:14

102:17,20
103:12,13
104:3,18
105:19 110:9
110:10 114:20
114:21 116:21
117:22 119:6
119:18 120:13
122:20 123:2
123:13,24
124:2,6 125:15
125:16 126:24
129:6,7 133:4
133:15 134:2
134:14 135:17
136:17
**knowing** 98:2
**knowledge**
53:18 92:19
113:18
**known** 22:4
23:19 24:7
25:6 41:12
45:10 90:25
**Kraut** 2:12 3:5

——————— **L** ———————
**L** 5:2,2 86:4,4
**lab** 43:11
**lack** 31:2
**Lafayette** 21:15
22:8,9,19,21
22:23,25 23:7
24:3,9 25:12
26:12 29:10
32:21 37:7,8
37:10,23 38:11
40:25 41:6
42:21 43:15
45:3,22 46:7
46:14 47:21
48:16,20 49:10
49:21 51:18
52:9 53:2 59:9
65:18 86:10
91:14 93:5
95:2,15 97:12
101:3,7 106:12

107:10 110:9
110:11,14
111:6 116:11
116:16,18,19
116:22 118:17
118:24 119:16
128:19 139:2
141:7
**Lake** 1:16 2:13
3:7
**Lana** 122:25
**land** 90:18
**large** 111:5
**lawsuit** 47:12
107:8
**layout** 58:17
76:13
**layouts** 92:10
**lead** 92:23 93:4
94:2
**leading** 67:16
84:12
**leads** 12:14,16
**learned** 41:21
**leave** 114:19
**leaves** 34:3
**leaving** 25:24
78:14 86:17
106:13 125:2,7
**Lecator** 21:4,12
21:12 22:6,6
22:14,17 23:19
24:2,2,11 25:6
25:7,11,11,17
25:23 26:2,4,7
26:11,17 27:16
27:19 28:2,15
30:3,17 31:3
32:13,19,23
33:4 39:19
48:11,16,19
49:9 51:16,21
52:6 55:15
61:19 74:10,13
75:25 91:17
121:11 130:13
**Lechter/Lecator**

45:8
**led** 66:25 74:21
101:25 102:9
102:23 103:21
104:14 111:6
113:21 129:24
**left** 13:7,14,15
65:20 68:6
77:11 82:17
111:12 113:25
114:11 115:6,7
116:23
**left-hand** 23:7,9
**legal** 140:20
**lend** 108:12
**let's** 27:5 112:7,
133:4,14,24
**levels** 125:17
**liable** 90:18
**liaison** 15:12,17
15:21 16:3,5
**lie** 138:16
**lieutenant** 89:11
91:21 93:13,22
107:13 108:7
108:17,21
109:2,10,25
110:20 111:15
111:25 112:11
114:8 136:18
**light** 30:21
**lighting** 36:18
**LINE** 144:8
**lines** 48:4 115:18
**list** 96:10
**listed** 95:22
**listened** 30:22
43:21
**listening** 30:10
30:25 44:6
**litigation** 141:5
**little** 45:13 50:21
106:24,25
117:17 120:25
**live** 34:9 35:13
100:5
**lived** 41:10,13

49:3 55:8
62:19,20,21
63:16 75:25
**living** 88:15
99:17 100:22
100:25 101:11
103:13 126:24
126:25
**LLP** 2:13 3:5
**load** 18:17,21
**located** 18:24
**location** 21:24
31:18 37:9
38:11 43:16
46:5 48:25
49:12,14,16,19
53:10,25 54:21
54:25 55:14,18
56:11,15 61:16
81:22 95:6
116:9,20
119:11 124:23
133:22
**lock** 53:11 74:25
75:5,17
**locked** 84:14
**locking** 69:16,21
84:16
**locks** 104:7,13
**long** 6:17 7:14
8:15 13:4
29:12 38:21
58:13 80:3
122:25 123:3
125:12,14,18
125:20
**longer** 16:2
**look** 22:22 28:11
36:11 53:10,14
61:21 64:22
65:19 68:11
75:13,20 78:15
79:6,10,17,20
79:22 89:15
96:10 104:8,11
104:13,20
131:22 139:20

**looking** 22:7,11
27:3 36:9,10
45:2 52:23
55:15 64:25
66:3,19 75:3,4
75:5 77:3
79:13 87:25
88:3,20 96:18
102:15 103:2
106:16
**lookouts** 24:19
**looks** 68:20
**lot** 30:21 84:21
105:2 117:8,9
117:25
**luncheon** 85:9
**L-e-c-a-t-o-r**
21:8

___

**M**
**M** 5:2 86:4
**Maher** 50:7,16
59:22 73:4
80:23 81:3
83:18 84:12
93:7 112:10
123:16 130:3
**mailbox** 50:23
52:15 53:8,16
137:23
**mailboxes** 50:23
60:10 65:21,23
66:3,5 90:7
93:23,24 94:2
94:6,19 96:13
107:20,24
108:11 109:9
111:21 113:19
128:25 131:12
**main** 96:17
**maintain** 28:13
**maintained**
17:21 39:12
**making** 38:24
53:22 54:11
79:10 94:21
133:6 135:13
138:16

**male** 39:25 40:2
40:4 62:24
63:22 87:12,17
89:16 120:10
**males** 91:4
**man** 74:15
100:12
**Manhattan** 10:2
10:7
**March** 1:17 2:8
65:14 66:10
68:10 72:4
**Marcus** 2:13 3:6
**marked** 65:13
65:14 66:9,10
68:9,10 72:3,4
72:11
**marriage** 142:17
**matches** 96:10
**materials** 139:17
**matter** 142:19
**mean** 18:9 20:3
24:15 39:7
47:9 56:9 87:3
94:8,13 103:7
117:18 126:5
139:5
**means** 33:20
**meant** 5:22
**mechanism**
69:16,22 84:16
**medical** 119:15
**medication**
140:19,23
**meet** 89:18,20,23
**meeting** 24:13
24:24 26:18
112:5,9,18,19
113:2,23
115:14 136:21
**meetings** 15:25
**member** 115:22
118:21 119:3
**members** 38:2
91:4 92:2,5
93:15 112:11
117:5 126:6

132:17
**memo** 63:6
**men** 74:17
**mental** 64:14
**mention** 64:16
102:21
**mentioned** 44:5
63:14 64:9
**merchandise**
29:18
**merge** 7:8
**merger** 7:24 8:9
**met** 87:22 89:11
91:25 110:20
136:19
**meters** 138:3
**middle** 22:25
64:5 69:18
**mind** 61:14
102:21 103:19
**mine** 41:15
47:15 93:16
**Mineola** 3:15
18:25
**minor** 8:4 9:21
**minute** 114:6
**minutes** 29:15
31:5 38:17
80:4,5 117:22
**Miriam** 21:25
22:2,4,11,19
22:21,23,24
23:2,6,7 24:16
43:14 45:3,17
45:20,24 52:21
52:24 90:25
91:14 110:6,9
116:13,18
117:14
**misleading**
138:11
**misspoke** 108:24
**modifications**
44:17
**moment** 36:6
**money** 28:4
**monitor** 32:9

**monitored** 26:22
37:18,19,25
38:4
**monitoring**
28:21 33:7
38:8
**monitors** 34:5
**months** 13:25
14:4,10,11,13
14:14,15
**morning** 5:9,10
115:11
**mother** 100:11
**mothers** 100:16
100:19,22
**mouth** 10:20
**move** 18:11,12
80:16
**moved** 8:6
**moving** 24:16
**multiple** 99:11
99:13,16 100:5
100:15,18,19
100:21,24
**M-a-h-e-r** 50:7
**M-i-r-i-a-m** 22:2

___

**N**
**N** 3:2 86:2,2,2
**Nah** 134:2
**name** 19:16
20:25 21:8
27:22 41:13
42:12,13,15
52:2 55:11
62:21 63:2,2,3
63:17 73:23
74:4,14,15
83:7 87:12,13
87:17 89:14
96:7,9,11 98:4
106:25 107:4
119:4 122:24
122:25 123:3,3
128:12
**named** 20:24
21:4 106:24
**names** 60:14

66:5,6 92:7
95:20,21 97:16
97:19 110:12
124:25 125:6
narcotics 45:18
124:7,15
Nassau 1:7,7,8,8
1:9 5:3 6:13,20
6:23 13:20,23
14:17,19 15:2
15:13,15,22
16:6,10,12
20:21 21:3
23:11,15 26:23
28:2 29:2
32:24 38:3
40:18 42:16
45:16,18 50:9
126:5,7,8
138:21
Natasha 106:24
106:25
nature 33:21
necessarily
11:13 94:13
103:7 124:22
necessary
128:22 143:4
need 115:3
135:22 136:5
140:7
neighborhood
97:11,23
neighborhoods
99:10
never 27:22 41:9
104:21 113:20
137:19
new 1:2,16 2:14
2:17 3:7,15 5:4
7:12 11:12,14
12:13,14,14,15
12:17 19:2
21:16 124:23
142:3,8
Newbridge
89:21

newspapers
141:6
newsworthy
10:7
Nichols 1:21
2:15 142:7,25
nickname 22:12
nighttime 78:2
nod 5:19
noise 117:9,23
117:25 118:6
118:10,12
119:7
normally 27:9
north 116:20,21
Notary 2:16 5:5
141:25 142:7
note 64:14
noted 86:3 140:7
141:16 143:10
notes 59:7 140:8
nuclear 99:8
number 25:22
numerous 27:6
NYPD 6:25 7:2,6
8:10,16 9:10
9:18 13:8,12
13:13,15,17,20
137:4,8

O

O 5:2 86:2,2,2,4
oath 4:14
object 46:15,20
120:22
Objection 55:16
objections 4:8
Objects 124:12
observation 25:4
52:14,18,20
53:20,23 94:22
101:23 102:8
105:6
observations
50:22 113:21
114:10 138:16
observe 24:10
25:11 33:10

53:6 65:2
78:13 79:10
104:20,21
138:12,17,17
observed 23:11
24:13 49:13,15
50:22,23 53:15
58:22 65:25
102:3 113:10
116:25 117:4,5
observing 30:9
obstructions
36:4
obtain 29:6 42:3
42:20 43:8
45:2,20,21
46:2 47:24
54:3
obtained 14:18
46:3,6,20
obtaining 45:15
45:25 47:16
obviously 17:13
68:16 69:11
104:24
occasion 20:23
occupy 19:10
20:6
occur 38:11
occurred 23:22
25:18 31:17
occurring 12:13
occurs 25:16
odd 140:14
office 6:14,21
13:21,24 14:17
14:20,24 15:3
15:13,15,23
16:7,11,13,15
18:15,23 19:25
20:3,3,6,15,22
21:3 23:12,16
26:23 28:3,9
29:3 32:25
38:3 40:19
42:17 45:16
47:6 50:14

51:11 60:20
85:4 86:19,23
89:21 128:17
138:21
officer 1:7,8
4:13 7:13,14
9:14 125:5
officers 88:24
114:8
offices 2:12
Oh 14:12 44:2
110:19
OK 6:8,9 34:11
46:15 51:6
55:21 78:25
85:5 102:7,13
110:19 119:23
131:9,16
old 5:3 18:25
61:25 84:20
86:19 123:14
133:10
older 61:23,24
once 27:11 88:2
104:23 105:3
127:22
one-family 50:25
54:4,15,22
57:19 58:8,9
58:12 59:4,15
90:9 93:10,14
93:19 96:16,22
97:4,5 98:13
98:20 101:25
102:9,12,23
103:4,12,18,22
107:15,18
108:3,5,19,23
109:4 111:22
131:12 135:14
open 6:7 64:25
82:20 84:22
opened 60:16
65:6 66:24
67:5 77:15
82:6,9 83:14
83:17,19 84:12

121:2
opinion 109:5
order 6:19
original 21:24
143:12
originally 21:24
82:6 121:15
outcome 142:18
outfitted 32:23
33:2
outside 16:2
67:11,16 83:6
105:11 117:19
125:11
o-r 21:10,13

P

P 3:2,2
PAGE 144:8
paint 84:21
paper 141:9
paperwork 43:9
43:10 44:5,8
paraphernalia
48:3 121:3
127:6
park 116:15
parked 116:24
part 20:18 25:2
25:4 57:7
104:2
partial 96:9
participate
18:20 40:6
126:10
participation
11:8
particular 11:19
30:8 46:23
70:23 92:24
parties 4:5 47:11
142:16
passed 84:5
patted 122:21,21
payroll 140:13
PD 45:17,20
46:4 112:12
113:14

pension 14:7
people 39:25
  41:3 74:7
  78:22 87:9
  88:21,24 92:8
  95:21,21 96:22
  96:24 97:6,15
  98:23 100:24
  101:20,22
  105:2 110:12
  110:14,16
  113:3 122:11
  122:16 125:6
  138:13,15,16
percent 42:9,11
  68:18 119:9
perform 9:19
  22:17
performed 89:2
period 79:23
Perlstein 2:13
  3:5
person 36:13
personal 31:22
personally 50:3
  126:10
personnel 17:12
  119:10,15
persons 110:11
PETILLO 3:12
  14:9 20:8
  35:20 39:21
  46:15 47:5,23
  55:16,21,25
  56:16,19 57:11
  68:15 69:4
  80:11 85:5
  114:6 134:20
Phil 123:8
phon 123:2
phone 25:22
  26:16,22 32:7
  32:9,11,12
photo 65:17
  68:16 69:6
  141:10,13
photograph

  65:16,20 66:12
  68:11,24 69:10
  69:18 72:5,13
  72:20,24,25
photos 77:4
  122:13,13,15
  123:21 139:22
  139:23
physical 49:11
  101:23
pick 27:4 36:15
picture 111:6
pictures 123:20
  123:24
piece 24:23
place 7:24 26:12
  29:9,12,25
  33:25 37:22
  38:5 49:5
  90:12 99:23
  107:9 135:25
placed 28:21,24
  120:16 121:4
Plaintiff 1:5 3:4
Plaintiff's 65:13
  66:9 68:9
  70:14 72:3,11
  77:11 78:8
  80:18 81:4
planning 111:8
plant 105:22
please 6:3 143:3
  143:7
pleased 96:23
pleasure 141:14
plenty 103:10
plotting 12:16
pocket 124:8
point 9:9,25 25:9
  31:10 44:18
  46:24 49:20
  51:17 53:7
  54:12 59:17
  60:8 63:23
  66:14,22 67:19
  72:7 75:22
  76:9 82:12

  83:23 84:23
  85:6 86:8
  103:9 105:6
  114:24 118:16
  119:18 120:4,8
  121:25 134:5
pointed 36:14,17
  65:7 70:24
pointing 72:21
pole 105:20,22
police 1:7,8 7:8,9
  7:13,14 24:20
  52:23 53:12
  117:8,10
  124:23,24,25
porch 67:2,7,10
  67:24 70:15,22
  82:10 84:13
portion 26:15
  48:7
position 6:20
  16:5 80:16
  116:2
positive 58:8
  68:18 102:8
  124:19
possible 27:10
  27:12 129:25
possibly 97:2
  117:13
postsale 38:7
practice 129:12
  129:17 130:7
predetermined
  115:14
premise 115:21
  115:21 117:20
  125:2,4
premises 45:25
  52:17 54:6
  64:9 86:15,18
  92:11 99:20
  100:22 105:5
  105:11,15
  106:2,6,13
  135:12 138:3,8
presence 34:15

  34:23 49:11
present 16:8
  39:19,25 40:3
  40:5,8 43:20
  52:8 101:3
  110:25 121:5
presented 139:2
  139:5
presently 6:10
  18:5
preserve 123:23
previous 33:15
  55:12 88:20
previously 43:4
  65:13 66:9
  68:9 72:3,11
primarily 10:12
  10:14 12:8
primary 10:13
print 88:5
prior 6:7,23 9:18
  23:20 27:16
  46:19 48:14,18
  105:11,16
  106:6 118:23
  139:17
prisoner 123:14
prisoners 122:17
  122:18 123:15
private 138:22
privilege 47:3
privy 111:4
probably 121:24
process 14:16
  31:17 104:2
procession 119:9
produced 33:11
  35:18
producing 28:4
product 31:11
  31:24,25
Professional
  2:16
promoted 16:25
property 40:10
  127:4
prosecute 47:7,9

prosecution
  46:23,25 47:14
prosecutors
  35:19
prove 98:9
Public 2:16 5:5
  19:14 141:25
  142:8
pull 92:10
pulling 83:7,8
purchase 54:11
purchased 28:10
  31:21
purchasing
  31:11
purely 140:3
purpose 46:13
  54:7 88:12
  89:4 101:6,12
pursuant 2:14
pursuit 122:5
push 78:25
put 10:19 61:23
  105:25
p.m 85:10 86:3
  141:16

**Q**

quality 33:19
question 4:9
  5:11 6:4,7 20:9
  33:6,22 41:14
  47:13 56:17,20
  79:16 99:18,25
  100:4 101:16
  102:5 103:19
  103:20 108:6
  108:14 113:13
  129:22 130:21
  131:7 132:5
  134:6 140:13
questions 6:3
  61:15 114:23
quick 64:21
quite 16:3 27:6
  53:3 123:3

## R

R 1:21 2:15 3:2
  86:2 142:2,7
  142:25 144:1,1
radio 119:12,14
raid 105:12,16
  106:7 117:2
railing 72:22
raise 78:22
range 113:5
rank 9:11,14
  110:23,24
  111:17 114:8
rap 92:6
rape 88:20
Rashon 21:5,6
  21:11 22:6,8
  22:13,16 23:19
  24:2,7,11 25:6
  25:11 28:15
  45:8 51:21
  55:15 62:20
Rashondra
  51:16 52:6
  61:19 66:18
  70:24 71:17
  74:12 82:3
  83:8,24 86:13
  101:20
Rashon's 51:15
reach 27:3
reached 72:8
reaching 80:17
read 26:13,15
  48:5,7 59:13
  141:5,9,11
  143:3
reading 141:12
really 8:24 18:2
  20:14,25 39:4
  40:7 52:25
  53:9,17 62:7
  64:12 75:4
  76:4 78:20
  104:21 116:7
  119:6 121:23
  129:6 135:22

real-time 34:11
  35:10,13,15
  38:7
rear 90:21
  109:15 125:4
reason 6:6 56:21
  107:14 113:4
  130:10 133:21
  138:9 143:5
  144:10,12,14
  144:16,18,20
reasons 100:17
  144:6
recall 20:25
  29:24 30:5
  38:18,20 39:4
  39:24 40:2
  41:16 44:20
  51:8 52:3
  60:15,17,18
  62:3,7 63:5
  64:2 66:7
  67:12 68:5
  70:20 72:6,14
  74:23 75:2
  77:16,17,25
  81:11,15,18
  83:4,6,19
  84:17,19 87:17
  89:6,14 91:8,9
  93:15 114:22
  116:4 119:5
  120:17 121:19
  122:9 123:10
  123:17 125:14
  125:20 126:21
  140:16 141:11
receipt 143:14
receive 96:15
received 128:4
  131:23
receiving 44:5
recess 85:9
recognize 65:15
  66:11 68:16
  70:14 72:5,12
  72:15

recollection 30:9
  59:14 66:4
  70:9 82:17
  140:4
recollections
  140:25
record 5:17,21
  26:15 27:12
  35:21,23 46:9
  46:10 48:7
  50:18,19 52:11
  52:12 65:10,11
  112:24,25
  137:24,25
  142:13
recorded 27:14
recording 33:22
  34:12,14,18
recordings 29:4
  29:7 39:16
records 88:17
  110:13
recovered 127:9
  127:21
referenced 68:13
referred 65:24
referring 15:18
  69:5,23,25
  70:5 80:12
reflected 91:10
  124:20
refresh 59:13
  66:4 140:3
refused 61:20
regard 54:18
regarding 12:23
  35:24 43:7,15
  45:24 54:13
  59:7 92:2,14
  101:17 111:21
  113:16 128:18
  138:22 139:3
  141:6
regardless 21:12
regards 107:9
  116:25
Reginald 21:4

21:12 22:6,14
  22:17 23:19
  24:2,7,11 25:7
  25:11 28:14
  30:3
Registered 2:15
regular 9:23
  15:25
related 91:6
  100:25 142:16
relating 11:6
relation 68:3
relationship
  130:12
relatives 103:13
relayed 54:13
  113:24
released 27:23
remain 115:4
remainder
  111:13
remained 15:8
  15:21
remember 30:6
  31:8,19 51:12
  54:19 57:17
  61:22 74:2
  83:6,8 84:20
  90:2 115:17
  120:11,12
  121:20,23
  123:25 125:24
  140:5,8,21
  141:12
remembering
  38:21
removed 121:24
rent 98:21 99:23
rented 97:2,6
repeat 20:8
  48:17
repeated 95:4
rephrase 6:5
  20:10 33:6
report 51:4
  61:12
Reported 1:21

reporter 2:16
  5:17
reports 92:7
represent 107:8
representations
  49:10
request 42:22
  44:7
requested
  124:18
requests 43:11
require 18:16
research 12:21
  87:8,25 88:5
  88:13 89:7
  138:6
resell 31:24,25
reserved 4:9
reside 21:13
  22:8 24:8
  100:16
resided 11:11,11
  21:15 40:24
  41:2,6,17,18
  48:16,20 49:9
  61:16 62:18,23
  62:25 63:15,25
  64:9 73:13,15
  73:16,19 74:7
  96:4 113:3
residence 51:23
  57:10,12,13
  80:10,12,13
  87:10 99:12,14
  131:4 132:19
  133:18,18
  136:10
residences 57:10
residents 87:4
residing 87:10
  98:25 99:2,12
  99:14 100:10
  101:22
respect 46:17,25
respective 4:4
responding
  71:18

**response** 44:4
48:6 61:5
71:21 102:6
108:15
**rest** 20:17 127:2
**result** 33:11
130:5
**resumed** 86:4
**retired** 13:16,17
13:25
**return** 81:6
143:12
**returned** 54:13
59:8
**review** 44:13
139:17
**reviewed** 139:24
**Ribando** 16:19
128:8
**Rice** 14:25
**right** 12:25
15:11,19 19:4
24:22 57:3
62:10 64:5
65:3,20 66:21
67:20 68:7
69:17,19 70:10
70:12 71:7
72:21,22 77:3
77:5 78:2
82:11 90:18
107:11 110:21
113:7,12
118:15 130:8
130:20 131:12
131:13,18
133:2,14
134:12
**right-hand** 23:8
**ring** 60:2
**road** 5:3 18:25
86:20 89:21
116:5 123:14
**rolls** 135:3
**room** 36:3,12,15
36:16 40:9,12
64:5,25 66:21

73:21 77:9,9
78:13 111:8
113:25 114:11
126:25,25
**rooms** 76:22
77:2,19 78:11
79:17,20,22
97:2,6 98:21
99:23 102:19
126:20,21,22
**rose** 94:17
**RPR** 1:21
**rules** 5:15
**run** 17:3 18:16
87:8 95:16
96:9
**running** 18:20
117:19,21
**ruse** 49:2,22
50:20 55:13
95:7 135:12
**ruses** 97:8 100:3
**Russian** 123:3
**R-a-s-h-o-n** 21:7
**R-i-b-a-n-d-o**
16:21

_____ **S** _____

**S** 3:2 5:2 86:2,2
86:2,4
**sale** 22:15,16,17
23:10,20,22
24:10,14,23,24
25:5,10,13,18
26:18,19 27:16
27:18,25 28:4
28:6,7,20 29:4
29:7,9,12,17
29:25 30:8,10
31:12 32:2,15
33:8 34:24,24
35:7 36:25
37:3,6,10,12
37:20,22,25
38:4,10,15,16
38:19,22 39:18
39:22 40:7
41:24

**sales** 30:5 38:7
38:12,22,23
39:11,25 40:24
90:11
**Sapuza** 123:2
**saw** 53:8,8 64:13
68:14 76:5
87:18,19 90:7
90:21 94:19
102:11,14
106:18 119:15
129:24
**saying** 41:11
58:4 76:23
81:23 86:13
94:5 99:20
129:21
**says** 58:6 135:24
136:4
**scene** 121:18
126:8,9 141:11
**scheduled** 31:16
**schooling** 6:19
**scouts** 52:22
**screaming** 117:7
**screen** 111:5
**scuffle** 120:25
**sealing** 4:5
**search** 42:4,20
42:23 43:8
44:8 45:2,11
45:12,15,20,21
45:25 46:3,6
46:14,19 47:16
47:17,20 51:22
56:5,5,14,23
57:5 64:15
78:21 88:23
89:5 95:19
96:9 110:8
112:14 113:15
115:18,20
117:8,10,14
121:16 122:5
122:14,15,20
123:10,22,22
124:4,5 125:12

125:15,19,22
126:2,11,15,16
126:20 127:22
129:8,13,19
130:9,16,18,22
130:23,25
131:19,21,23
132:21,24,25
133:8,8,10,17
133:19,23,23
134:15,18,22
135:17,23
136:7,14,25
137:4,17,19
**searched** 122:2
122:22
**searches** 95:16
**searching** 79:10
122:6 123:7
136:10
**second** 7:21,22
7:23 8:7,13,15
9:5 31:16 32:2
36:25 50:23
53:16 56:10
57:6,7,9,11,13
58:22 61:20
63:16,19 64:19
73:14 74:20
80:10,12 81:14
86:14 103:5,23
104:14 109:15
121:17 125:19
125:22 126:4
126:11,14,16
127:14,22
129:8,13,16,18
130:9,9,14,16
130:24 131:3
132:18,19
133:12,16,17
133:19,22,25
134:3,7 135:22
136:9
**secure** 14:3,15
29:3 115:22
**secured** 14:23

**securing** 14:16
**see** 24:23,24,25
25:2 34:5
36:12 53:5,17
57:23 60:9
63:24 64:3,18
64:20,23 65:21
67:9,10,20
69:16,23 70:5
75:6,8,13 76:4
76:10,16 77:8
78:24 79:9,18
79:18,21 80:6
82:23 83:24
87:5 88:17,21
88:24 92:14,18
95:6,7,10
96:10,19,21
101:12 102:10
102:10,15,22
102:25 103:3
103:21,23
104:3,13 106:2
106:12,16,17
106:18 108:10
111:5 112:7
119:25 129:17
129:21 130:8
132:23 135:3
138:6
**seeing** 64:2 66:7
96:13 120:11
120:12 128:25
131:12
**seek** 97:9 130:22
130:23 131:19
131:20
**seeking** 48:9
**seen** 55:10,11
103:5 113:19
**segregated** 19:19
19:23 20:4,11
75:14 78:16
79:4 99:15,17
99:21 100:4,6
100:16 101:13
101:18 104:9

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

137:10,16
seize 127:4
seized 127:11,12
self-preservati...
97:24
send 56:7 135:6
sent 22:5,13
53:24 55:20
56:21 95:5
130:2
separate 57:9
130:23 131:3
131:19,20
132:19 133:7
133:18 134:6,9
137:10 138:7
sergeant 9:14
serve 7:11 8:10
service 114:25
116:3
services 137:4
137:13
set 25:23 27:11
32:2,5 33:25
37:12 142:11
142:21
sets 109:13
seven 23:4 117:4
Sha 22:4,5,12,13
25:24,24 26:4
45:9,10 91:15
shed 133:20,21
sheer 97:24
sheet 143:6,7,10
143:13
sheets 92:7
Shon 24:8 74:9,9
74:11
shooting 107:9
139:13 141:6
shootings 10:15
short 18:10
102:5
shot 107:2,4
118:5 119:13
119:19,24
120:2 139:16

show 43:17
65:12 66:8
68:8 72:2,10
95:24 107:21
showed 139:6,21
showing 111:5
shrubs 53:17
side 11:24 12:18
12:20 23:7,8,9
24:19 26:7
68:20
sign 44:15 94:4
143:7
signature 44:19
144:23
signed 4:13,15
signing 143:9
similar 33:15
35:10 38:6,15
126:16 137:11
simply 98:3
111:25 129:13
130:24
simultaneous
110:8
single 18:11
100:15,19
125:16
sir 5:9
sister 21:10
51:15 52:4
sit 24:22,23 27:5
52:25 53:2
62:15 101:24
107:3 120:13
122:20
situation 129:10
134:18
six 23:4 62:6
64:4 90:16
117:4 122:10
skipping 25:24
sleeping 110:4
slowed 15:24
small 31:2,6,7,9
38:25 54:2
64:3 124:7

137:22
SMITH 1:7
snooping 135:7
somebody 118:3
118:4 124:18
someone's 61:14
son 73:19
sorry 10:19
11:21 13:9
14:12 19:21
33:4 37:5
39:21 48:17
54:24 56:18
76:8 94:8
112:18 131:8
132:13 136:22
sort 49:22 94:9
97:9 103:15
sought 46:13
sounded 118:5
sounds 107:6
134:14
sources 12:22,23
south 10:2,7
116:20,21
so-and-so 12:16
space 20:6,15
75:14 79:4
99:15,17,21
100:4,6,16
101:18 104:9
137:16 143:5
spaces 101:13
speak 5:16 27:3
42:8,19 79:2
86:12 128:2,15
139:8
speaking 5:18
38:23 47:15
48:15,18 57:18
80:20,24 82:2
86:9 95:2
128:17
special 6:16,23
15:5,9 16:11
17:7,12,20
20:14 50:11

51:11,12
specific 33:21
36:6 69:6
72:19
specifically
54:17 57:15
93:9
specifics 11:3
46:16,21
spell 16:20 21:6
42:12,13
spies 52:22
spoke 42:3 49:8
54:21,24 55:4
60:5,16,17,18
72:17 114:7
136:18 139:15
spoken 138:19
138:25
spot 78:13
115:14
spotters 106:9
squad 9:24,24
10:2,6 11:14
11:22 12:4
53:19 126:7,7
ss 142:4
staff 17:17
staircase 65:2
72:6,8,23 75:6
76:5,11 78:13
78:14 79:14
90:21,22
102:14,15
109:16
stairs 64:18,24
71:22,23 81:7
81:10 82:5
109:11
stairway 58:22
stairwell 109:15
109:18
stand 95:11
standing 36:3
60:9 62:15
64:21 76:15
77:5 80:25

116:22 117:23
141:10
started 7:7,21
103:20
starts 30:13
state 2:17 124:23
124:23,24
125:5 142:3,8
143:4
stated 95:5
110:5
States 1:1 12:6
static 106:8
stationary
105:10,15,18
stay 5:23 111:12
111:13 114:20
115:5,24
step 31:15 37:2
Stephanie 20:24
41:21,22
STIPULATED
4:3,7,11
stocky 89:16
stood 62:10,17
72:16,18
118:15
stop 71:24 95:12
102:4
story 78:23
straight 22:24
36:14,17 53:14
64:23
strategy 46:17
46:22 47:5
street 3:14 21:25
22:5,11,18
structured 98:23
stuck 84:20
study 104:15
subdivided
56:25
subdivision
16:12
subdivisions
19:24
subject 56:25

143:9
submit 44:9
submitted 14:19
Subpoena 2:14
Subscribed
  141:21
substance 44:25
  64:7
Success 1:16
  2:14 3:7
SUFFOLK
  142:5
Suite 3:6
sum 64:7
supervising
  92:23
supervisor 16:17
support 17:17
  109:4
sure 5:15,16,20
  8:23,25 14:2
  18:2 19:17
  20:19 35:22
  40:9 41:12
  42:10,11,14
  49:6 51:5
  53:12 56:4
  77:14 79:12
  85:7 99:19
  102:5 119:9
  124:17 127:3
  129:8,20,22
surrounding
  117:6
surveillance
  24:21 105:11
  105:15,19
  106:6,7,11
surveillances
  49:19
Swan 20:24
  41:21,22
sworn 4:12,15
  5:5 141:21
  142:12
S-h-a 22:12

_____
    T

T 5:2 22:23,24
  23:3 86:2,4
  142:2,2 144:1
tactics 115:2
take 5:18 6:5
  29:9,12 37:22
  49:5 64:21
  65:19 68:11
  85:5,7 90:12
  94:17,24
  122:13 123:21
  124:25 125:13
taken 85:9
  121:20,21
  122:13 123:24
  123:25 124:2
  127:9 135:25
takes 27:6 33:25
talk 31:2,6,7,9
  38:25 45:12
  54:2 97:22
  115:12 132:20
  138:13 139:12
talked 113:8
talking 9:13 14:6
  32:12 40:9
  41:7 42:6 50:2
  72:19 83:10
  101:20,20,21
  104:18 105:19
  105:20 110:18
  111:16 115:2
  138:15
tapes 39:3,5,7
target 27:3
  45:10 120:11
  121:8 137:9,17
targeting 21:25
  45:5
targets 11:6,10
target's 87:19
task 9:17 10:12
  10:17,22,25
  11:9 13:5,14
  15:12,18,19
tasking 12:11
  15:4

taxation 92:14
team 25:5,10
  53:19 123:11
  132:17
telephone 27:15
  37:15,17
tell 24:15 30:13
  33:13 36:2
  54:16 57:16
  67:15 68:15
  69:2,5 70:6
  73:25 76:11,13
  76:18,21,90:5
  93:7,12 95:20
  107:13,17,23
  108:17,21
  109:7,18,24
  116:24 118:7
  122:4 126:13
  128:7,8 129:13
  131:22 134:13
  136:4,13,14
telling 48:23
ten 29:14 38:16
tend 97:15,19,22
term 11:2
terrorism 11:2
terrorist 9:17
  10:17,25 13:5
  15:12,18,19
tested 29:20
testified 5:6
  22:13 86:5
  93:18 98:13
  104:12 108:7
  111:21 113:25
  129:23 140:17
testify 75:9
  139:3
testifying 139:18
testimony 55:17
  65:24 98:17
  111:16,20
  113:8 138:22
  142:13
testimony's
  79:12

thank 84:6
Theresa 63:14
  65:4,4,8 66:19
  71:11 72:17
  75:24 101:21
  130:13
thin 62:2,3,4
thing 25:16,20
  41:25 58:5
  64:6 69:25
  71:17 84:22
  89:8 96:17
  106:15 137:23
  138:11
things 104:16,17
  104:22 105:2
think 14:10
  17:21 20:2
  21:19 55:11,17
  68:4 75:21
  78:20 102:20
  116:2 119:8
  123:16 124:13
  126:25 127:2
  127:12 128:22
  132:21 136:16
  136:17
thinking 117:13
third 7:21 8:3
  126:7
thirty 61:24
  143:13
Thomas 1:15,21
  2:11,15 123:16
  141:19 142:7
  142:10,25
thorough 124:4
  126:18
thought 90:15
  103:6 104:2
  109:7 118:3,4
three 19:6 39:25
  62:11 73:3
  78:6 80:5
  83:20 103:11
  125:17 132:5
thriving 52:22

throw 90:17
till 16:8 86:14
  113:9
time 4:10 5:16
  5:18 7:10,24
  8:19 9:9,9
  13:12,16 16:7
  17:22,23,24
  18:20 21:2
  23:14 24:7
  25:9 27:2,6
  31:10 38:14,24
  44:18 49:21
  51:17 54:12
  58:13 59:2,3
  59:17 60:8
  63:23 64:24
  66:14 67:19
  72:7 75:22
  77:24,25 81:2
  82:12,21 83:23
  84:23 86:3,8
  86:14 90:2,3
  96:4 104:15,19
  104:23 105:6
  112:15 113:5
  113:19 115:16
  117:17,22
  118:16 119:18
  120:4,8 121:4
  121:21,25
  125:15,16
  127:23 141:16
times 55:12
title 16:25
today 101:24
  107:4 120:13
  138:20,23
  139:4,18
  140:11
toddler 90:14,16
toddler's 64:3
told 62:19 64:15
  71:16,17 90:6
  90:7,11,13,14
  90:20,24 92:3
  93:16 107:19

108:7 109:2,14
109:21 110:4
111:11 114:9
115:21,25
118:19 119:2
121:15 128:9
128:10,11
130:25
**Tomkins** 86:9
**Tompkins** 71:11
71:13,20 72:17
73:6 75:24
78:7 80:7,21
80:24 81:9,16
82:3,6 87:21
**ton** 95:21
**top** 22:23 30:15
38:18 41:23
72:8 133:9
**total** 132:19
**totally** 36:12
133:18
**tough** 24:20
**transcript**
143:14,15
**transferred** 9:16
9:25
**transfers** 39:2
**transported**
123:14
**transporting**
123:15
**trial** 4:10
**trials** 35:18
**tried** 79:8 90:7
120:24
**true** 39:15
142:13
**try** 27:2,10,11
53:3 54:2 58:6
87:11 95:7
96:20 138:12
**trying** 52:25
59:3 75:6,7,15
76:4,9,10
78:10,12,12
86:25 87:5

104:9,10,18,19
104:22 105:4
140:5
**tug** 84:21
**turned** 34:3,19
34:25
**TV** 61:14
**twenty** 18:10
**twig** 105:25
**two** 8:17 36:11
38:22 39:4
43:13 48:25
50:23 57:2,9
60:13 65:23
67:2 68:19
90:7 91:18
93:23,24 94:2
94:6,7,19
101:11,13
104:17 107:19
107:24 108:11
109:9,12,19
110:7 112:14
113:19 128:25
136:12 137:22
138:3
**two-family** 51:2
54:4 56:3,8,23
57:4,4 59:5
75:11 90:9
91:23 93:10,14
93:20,25 94:3
94:4,6,10,12
94:13,20 95:2
95:11,14,17
96:21 98:19
101:8 103:6,8
103:9 107:21
108:10,11,12
108:23 109:8
113:10,17,22
127:24 128:6
128:19,25
129:3,4,11,25
130:6 131:11
131:15,24
132:8,11 135:4

135:8,14,21
**type** 8:2 9:20
15:6 36:23
64:6 88:21,24
99:10 137:23
**types** 100:8
**t-o-r** 21:9
**t-u-r** 21:9

_____
**U**
_____
**Uh-huh** 71:25
108:16
**uh-uh** 5:24
**ultimately** 47:8
**um** 12:12 13:9
15:11 22:22
41:15 44:7
53:24 70:24
74:6,9 78:20
88:19 100:7
103:14 110:3
112:13 116:5
119:7,8 122:18
129:6 134:14
136:20
**unable** 91:22
93:13,18 98:17
140:15
**understand** 6:4
13:10 31:19
114:24 129:20
131:7
**understanding**
68:13 87:7
**unidentified**
91:5
**unit** 11:19 17:15
114:25
**United** 1:1 12:5
**unrelated** 57:7
100:10,12
**upstairs** 58:15
66:21 73:8
74:12,21 75:23
76:14 79:9
91:5 119:24
131:22 132:3
132:10 133:5

136:5
**use** 31:11,22
35:12 103:3
110:3 120:18
120:20 133:10
134:17
**uses** 96:12
**usually** 10:15
31:8 90:17
**utilities** 138:7
**utilized** 20:7
35:25 47:6
87:8 140:11
**u-r** 21:10,13
**U.S** 30:3

_____
**V**
_____
**vantage** 53:7
76:9
**vary** 36:8
**vehicles** 116:3
117:5
**verbalize** 5:21
**verify** 58:4,6
**vicinity** 22:19
91:20 119:21
**victim** 121:21
**video** 28:25 29:6
30:9,12,13,19
32:24 33:7,10
33:14,21,23
34:6,12,14,18
34:22 35:17,25
36:3,4,16,19
37:25 38:4,8
39:10 40:23
41:3,5,7 43:17
43:23 44:6
105:6,10,15,18
**videotape**
123:18
**viewed** 39:3
**viewpoint** 77:6
**violence** 88:21
**Vouchers** 43:11
**vs** 1:6

_____
**W**
_____

**wait** 114:6
125:25 126:3
**waived** 4:6
**waiver** 14:3,7,8
14:15,18
**walk** 70:18,22
**walked** 64:22
70:21 71:23
84:8 111:5
122:14
**walking** 23:6
**Walsh** 50:6,8
59:22 73:4
80:23 81:3
83:17 84:12
93:8 123:13
130:3
**want** 6:5 34:8
40:8 41:12
46:18 47:16,20
53:9,10 56:2,9
56:11,12,13,19
56:23 57:3,5
57:10 78:19,21
78:25 79:12,24
98:3,11 99:19
99:20 102:4
104:8,16
122:19 130:9
130:10 133:5
133:15 134:2
134:11
**wanted** 28:10
47:17 50:24
51:5 56:4 58:3
58:3 78:24
112:14 129:17
130:17 132:10
132:12,14
133:13,20
**warrant** 42:4,20
42:23 43:8
44:8 45:2,15
45:20,21,25
46:3,6,14,19
47:16,17,20
51:22 56:5,6

56:23 57:5
64:15 78:21
79:25 88:25
89:10 105:8
110:8 113:15
115:10,18,20
117:2,8,10,15
128:4 129:8,13
129:19 130:9
130:16,18,22
130:25 131:19
131:23 132:22
132:24,25
133:8,10,17,19
133:23,23
134:4,12,15,18
134:22 135:17
135:25 136:3,6
136:13,15
137:2,5,17
139:7
warrants 45:11
56:14 112:14
130:23 131:21
133:9 137:9,20
wasn't 54:10,10
56:24 58:2
64:12 68:14
75:4 77:7 78:2
88:2 96:2 99:4
102:6 108:13
111:4,8,12
113:9 114:20
120:15,15
watch 52:25
watched 43:20
watching 44:6
120:19
way 5:21 9:7,21
20:13 28:17
29:20 47:18
81:21 99:4
115:19 116:6
120:21 136:16
136:17 142:18
ways 21:9
weapons 48:4

91:3 122:7,22
127:18,20
wearing 36:7,13
Wednesday 1:17
week 97:2
weighed 29:18
went 22:5 28:9
43:4 44:24
47:9 48:24
54:9 55:18,21
57:23 59:21,24
65:2 78:22
81:21,24 82:5
85:4 90:20
95:7 96:23
109:19 118:17
120:5 121:22
124:6 130:2
132:2
weren't 12:4
40:7,14 101:10
West 3:14
we'll 27:13
we're 14:9 45:2
51:10 71:18
77:14 78:23
81:23 99:19,20
111:14 133:5
141:15
we've 131:23
WHEREOF
142:20
white 89:16
William 122:12
windows 67:10
69:13 82:24
wire 34:2
wired 54:9 63:12
wiring 34:4
wish 144:5
wished 137:17
withdrawn 39:6
99:9
witness 5:4
14:13 47:22
55:20,23 56:18
121:6 142:10

142:14,20
143:1 144:23
woman 60:18
61:17,18,20,21
62:9,23 65:5
73:16,21 75:24
107:2,4 119:24
119:25 127:7
139:13 141:6
woman's 73:23
74:4,14
word 47:18
words 10:19
44:25 54:19
57:17
work 8:2 9:6
11:15 16:11
26:4 50:13
137:3,13
139:15
worked 11:18
26:7 117:24
136:24
working 13:13
18:14 23:15
workplace 59:12
works 92:25
world 11:7
worry 116:7
136:6
wouldn't 12:14
12:17 24:23
75:13,17 79:6
100:23 103:7
110:3 121:18
125:15,16
129:5 136:10
write 63:6

**X**

X 1:3,12

**Y**

yeah 5:24 14:18
99:22 109:22
year 8:22,23
years 6:18 7:16
7:17 8:18 13:6

15:10,22 39:4
yelling 117:9
118:11
yesterday
140:10
York 1:2,16 2:14
2:17 3:7,15 5:4
7:12 11:12,14
12:13,17 19:2
21:16 124:23
142:3,8
yu 71:17

**Z**

Z 123:2
zoned 92:15,19

**#**

#1-5 1:8,9,10

**1**

1 65:13
1:32 86:3
10 92:4
10th 48:24 50:22
52:19 53:13
55:14,18,19
59:2,9 65:25
113:9 135:3
10:28 2:9
11th 51:3,3
55:22,24 57:24
59:19 77:23,23
93:10 101:7
135:11,17
11042 3:7
11501 3:15
12 110:16 114:8
12th 89:25
114:14,15
136:19
12:37 85:10
13th 115:11,13
134:20
14th 26:10,18
27:16,19,25
28:11,20 29:4
31:12 35:5,25

36:20 37:10
38:6,12,15
39:11,18,23
40:24 41:8
49:12,17,18
15 92:4 110:16
114:8
15th 31:17 32:3
32:6,15 33:8
33:11 34:22
36:20,25 37:6
38:7,12,15,23
39:11 40:24
41:8 49:12
19th 37:4,12
38:10,19,23
39:11 40:24
41:8,24 49:7
49:12 112:8,23
113:6 136:21
1983 7:7,10
1995 7:10,24 8:9
9:19
1997 10:3

**2**

2E1 3:6
2:45 141:16
20 21:25 22:4,11
22:21 23:2,7
24:16 43:14
45:3,17,20,24
52:21,24 90:25
91:14 110:6,9
116:13 117:14
2000 9:3
2001 9:19 10:16
10:21
2010 21:19 23:23
31:17 112:23
139:3
2012 1:17 2:8
65:14 66:10
68:10 72:4
141:22 142:21
211 14:8,15
24-hour 105:6
24763 1:22

| | |
|---|---|
| **25** 61:23 | **7** |
| **272** 5:3 18:25 | 7 72:3 |
|   86:19 123:14 | |
| **28** 1:17 2:8 | **8** |
| | 8 65:14 66:10 |
| **3** |   68:10 72:4,11 |
| **30** 105:7,16 |   77:12 78:8 |
|   143:14 |   80:18 81:4 |
| **3000** 2:13 3:6 | |
| **31** 21:15 22:7,9 | **9** |
|   22:20,25 24:3 | **9th** 142:21 |
|   24:9 25:12 | **9/11** 9:16,18 |
|   26:12 29:10 |   10:20 11:6 |
|   32:21 37:7,8 |   12:8 |
|   37:10,23 38:11 | **95** 7:8 |
|   40:25 41:6 | **97** 9:25 |
|   42:21 43:15 | **99** 8:24 |
|   45:3,22 46:7 | |
|   46:14 47:21 | |
|   48:16,20 49:9 | |
|   49:21 51:18 | |
|   52:9 53:2 59:9 | |
|   65:18 86:10 | |
|   91:14 93:5 | |
|   95:2,15 97:12 | |
|   101:3,7 106:12 | |
|   107:10 110:9 | |
|   110:11,14 | |
|   111:6 116:11 | |
|   116:16,22 | |
|   118:17,24 | |
|   119:16 128:19 | |
|   139:2 141:7 | |
| **35** 17:22 | |
| | |
| **4** | |
| **40** 17:22 | |
| | |
| **5** | |
| **5** 68:9 | |
| **5th** 49:7,17,18 | |
|   112:8,23 113:6 | |
|   134:19,21,25 | |
|   136:21 | |
| | |
| **6** | |
| **6** 66:9 70:14 | |

DAVID FELDMAN WORLDWIDE, INC.
450 Seventh Avenue - Ste 500, New York, NY 10123  (212)705-8585

# EXHIBIT B



**COUNTY OF NASSAU**
**OFFICE OF THE COUNTY ATTORNEY**
One West Street
Mineola, New York 11501-4820
516-571-3056

Writer's Telephone: 516-571-6074
Writer's Facsimile: 516-571-3058
Writer's E-Mail: tlai@nassaucountyny.gov

March 11, 2014

Honorable Leonard D. Wexler
Long Island Federal Courthouse
944 Federal Plaza
Central Islip, New York 11722

     Re:    *Davis v. CON et al.*
            CV-11-0076 (LDW)(ARL)

Dear Judge Wexler,

     This office represents County of Nassau, Nassau County Police Officer Michael Capobianco, Serial #6971, Sgt. Hermann, Police Officer Carl Campbell, Police Officer Dwight Blankenship, Police Officer Joseph Grella and Nassau County District Attorney Investigator Thomas Bidell ("County Defendants") in the above-referenced matter.  The purpose of this letter is to inform you Exhibit B, a complete copy of the Nassau County Office of the District Attorney Video, Case No: Hom. SPL 21-10 Ferro, May 13, 2010, from County Defendants' Motion That The Court Rule On The Search Warrant As A Matter Of Law is enclosed.

     Thank you for your consideration of the instant application.

                         Respectfully submitted,

                         *Thomas Lai*
                         Thomas Lai
                         Deputy County Attorney

cc:     Plaintiff (via ECF)

# EXHIBIT C

**138**

1          Capobianco
2    information?
3         Would you like an example?
4      A.   Go.
5      Q.   Did they ever indicate to you for
6    instance how many people lived at the house?
7      A.   They indicated that the house would
8    flux with the amount of people in and out of it
9    due to who slept at one place or another. Because
10   there was that second house involved and they
11   weren't too sure who was going to be where at what
12   time.
13     Q.   As far as 31 Lafayette goes though,
14   did they ever indicate to you at any point in time
15   a minimum number of people to expect at the
16   premises during the insertion?
17     A.   Not that I can recall, not a minimum
18   number.
19     Q.   Do you remember at the briefings them
20   indicating that they had a confidential informant
21   that had informed them that drug activity was
22   taking place at the premises?
23     A.   Yes.
24   · Q.   And did they give you a description of
25   information relayed by that confidential

**139**

1          Capobianco
2    informant?
3      A.   Yes.
4      Q.   What was the information that the
5    confidential informant had given to the
6    authorities regarding the premises?
7      A.   Well, that's what I'm saying, I'm not
8    remembering. I know that we received information
9    that there were drugs, possible guns, armed
10   suspects, and they of course had the name of one
11   or two and who we were looking for. But as of
12   right now, I couldn't remember who or what we
13   exactly were going in for.
14     Q.   Is there anything that you could look
15   at that would refresh your recollection as to what
16   you knew prior to insertion?
17     A.   I would probably need that tactical
18   plan if we had it. I would need the notes on what
19   we had and who was in, and so forth and so on.
20     Q.   What kind of notes? Is that also part
21   of it?
22     A.   The tactical plan. That would be
23   individuals, and so forth.
24   RQ      MR. HORN: At this point in time I
25       would respectfully request again the

**140**

1          Capobianco
2 '   tactical plan as well as any notes, exhibits
3    or attachments thereto.
4         MS. PETILLO: Take it under
5    advisement, and you can follow up in
6    writing.
7      Q.   Did you receive any information that
8    was derived from the confidential informant as to
9    the layout of any portion of the house?
10     A.   Two-story house, front and rear door,
11   unknown accessibility up and down. And that's
12   about it. That's all I can remember.
13     Q.   Did the confidential informant ever
14   indicate that the property was segregated in any
15   fashion?
16     A.   Segregated, again?
17     Q.   I'll break it down. Did you ever
18   receive any information at any of the briefings
19   that there was segregated space; i.e., two
20   different living areas?
21     A.   Yes.
22     Q.   And specifically, what were you
23   ·informed? What was communicated to you at the
24   briefing?
25     A.   That we had, we had, um, the warrant

**141**

1          Capobianco
2    covered the whole house, and that the bottom
3    floor, we weren't sure if the bottom floor linked
4    to the top floor, but the bottom floor, that's why
5    they went in first, the bottom floor was
6    supposedly where the activity was. The top floor
7    was supposedly a secondary unit and we knew that
8    there was a child on the second floor.
9      Q.   Did you know the identities of any of
10   the individuals --
11     A.   I'm sorry, it's not -- it's not the
12   top floor, but the back of the house led -- OK.
13     Q.   Let me see if I can break this down.
14   As far as the way the -- you were informed the
15   house was subdivided was that there was a
16   downstairs that also linked to the front portion
17   of the upstairs?
18     A.   We didn't -- we weren't a hundred
19   percent sure if there was, um, if there was
20   accessibility through the apartments or if it was
21   completely separated.
22     Q.   But you knew that the space was
23   subdivided into two living areas, correct?
24     A.   Yes.
25     Q.   And if I'm understanding you

36 (Pages 138 to 141)

142

Capobianco

1
2 correctly, you just weren't sure how these two
3 areas were accessible to each other.
4    A.   Correct.
5    Q.   Was it communicated to you that the
6 upstairs was only accessible through the rear
7 entrance?
8    A.   That I don't remember.
9    Q.   You were eventually tasked with the
10 rear entrance, the rear portion of the house,
11 correct?
12    A.   Yes.
13    Q.   And your primary purpose was to make
14 sure that no one really fled out the windows or
15 fired out --
16    A.   'Correct.
17    Q.   -- the windows, correct?
18    A.   Yes.
19    Q.   I want to go to exactly what it was
20 your knowledge was regarding the layout of it. So
21 we've established that you knew that it was
22 subdivided and that it had a second story,
23 correct?
24    A.   Yes.
25    Q.   What else about the residence did you

143

Capobianco

1
2 know physically? For instance, did you know there
3 was a basement? Or whether there was a basement I
4 should say.
5    A.   I couldn't say yes or no.
6    Q.   Do you know whether there was an
7 attic?
8    A.   Again, no. I don't know.
9    Q.   And you knew there was a child living
10 at the residence, correct?
11    A.   Yes, that was given to us.
12    Q.   Were you made aware that there were,
13 in the separate dwelling unit upstairs that there
14 were females living in that area?
15    A.   Give me a second.
16        Not that I can just pop out now. I
17 remember the child because that's something that's
18 important to us.
19    Q.   Were you made aware whether there were
20 any males living on the second floor?
21    A.   We weren't sure who would be where.
22 We just knew we had the whole house.
23    Q.   When you say that you had the whole
24 house, you're talking about the scope of the
25 warrant, correct?

144

Capobianco

1
2    A.   Yes.
3    Q.   And what else was the scope of the
4 warrant? Not geographically, but what were you
5 entitled to do under the warrant to your
6 understanding?
7    A.   I believe we were going in to search
8 for certain subjects and place those subjects
9 under arrest and then we turn over to the
10 detectives to do their investigation.
11    Q.   So as far as primary mission was to
12 secure the two subjects of interest, correct?
13    A.   Yes.
14    Q.   And I know you don't recall them now,
15 but at the time did you know who they were, their
16 names?
17    A.   I'm pretty sure, yeah, we had
18 information on them, yes.
19    Q.   At the time did you know whether it
20 was a man and a man, a woman and a woman or a man
21 and a woman?
22    A.   I can't remember that right now. I'm
23 not sure.
24    Q.   Not right now. At the time did you
25 know the gender of who you were looking for?

145

Capobianco

1
2    A.   Oh, when we were briefed.
3    Q.   Yes.
4    A.   I am more than sure that was given to
5 us, yes.
6    Q.   And if not a photograph, you had a
7 description of people that you were seeking,
8 correct?
9    A.   Yes.
10    Q.   And once that primary objective was
11 performed BSO's job would then be turned over to
12 whoever the detectives were that were involved in
13 actually the criminal investigation, correct?
14    A.   Yes.
15    Q.   Directing your attention back to that
16 conference room where you received the briefing,
17 did Sergeant Hermann give you any directive as to
18 what type of equipment you should bring with you?
19    A.   Yes. The R4 was my weapon.
20    Q.   And that was directed by
21 Sergeant Hermann?
22    A.   By the tactical plan that comes
23 through there, who draws what weapons.
24    Q.   The tactical plan would not only
25 indicate who draws what weapons, but also who

## 170

Capobianco

1 audio, over the radio, of what was transpiring in
2 the front door insertion before individuals came
3 down the driveway?
4   A. Well, you could hear the door go. You
5 could hear the team enter. You could hear them
6 screaming. You can hear things moving like you
7 could tell they're going through. Either opening
8 up doors, you know, breaking through whatever they
9 may need to. That's about it.
10   Q. Did you ever hear any indication that
11 someone, that contact had been made? Something
12 that you heard and went, OK, they've had contact?
13   A. Not that I can remember right now.
14 No.
15
16   Q. There came a point in time where
17 individuals of BSO came down the driveway,
18 correct?
19   A. Yes.
20   Q. Who?
21   A. I couldn't answer that. When they
22 came down, like I stated before, I caught a team
23 coming in my peripheral and my attention was more
24 or less on the windows to make sure that everybody
25 was safe.

## 171

Capobianco

1
2 I really couldn't tell you who, what
3 team came down, what members made the entry into
4 the back of the building.
5   Q. Was that something you were expecting?
6   A. Yes, yes.
7   Q. And you had been briefed according to
8 the tactical plan that --
9   A. We had both sides of -- sorry.
10   Q. Is it fair to say you were briefed
11 according to the tactical plan that there would be
12 a team coming through your sector at some point in
13 time during the insertion?
14   A. Yes.
15   Q. And were you made aware that they
16 would be coming down the driveway and going past
17 you toward the rear entrance?
18   A. I knew they would be coming down, yes,
19 going to the rear entrance, yes.
20   Q. And all along after the briefing you
21 knew there would be a rear entry, correct?
22   A. Correct.
23   Q. And --
24   A. Well, can I back up?
25   Q. Sure.

## 172

Capobianco

1
2   A. If there was any access through the
3 front I wasn't sure whether they would be coming
4 through the back. Because it was sketchy as to
5 whether or not the apartments were linked.
6     So if there was access then I would
7 have probably expected to see guys just filtering
8 into the back apartment also.
9   Q. And when we're talking about the
10 apartments we're talking about the first floor
11 apartment as opposed to the second floor
12 apartment, correct?
13   A. I guess so. The front and rear would
14 be better to say, because the rear apartment also
15 has a first floor.
16   Q. And the first floor would be the
17 hallway that goes up the stairs, correct?
18   A. I believe there was a room as soon as
19 you entered, yeah, the hallway that goes in.
20 Uh-huh. So there's this rear entry and there is a
21 space in there, yes. So, I mean, there is a front
22 and, a front and rear of the house.
23   Q. Just for clarification, so I'm using,
24 I want to use terms you're comfortable with. The
25 front entry insertion by BSO, that was to get into

## 173

Capobianco

1
2 what you're using the term "front apartment,"
3 correct?
4   A. The front. And I'm not sure if the
5 front had a second floor or not. I just knew it
6 was a front floor.
7   Q. And then when you refer to the back
8 apartment, you're referring to the upstairs back
9 apartment,
10   A. The rear, yes.
11   Q. That's the one you entered, correct?
12   A. Yes.
13   Q. So if I use the "rear apartment,"
14 you're comfortable with that terminology?
15   A. Yes.
16   Q. As far as the front apartment we're
17 referring to that apartment that was accessible
18 through the front door.
19   A. Yes.
20   Q. There came a point in time when this
21 team went by you coming from the front of the
22 house to the rear portion of the house, correct?
23   A. Yes.
24   Q. Were you made aware of whether there
25 was access to a second floor from the first floor?

## 174

Capobianco

1
2    A.  No.

3    Q.  But by them going by, you had been

4 briefed that a rear entry would only be necessary

5 if they can't access the second floor from the

6 first floor, correct?

7    A.  We were briefed that we had the whole

8 house and that we would clear the whole house.

9    Q.  No, I understand. But earlier when I

10 said whether you anticipated a team coming by you

11 and going through that back door, you had said,

12 well, it depended on the access from the first

13 floor to second floor; is that correct?

14    A.  No, what I'm saying is that when they

15 entered through the first floor sometimes a

16 tactical plan or a floor layout is not correct.

17 So if they entered the first floor and they have

18 access to the second floor, they would make access

19 to the second floor.

20    Q.  You had a floor layout, correct? You

21 just don't know what form it came in.

22    A.  Right, what exactly it looked like. I

23 don't know if it was a sketch or what exactly they

24 had, or they just had a verbal as to what to

25 expect when they went in.

## 175

Capobianco

1
2    Q.  Leaving aside any contingencies or

3 adapting to the plan, the plan as far as the

4 insertion went, what was the plan regarding access

5 to the -- withdrawn.

6    According to the plan what was the

7 insertion through the rear entrance? Was that

8 something that was a contingency or something that

9 was definitely going to be done?

10    Let me rephrase it.

11    When you guys were given the layout

12 did they tell you whether you could access the

13 back apartment through the front door?

14    A.  I am not sure.

15    Q.  And you had indicated earlier that you

16 didn't expect an insertion through the rear door,

17 but you were told that it was possible if they

18 weren't able to access the back apartment through

19 the front entrance, correct?

20    A.  Not that I didn't expect. I expected

21 them to do whatever they needed to do to clear the

22 house.

23    Q.  But is it fair to say that you only

24 expected insertion through the rear entrance if

25 they couldn't access the back apartment through

## 176

Capobianco

1
2 the front door?

3    A.  Yes.

4    Q.  They came by you and they now -- one

5 of those individuals has a battering ram, correct?

6    A.  Yes.

7    Q.  Were you actually in a vantage point

8 where you could see them battering the back door?

9    A.  My attention was not really on them as

10 far as what they were doing. I could see them

11 peripherally, but my field of vision is still on

12 where I'm supposed to be. So I'm not really

13 watching what they're doing. I'm watching what

14 I'm supposed to be doing.

15    Q.  But where you're standing, you had a

16 clear line of sight to them. You just weren't

17 focused on them.

18    A.  I wasn't focusing on them, correct.

19    Q.  And there came a time through one of

20 your five senses you became aware that they had

21 battered the rear door, correct?

22    A.  Yes.

23    Q.  At any point in time prior to them

24 battering the door were you aware of the name of

25 any of the individuals that had come for the rear

## 177

Capobianco

1
2 entrance insertion?

3    A.  No.

4    Q.  Did there come a point in time that

5 through your peripheral vision you were able to

6 discern the fact that they had actually executed

7 an insertion through the rear door?

8    A.  Yes, and they had also as they came

9 by, I don't remember who it was, they had drawn

10 one extra guy to go in with them. OK?

11    Q.  So let's backtrack to that. The team

12 comes down the driveway. You're looking at them

13 through the peripheral. You know that they might

14 be coming back there if they can't get up through

15 the front entrance, correct?

16    A.  Yes.

17    Q.  They come by you?

18    A.  Yes.

19    Q.  And at some point in time they

20 incorporate another individual?

21    A.  Another body.

22    Q.  Into their insertion team, correct?

23    A.  Correct.

24    Q.  Who do they add to their insertion

25 team?

# EXHIBIT D

Grella

1     Grella
2    A. Yes.
3    Q. The presence of innocent
4 bystanders, would that be discussed at the
5 briefing?
6    A. It's not known who's innocent or
7 who's not when we go into a house.
8    Q. What if there's segregated space?
9    A. If it's a separate and apart
10 dwelling, is that what you're asking me?
11    Q. Yes.
12    A. That would be discussed, yeah.
13    Q. Was it discussed at 31 Lafayette
14 Avenue?
15    A. I don't recall if it was or not, I
16 just recall that we had a search warrant for
17 the entire premises.
18    Q. Well, I'm focused in on if there
19 are separate dwelling spaces, is that
20 something that's typically discussed at the
21 briefing?
22    A. It could be.
23    Q. And in this particular situation,
24 was it discussed at the briefing, separate
25 dwelling space?

Grella

1     Grella
2    A. I don't recall that.
3    Q. You never had any information
4 regarding any criminal activity on the second
5 floor; isn't that correct?
6    A. That I don't recall, no.
7    Q. Is it a fact you never had any
8 information that any of the residents of the
9 second floor were involved in any criminal
10 activity?
11    A. I don't recall that.
12    Q. After you entered the premises and
13 reached the kitchen, what did you do?
14    A. We turned around and exited out the
15 front door in an attempt to get up stairs
16 through the back of the house.
17    Q. And when you say, "we," who do you
18 mean?
19    A. Myself and Officer Blankenship.
20    Q. Did you eventually make it out to
21 the back portion of the house?
22    A. Yes.
23    Q. With whom did you make it to the
24 back portion of the house?
25    A. It was myself, Officer Blankenship,

Grella

1     Grella
2    A. I don't recall if it was or not.
3    Q. You were aware prior to entry
4 though that there was segregated space
5 between the second floor and the first floor,
6 correct?
7    A. I don't recall if it was discussed
8 that it was segregated space or not, I recall
9 we had a search warrant for the entire
10 premises.
11    Q. You were aware that there would be
12 children on the premises, correct?
13    A. I believe that was part of the
14 briefing.
15    Q. And you're aware that they were not
16 the children of either subject that you were
17 looking for, correct?
18    A. That I don't recall.
19    Q. There were two individuals who were
20 there who were subjects of interest upon
21 entry, correct?
22    A. I don't recall that either.
23    Q. All the information that you had
24 indicated that the drug traffic was taking
25 place out of the first floor, correct?

Grella

1     Grella
2 and I recall Officer Mastropierro being
3 there.
4    Q. Were there any bosses with you at
5 that time?
6    A. Not that I recall immediately, no.
7    Q. And Officer Mastropierro, he was on
8 the battering ram, correct?
9    A. Correct.
10    Q. And did Officer Mastropierro batter
11 the back door?
12    A. Yes.
13    Q. I'd like to show you what's been
14 previously marked as Plaintiff's Exhibit 1
15 and ask you if you recognize what is depicted
16 in that photograph (handing)?
17    A. Looks like the front of the
18 residence.
19    Q. And we're talking about 31
20 Lafayette?
21    A. Yes.
22    Q. And I'd like to show you what's
23 been marked as Plaintiff's Exhibit 2 and ask
24 you if you recognize what's depicted in that
25 photograph (handing)?

# EXHIBIT E

Blankenship

1 can from the town the house plans just to
2 take a look, but that's no certainty that
3 it's still that way because most of the
4 houses were built back in the thirties that
5 in 2012 it's still the same exact way.
6 Q. Now, dealing with 31 Lafayette,
7 what information did you have regarding that
8 house prior to entry?
9 A. We had the whole house.
10 Q. Can you stop there. When you say
11 you had the whole house, what do you mean?
12 A. We had all three floors on the --
13 from what we were told from the search
14 warrant.
15 Q. Well, dealing with just the
16 information you were just talking about,
17 floors, rooms, bad guys, dogs, children, the
18 house plans from the town, what information
19 was disseminated to you prior to insertion on
20 May 13, 2010?
21 A. The second floor was accessible
22 through the first floor, the kitchen.
23 Q. What was the source of that
24 information?

Blankenship

1 A. I think they had either a UC or an
2 undercover inside the -- in the house.
3 Q. Were you informed whether there
4 would be children?
5 A. I don't recall if we had that
6 information.
7 Q. Is there any document that would
8 reflect what information was disseminated
9 down to the rank and file prior to the raid
10 on May 13, 2010?
11 A. You would have to see the boss on
12 that if the tac plan what was given out. I
13 don't know. I know we had pictures of the
14 house.
15 Q. Well, as a member -- and I don't
16 mean this in a demeaning way. But, as a
17 member of the rank and file if you walked out
18 of here and said, you know, I'd like to know
19 what exactly was put out prior to us going in
20 and raiding 31 Lafayette and you went back to
21 BSO headquarters, are there any documents
22 that you could look at to figure out what was
23 put out to you?
24 A. You'd probably go back to the tac

Blankenship

1 plan, it would be attached with the tac plan.
2 Q. But, do we see the tac plan?
3 A. Do we see it after, before? Not
4 after we sketch a room and give all that
5 information to our bosses I don't go back and
6 look at them.
7 Q. But, at some point you did see the
8 tac plan, correct?
9 A. We see what we have at the
10 briefing.
11 Q. Okay, let me make sure we're clear
12 on this. A briefing is given, is a tac plan
13 presented to the rank and file?
14 A. A plan of what's going to go on is
15 because you don't know if you're going to be
16 here that day. You may have the shield that
17 morning, but you don't know if you're going
18 to get sick or what happened. So, we do have
19 secondaries, so nothing -- at that point in
20 time they'll tell you you're shield two with
21 your partner, okay, what do we have, and then
22 you go through looking at the house, looking
23 at your bad guys, you know, seeing what's
24 going on.

Blankenship

1 Q. So you do see the tac plan, but
2 you're only --
3 A. What are you talking as a tac plan?
4 Q. I'm using your words.
5 A. I'm seeing a picture of the house,
6 they're telling us we have three floors.
7 That's pretty much our tac plan, we have --
8 we don't know what rooms are inside, if
9 they've changed them since the time that
10 we've gotten, you know, an updated plan from
11 the town, if we can pull that up on the
12 computer, stuff like that.
13 Our tac plan is you're going to be
14 first shield, second shield, you go through
15 the positions, and after that we've been
16 trained you flow off of the first guy. So
17 I'm saying tac plan because you know your
18 position, you know what the house is, and
19 where you're going. After that we'll try to
20 do a sketch of the rooms, give that back to
21 the boss so if we ever have to hit that house
22 again that gets added to it, that's our
23 folder for the tac plan for that house.
24 MS. PETILLO: Is a tac plan an

8 (Pages 26 to 29)

# EXHIBIT F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
IYANNA DAVIS,

    Plaintiff,

    - against -

THE COUNTY OF NASSAU, NASSAU COUNTY
POLICE OFFICER MICHAEL CAPOBIANCO, serial
#6971, SGT. HERMANN, POLICE OFFICER CARL
CAMPBELL, POLICE OFFICER DWIGHT
BLANKENSHIP, POLICE OFFICER JOSEPH GRELLA,
POLICE OFFICER JOHN DOES #1-5, NASSAU
COUNTY DISTRICT ATTORNEY'S OFFICE
INVESTIGATOR THOMAS BIDELL, NASSAU
COUNTY DISTRICT ATTORNEY'S OFFICE
INVESTIGATORS JOHN DOES #2-5, NASSAU
COUNTY ASSISTANT DISTRICT ATTORNEY JOHN
DOES #1-5.

    Defendants.
-------------------------------------------------------------------X

CV-11-0076
(LDW)(ARL)

**AFFIDAVIT OF SGT.
JOHN HERMANN IN
FURTHER SUPPORT
OF DEFENDANTS'
MOTION FOR
SUMMARY
JUDGMENT**

SERGEANT JOHN HERMANN, Serial No. 6570, being duly sworn, deposes:

1) I have been employed by the Nassau County Police Department (NCPD) since on April 4, 1986.

2) Upon joining the NCPD in April of 1986, I received six months of training at the police academy, including firearms and the use of force.

3) I was then assigned to the third Precinct where I was a uniform patrol officer until January of 1995.

4) I then sat for and passed the promotional exam given by the NCPD to be a Sergeant.

5) Upon passing the exam, I attended Supervisory School at the NCPD Academy where I received one month of training including training in the supervision of other officers, use of force, tactical training and the use of search warrants.

6) Upon completion of Supervisory School, I was assigned to the Fifth Precinct where I worked as a uniform patrol supervisor until 2000.

7) Sometime in 2000, I was transferred to Police Headquarters where I was the Administrative Supervisor for the Support Division until 2003.

8) Upon my request, I was transferred to the Bureau of Special Operations ("BSO") in 2003.

9) Upon my transfer to this unit, I received firearms and tactical training; including the execution of search warrants.

10) In approximately 2005, I also attended the FBI Swat School at Fort Dix for one week where I received training consisting of precision firearms and tactical training regarding the execution of search warrants.

11) In addition to the training I received when I first joined BSO, all BSO officers receive periodic training in various topics including, vehicle takedowns, officer rescue, firearms, search warrant execution regarding slow and deliberate versus dynamic entry and room clearing.

12) On May 13, 2010, I was one of the supervisors present at the execution of a search warrant at 31 Lafayette Avenue in Hempstead, NY, at which time I was in possession of a "No Knock" Search Warrant Order signed by Judge Steven Jaeger which authorized a search of the entire premises.

13) The priority when executing a warrant is people, open doors, closed doors.

14) Upon arrival at 31 Lafayette Avenue, members of BSO, all dressed in black dress uniforms, with the word "Police" prominently displayed on the front of the vest, helmet, and shoulders of the shirt, breached the front door, yelling " Police, get down" and proceeded to the kitchen to gain access to the second floor.

15) Once we were in the kitchen, Officer Blankenship yelled "alternate breach" as the access door to the second floor was blocked by a refrigerator.

16) I then proceeded to the back of the house with Officers Blankenship and Grella in order to access the second floor.

17) As we proceeded around the back of the house, I instructed Officers Hughes and Capobianco to assist in the warrant entry and search of the second floor.

18) Once the back door was breached, the BSO officers then proceeded up the stairs to the second floor yelling "Police, get down".

19) Upon arriving on the second floor, I instructed Officer Capobianco to assist Officer Campbell in executing a secondary search of the room where it was a woman, later determined to be Iyanna Davis, the Plaintiff, was hiding in a closet.

20) I then proceeded down to the basement with Officers Blankenship and Grella as that area had not yet been searched.

21) We were in the process of conducting a search of the basement when I heard a gunshot from upstairs.

22) I then proceeded upstairs where I observed the Plaintiff being removed from the scene in an ambulance.

23) I later learned that Officer Capobianco's weapon had been discharged on the second floor of the premises.

SGT. JOHN HERMANN

Sworn to before me this 15 day of Aug. 2012

Notary Public

LISA D GUARIGLIA
NOTARY PUBLIC State of New York
No.4890492
Qualified in Suffolk County
Commission Expires June 01 20 15.

# EXHIBIT G

```
1              Campbell
2    brought to perform an entry?
3       A.  Yes.
4       Q.  Can you just give me an example?
5       A.  Multiple floors.
6       Q.  And multiple floors would equate to
7    more personnel required; is that correct?
8       A.  Yes.
9       Q.  Now, when you're attempting to
10   effectuate the arrest of individuals, the
11   other occupants within the premises, is there
12   any information given about those occupants
13   other than their number?
14      A.  Gender.
15      Q.  How about age?
16      A.  Yes, approximate age.
17      Q.  And these factors that we've just
18   discussed, the amount of occupants in the
19   house, the possible presence of dogs,
20   children, these are all important factors
21   when planning an entry, correct?
22      A.  Yes.
23      Q.  At the briefing for 31 Hempstead --
24         MS. PETILLO:  31 Lafayette Avenue.
25         MR. HORN:  Just off the record for
```

```
1              Campbell
2       A.  Yes.
3       Q.  How many?
4       A.  I don't recall.
5       Q.  Where were those children expected
6    to be within the premises?
7       A.  I believe upstairs.
8       Q.  In the upstairs apartment?
9       A.  Upstairs, I don't think it was a
10   separate apartment.  Can I rephrase that?
11      Q.  Would you like to rephrase?
12      A.  Yes, I would.  I guess it probably
13   wasn't a legal apartment.
14      Q.  Leaving aside the Town of Hempstead --
15   or the Town of Hempstead building codes, you
16   were made aware that there was a separate
17   apartment upstairs, that there might be a
18   child present, correct?
19      A.  I don't know if we were told it was
20   a separate apartment, but I believe we were
21   told there was a child or children upstairs.
22      Q.  Were you made aware that there was
23   any subdivision within this house?
24      A.  No.
25      Q.  Now, I just want to make sure we're
```

```
1              Campbell
2    a second.
3          (Discussion off the record.)
4       Q.  In the preparation for the entry
5    into 31 Lafayette, were any of these factors
6    discussed what you've just discussed such as
7    occupants that were anticipated to be on the
8    premises, the possibility of the presence of
9    dogs, children?
10      A.  Yes.
11      Q.  What was discussed?
12      A.  All of that.
13      Q.  Did they indicate that there might
14   be the presence of dogs on the premises?
15      A.  No, but it was asked.
16      Q.  So according to the intel that was
17   collected prior to entry, there was no dog on
18   the premises, correct?
19         MS. PETILLO:  Yes?
20      A.  Yes, I'm sorry.  I didn't speak up,
21   I'm sorry.
22      Q.  Now, according to the intel
23   collected prior to the entry, were you
24   informed whether there were any children
25   expected to be at the premises?
```

```
1              Campbell
2    clear.  Is that something you specifically
3    remember that you were -- there was no
4    discussion regarding separate dwelling space
5    or are you not sure whether there was a
6    discussion regarding separate dwelling space?
7       A.  The latter, yeah, I'm not sure.
8       Q.  You were informed of the extent of
9    the search warrant, correct?
10      A.  Yes.
11      Q.  And what were you informed in that
12   regard?
13      A.  The premises at 31 Lafayette.
14      Q.  To include the entire house,
15   correct?
16      A.  Yes.
17      Q.  And there was a confidential
18   informant that had given specifics as to the
19   interior of the house, correct?
20      A.  I have no knowledge.
21         MS. PETILLO:  Off the record.
22         (Discussion off the record.)
23      Q.  Do you know if there was any
24   information given at the briefing that was
25   conveyed firsthand from someone who had
```

# EXHIBIT H

POLICE DEPARTMENT, COUNTY OF NASSAU, N.Y.
SUPPORTING DEPOSITION

**INSTRUCTIONS:** Deponent must place signature immediately after his/her narrative statement which shall include a statement of non-permission when applicable. Police Officer will complete boxed area of form and will witness the deponent's statement by placing signature immediately below the deponent's signature.

| Case Report No. | D.D. No. | | Defendants Name if Known | | Relationship of Deponent to Property |
|---|---|---|---|---|---|
| | | | | | |

| Date & Time of Deposition | WITNESS | Rank | Name Printed | Serial No. | Command |
|---|---|---|---|---|---|
| 5-13-10  0830 | | Det | Vecchiano | 8310 | 3SG |

NOTICE
ANY FALSE STATEMENT MADE IN THIS DEPOSITION IS PUNISHABLE AS A CLASS A MISDEMEANOR
PURSUANT TO SECTION 210.45 OF THE PENAL LAW.

I am ___Joanna Little  3-30-89___ I have read and understand the above notice.

On the ___ day of _____ 19___ at about ___ ☐ AM ☐ PM I was home at 21 Lafayette ave in Hempstead I live on the Second floor with my one year old son Karmell. My room mate's name is therese thompkins but she was not home last night. Last night my friend Elouise and my half sister tasha Little had stayed over with me. I was sleeping in the bedroom that is near the stairs. I woke up one morning because I heard a lot of noise and yelling coming from the first floor. I got up and went into the front bedroom were Therese and Elouise were sleeping. We looked out the window and could see cop's were outside. I could hear them yelling saying Police and check the back. I left the room and went downstairs to my door. I could hear them saying Police open the door we have a search warrant. I opened the door and I saw a few cops wearing black uniforms with guns. They went upstairs and I told one cop that I had my son upstairs. the cop took me to my bedroom with my son but then they took us to the front bedroom. It was just Elouise in the room I didn't see Therese. The cops asked me who's room was next to the one we were in and I told them it was my roommates but she wasn't home. They went in to check it - everyone saw them go and check the rest of the house. A few seconds went by when I heard a closet door open and I heard the cops say Get out of the closet get on the floor. I heard the cops say it twice. I heard tasha say I'm sorry I'm scared please don't shoot. Then I heard a gunshot and tasha said you shot me. I saw the cop's run out of the room. This is a true and correct statement that Detective Vecchiano is writing for me. X Joanna Little

# EXHIBIT I

HON. STEVEN JAEGER
ACTING SUPREME COURT JUDGE
SITTING AS A LOCAL CRIMINAL COURT JUDGE
----------------------------------------------------------X
In the Matter of the Application of

THOMAS BIDELL,                                    SEARCH WARRANT
                                                  ORDER

A Investigator in the Nassau County District
Attorney's Office, shield no. 330, to conduct a   SW # 23/10
search of the premises located at 31 Lafayette
Avenue, Hempstead, Nassau County, New York.
----------------------------------------------------------X
STATE OF NEW YORK)
                 ) SS.:
COUNTY OF NASSAU )

TO:   DETECTIVE THOMAS BIDELL OR ANY OTHER INVESTIGATOR OF THE
      NASSAU COUNTY DISTRICT ATTORNEY'S OFFICE, OR DETECTIVE OR
      POLICE OFFICER IN THE VILLAGE OF HEMPSTEAD POLICE DEPARTMENT
      OR THE NASSAU COUNTY POLICE DEPARTMENT.

      Proof by affidavit, having been made this day before me by THOMAS BIDELL, an

Investigator in the Nassau County District Attorney's Office, Shield No. 330, that there is

reasonable cause to believe that certain property is unlawfully possessed, or has been used, or is

possessed for the purpose of being used to commit or conceal the commission of an offense, or

constitutes evidence or tends to demonstrate that an offense was committed or that a particular

person participated in the commission of an offense, to with: Violations of Article 220 of the

Penal Law of the State of New York.

      YOU ARE THEREFORE COMMANDED, within ten (10) days of the issuance of this

Order, to make immediate search, without giving notice of your authority and purpose, of the

premises located at 31 Lafayette Avenue, Hempstead, Nassau County, New York (hereinafter

"target premises") between 6:00 A.M. and 9:00 P.M.

The target premises is located on the west side of Lafayette Avenue in Hempstead. Meriam Street is approximately 20 feet to the north of the target premises, and it runs east to west and Van Cott Avenue is approximately 400 feet to the south of the target premises, and it runs east to west. The target premises is a two-story residential home with a brown shingled roof and an enclosed stucco porch on south-side of the front of the house and siding on the north-side of the front of the house. There is a driveway on the south-side of the target premises, and it leads from the street to the back of the house where there is a detached garage. There is a door on the front of the home with two cement steps leading to it. The front door is white and next to the front door, on the south side, is the number "31" over a black mailbox. The house on the south-side of the target premises has the number "25" on it and the house on the north-side of the target premises has the number "35" on it

YOU ARE FURTHER AUTHORIZED to search the entire target premises described above, for cocaine, packaging material and weighing devices, drug paraphernalia, firearms, ammunition, sums of money and records, including computer records, computers, the information contained in computers and computer systems, including printers, monitors, hard drives, floppy discs, compact discs (CDs), cellular telephones, electronic organizers, papers, loose or bound with names and numbers on them, locked or unlocked containers, including but not limited to, storage areas, vaults, cabinets, safes, closets, strong boxes, desks, drawers, suitcases, briefcases, boxes, or other such enclosures where narcotics or similar equipment can be found inside, and other evidence and/or record of illegal sales and/or possession of heroin in violation of Article 220 of the Penal Law of the State of New York.

YOU ARE FURTHER AUTHORIZED to photograph and/or videotape the interior and exterior of the target premises, and the effects found therein.

YOU ARE FURTHER DIRECTED that if you find such evidence, you are to seize it and bring it before me in the County Courthouse, County of Nassau, without unnecessary delay.

IT IS FURTHER ORDERED that the accompanying affidavit be sealed for the reasons

set forth therein.

Dated Mineola, New York
May 1, 2010

Time: 3:40 p.m.

HON. STEVEN JAEGER
ACTING SUPREME COURT JUDGE
SITTING AS A LOCAL CRIMINAL COURT JUDGE

NASSAU COUNTY

000023

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
IYANNA DAVIS,

                                    Plaintiffs,          **11-CV-0076
                                                         (LDW)(ARL)**

            -against-


COUNTY OF NASSAU, NASSAU COUNTY POLICE
OFFICER MICHAEL CAPOBIANCO, Serial #6971,
SGT. HERMANN, POLICE OFFICER CARL              **COUNTY DEFENDANTS'**
CAMPBELL, POLICE OFFICER DWIGHT                **MOTION THAT THE**
BLANKENSHIP, POLICE OFFICER JOSEPH             **COURT RULE ON THE**
GRELLA, POLICE OFFICER JOHN DOES #1-5,         **SEARCH WARRANT**
NASSAU COUNTY DISTRICT ATTORNEY'S              **AS A MATTER OF LAW**
OFFICE INVESTIGATOR THOMAS BIDELL,
NASSAU COUNTY DISTRICT ATTORNEY'S
OFFICE INVESTIGATORS JOHN DOES #2-5,
NASSAU COUNTY ASSISTANT DISTRICT
ATTORNEY JOHN DOES #1-5,


                                    Defendants.
---------------------------------------------------------------------X

## PRELIMINARY STATEMENT

      The facts, as a matter of law, establish that it was objectively reasonable to conduct a

search of the entire premises.  Defendants County of Nassau, Nassau County Police Officer

Michael Capobianco, Serial #6971, Sgt. Hermann, Police Officer Carl Campbell, Police Officer

Dwight Blankenship, Police Officer Joseph Grella and Nassau County District Attorney Investigator

Thomas Bidell ("County Defendants") at no point came into possession of clear information after

issuance but before execution of the warrant that the second story of the premises ("31 Lafayette

Avenue") was a completely separate residence not involved in the drug trade.  *See [DE # 52]*; *Davis*

*v. County. of Nassau*, 2013 WL 66021 at *12 (E.D.N.Y. Jan. 3, 2013).

<u>**ARGUMENT**</u>

**I. County Defendants are entitled to qualified immunity.**

For the reasons set forth below, the County Defendants are entitled to qualified immunity.

**a. District Attorney Investigator Bidell is entitled to qualified immunity.**

When the question of qualified immunity turns on statements made in support of an affidavit the corrected-affidavit doctrine is applied. *Southerland v. City of New York*, 680 F.3d 127, 143 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 980, 184 L. Ed. 2d 773 (U.S. 2013). Pursuant to the corrected-affidavit doctrine, a defendant is entitled to qualified immunity even though an erroneous statement of fact was made in a search-warrant affidavit unless the false statements were "necessary to the finding of probable cause." *Id.* (internal citations omitted). To determine if the false statements were "necessary to the finding of probable cause" the court puts aside the allegedly false material, incorporates any omitted information and then determines whether the contents of the corrected affidavit would have supported the finding of probable cause. *Id.* at 143-144. "[Q]ualified immunity is warranted only if, after correcting for the false or misleading statements, the affidavit accompanying the warrant was sufficient to support a reasonable officer's belief that probable cause existed." *Id.* at 143-144 (internal quotation marks omitted).

District Attorney Investigator Bidell ("Bidell") did not come into possession of clear information, after issuance but before the execution of the warrant, that the second story of the premises was a completely separate residence not involved in the drug trade.

There is no doubt that the Justice issuing the warrant to Bidell was a "disinterested magistrate" and that the information provided to the issuing Justice at the time of issuance was sufficient to establish probable cause to believe that drugs were being sold at the Premises. *Id*. at 8.

After obtaining the warrant Bidell, accompanied by fellow District Attorney Investigators Walsh and Maher, went to the premises to conduct a ruse. Bidell knocked on the door and entered the house under a ruse to determine if Rashon lived there and whether it was a one-family or two-family home. *See* Exhibit A annexed to Decl. of Thomas Lai at 48-49:22-3; 50-51:20-6. Although Bidell noticed two mailboxes after obtaining the warrant, he did not recall seeing any names on the mailboxes during his observations and learned from various individuals Rashon resided at the premises. *Id*. at 52-53:20-17, 62:14-22, 66:3-7.

Inside the premises Bidell was allowed to have a look around. *Id*. at 64:18-22. He was walked straight through the kitchen, did not see any stairs at the time, did not go into any other rooms and did not open any doors. *Id*. at 64-65:18-9. Although he was looking for a staircase he did not observe one. *Id*. at 64-65:18-9. Bidell was then led through the kitchen door to an "enclosed porch area" where there were two other doors. *Id*. at 66-67:22-4; *see* Exhibit B annexed to Decl. of Thomas Lai at 1:30-2:25. The "enclosed porch area" is indoors. *Id*. at 66-67:22-4; *see* Exhibit B annexed to Decl. of Thomas Lai at 1:30-2:25. One of those doors was then used to gain access to the upstairs. *Id*. at 66-67:22-4. He knocked on the door and was greeted by Theresa Thompkins. *Id*. at 70-71: 21-11. Theresa Thompkins told Bidell she resided on the second floor with her child. *Id*. at 73:10-22. Ms. Thompins also stated that another woman she didn't know, who had a room with a child. *Id*. at 73:10-22. While upstairs Bidell was looking for an inside staircase but was unable to make a determination because the other doors appeared to be closed and if they were open he was unable to see into the other rooms. *Id*. at 75:3-8; 76:8-14; 77:2-9. He also learned from Theresa Thompkins that Rashon frequently "hangs out" with her upstairs and he got the impression there may have been an ongoing relationship between Theresa Thompkins and Rashon. *Id*. at 74:1-13; 130:5-14.

After exiting the premises Bidell performed a computer search and then informed the BSO lieutenant. *Id*. at 86-87:21-2; 89:7-12. Bidell told the BSO Lieutenant he determined the premises

was a one-family home, there were children in the home and the premises was affiliated with 20 Miriam, which is a known gang hangout. *Id*. at 90-91:5-5; 108-109:17-6. Because there were children in the house Bidell instructed that a flash bang not be used. *Id*. at 90:13-19.

In addition, Plaintiff has persistently claimed that on May 12, 2010 "Bidell met with the members of BSO who were to execute the warrant at 31 Lafayette Avenue and relayed all the information he possessed about the premises and his investigation, including informing the BSO members, who were to execute the warrant, that 31 Lafayette Avenue was a two family house." In reality, Bidell never testified to that effect. *Id*. at 108-109:21-6. Bidell testified:

Q.   So my question to you is, you just testified that you told the lieutenant in BSO that you couldn't make a determination, did you not?

A.   I couldn't make a determination that it was a two-family house. I didn't see that it was a two-family. Because two mailboxes would lend you to believe that it was a two-family. However, I wasn't able to make that determination.

Q..   I'm going to have to ask this question again because I'm not clear on your response.

A.   Uh-huh.

Q.   Did you tell the lieutenant in BSO that you made a determination that it was your belief that that was a one-family house?

A,   Yes.

Q.   Did you tell the lieutenant from BSO that you could not make a determination as to whether it was a one-family or a two-family?

A.   No if I said that, I misspoke.

Q.   When you had this conversation with the lieutenant from BSO and you told him that you had made a determination that this was a one-family, did you give him any support for your opinion?

A.   No.

*Id*. at 108-109:21-6.

Therefore District Attorney Investigator Bidell is entitled to qualified immunity because a reasonable police officer who obtained the above information would have been privileged to search the second floor of the premises.

**b. Police Officer Michael Capobianco is entitled to qualified immunity.**

Police Officer Michael Capobianco ("Capobianco") did not come into possession of clear information, after issuance but before the execution of the warrant, that the second story of the premises was a completely separate residence not involved in the drug trade.

Capobianco testified that 31 Lafayette Avenue:

- was a "[t]wo story house, front and rear door, unknown accessibility up and down. And that's about it. That's all that I can remember." *See* Exhibit C annexed to Decl. of Thomas Lai at 140:10-11.

- contained "two different living areas." *Id*. at 140:19-20.

- was informed that "the warrant covered the *whole house*, and that the bottom floor, we weren't sure if the bottom floor linked to the top floor, but the bottom floor was supposedly where the activity was. The top floor was supposedly a secondary unit and we knew that there was a child on the second floor." *Id*. at 140-141:25-8.

- "wasn't a hundred percent sure if there was, um, if there was accessibility through the apartments or if it was completely separate." *Id*. at 141:18-21.

- knew that the space was "subdivided into two living areas" and was not "sure how these two areas were accessible to each other." *Id*. at 141:22-24.

- was not sure if entry into the back of the house would be necessary because "[i]f there was any access through the front…[he] wasn't sure whether they would be coming through the back. Because it was sketchy as to whether or not the apartments were linked. So if there was access then…[he] would have probably expected to see guys just filtering into the back apartment also." *Id*. at 172:2-9.

- was "briefed that we had the whole house and that we would clear the whole house." *Id*. at 174:7-8.

- only expected to enter the back of the house if the other officers "couldn't access the back apartment through the front door." *Id*. at 175-6:23-3.

In addition, Police Officer Michael Capobianco adopted the terminology "rear apartment" at the March 8, 2012 deposition:

> Q.     Just for clarification, so I'm using, I want to use terms you're comfortable with. The front entry insertion by BSO, that was to get into what you're using the term "front apartment," correct?
>
> A.     The front.  And I'm not sure if the front had a second floor or not.  I just knew it was the front.
>
> Q.     And then when you refer to the back apartment, you're referring to the upstairs back apartment.
>
> A.     The rear, yes.
>
> Q.     That's the one you entered, correct?
>
> A.     Yes.
>
> A.     So if I use the "rear apartment," you're comfortable with that terminology.
>
> Q.     Yes.

*Id*. at 172-3:23-15.

The "terminology" Capobianco is "comfortable with" is irrelevant to the validity of the warrant. Further, the term "terminology" quote "rear apartment" was a term suggested by Plaintiff's counsel and not a term or phrase that Capobianco used on his own.

Moreover, none of Capobianco's testimony constitutes clear information, after issuance but before the execution of the warrant, that the second story of the premises was a completely separate residence not involved in the drug trade.  Therefore Police Officer Michael Capobianco is entitled to qualified immunity because a reasonable police officer with the above information would have been privileged to search the second floor of the premises.

### c. Sgt. Hermann, Police Officer Carl Campbell, Police Officer Dwight Blankenship, Police Officer Joseph Grella are entitled to qualified immunity.

Sgt. Hermann, Police Officer Carl Campbell, Police Officer Dwight Blankenship and Police Officer Joseph Grella did not come into possession of clear information, after issuance but before the execution of the warrant, that the second story of the premises was a completely separate residence not involved in the drug trade. They were all informed that they had a search warrant for the entire premises. *See* Exhibit D annexed to Decl. of Thomas Lai at 30-31; Exhibit E annexed to Decl. of Thomas Lai at 26; Exhibit G annexed to Decl. of Thomas Lai at 41; Exhibit F annexed to Decl. of Thomas Lai at ¶12. Therefore Sgt. Hermann, Police Officer Carl Campbell, Police Officer Dwight Blankenship and Police Officer Joseph Grella are entitled to qualified immunity because reasonable police officers informed they had a warrant for the entire premises would have been privileged to search the second floor of the premises.

### II. In addition, the County Defendants are entitled to qualified immunity because it was objectively reasonable for the County Defendants to secure the second floor.

Assuming, *arguendo*, that the warrant was overbroad in regards to the second floor of the premises the County Defendants are nonetheless entitled to qualified immunity. The County Defendants were justified in accessing the second floor of the premises because Joanna Little opened the back door accessing the stairs, thus consenting to the County Defendants entering the upstairs portion of the premises, and alerted the County Defendants to the presence of people on the second floor while they were carrying out a search warrant for guns and drugs. As a result, the County Defendants were entitled to perform a protective sweep. *See* Exhibit E annexed to Decl. of Thomas Lai at 54:3-12; Exhibit G annexed to Reply Decl. in Support of Thomas Lai; Exhibit H annexed to Decl. in Support of Thomas Lai. The act of Joanna Little opening the interior door that accesses the hallway on the first floor and the stairs provided the County Defendants with an *articulable fact*, thus permitting them to perform a protective sweep on the second floor and search in the closet. *See*

*People v. Boyland*, 79 A.D.3d 1658, 914 N.Y.S.2d 805 (2010) *aff'd*. 20 N.Y.3d 879, 979 N.E.2d 1192 (2012). Therefore, even if the search warrant was overbroad in regards to the second floor of the premises, the County Defendants are nonetheless entitled to qualified immunity because a reasonable police officer with the above information would have been privileged to perform a protective sweep on the second floor of the premises and open the closet door.

## **CONCLUSION**

The County Defendants at no point came into possession of clear information after issuance but before execution of the warrant that the second story of the premises ("31 Lafayette Avenue") was a completely separate residence not involved in the drug trade. *See [DE # 52]*; *Davis v. County. of Nassau*, 2013 WL 66021 at *12 (E.D.N.Y. Jan. 3, 2013). As a result, the warrant is a matter of law and the County Defendants are entitled to qualified immunity because it was objectively reasonable for the County Defendants to conduct a search of the entire premises.


Dated: Mineola, New York
      March 11, 2014

<div style="margin-left:40%">

CARNELL T. FOSKEY
Acting County Attorney

By:    <u>Thomas Lai</u>
      Thomas Lai
      Deputy County Attorney
      One West Street
      Mineola, NY 11501
      (516) 571-6074

</div>

To:    Charles Horn (via ECF)